IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO: 1:20-CV-1050

| | |
|---|---|
| PATRICK C. MCCARTER, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNIVERSITY OF NORTH | ) |
| CAROLINA AT CHAPEL HILL, | ) |
| KEVIN M. GUSKIEWICZ, Chancellor of | ) |
| the University of North Carolina at Chapel | ) |
| Hill, RICHARD Y. STEVENS, Chair of | ) |
| The University of North Carolina at Chapel | ) |
| Hill Board of Trustees, RANDALL C. | ) |
| RAMSEY, Chair of University of North | ) |
| Carolina Board of Governors, TIMOTHY | ) |
| C. ELSTON, BEVERLY ERREDE, ERIC | ) |
| T. EVERETT, HENRIK G. DOHLMAN, | ) |
| SHAWN GOMEZ, CARA MARLOW, | ) |
| STEVEN W. MATSON, LAURA MILLER, | ) |
| WILLIAM VALDAR, HOI NING NGAI, | ) |
| LESLIE PARISE, ALAN JONES and, | ) |
| SARA KIMIKO SUZUKI-MCGIRR, | ) |
| Defendants. | ) |

NOW COMES Plaintiff, Patrick C. McCarter, and for his complaint against

the University of North Carolina at Chapel Hill, its administrators, employees, and

students, and alleges and says as follows:

PARTIES

1

1. Patrick C. McCarter, PhD (hereinafter "Plaintiff") is a citizen and resident of Mebane, Alamance County, North Carolina. Plaintiff is a former doctoral student in the University of North Carolina at Chapel Hill's Curriculum in Bioinformatics and Computational Biology program. Plaintiff is a citizen and resident of North Carolina.

2. Defendant University of North Carolina at Chapel Hill (hereinafter "UNC-CH") is one of the campuses or universities of the University of North Carolina System (hereinafter "UNC") and is located in Orange County, North Carolina.

3. Pursuant to N.C. Gen. Stat. § 116-3, The University of North Carolina is a public multicampus university established and operated by the State of North Carolina and is a body politic and corporate, capable in law to be sued in all courts, and Defendant UNC-CH is one of the constituent institutions of the University of North Carolina, capable in law to be sued in all courts whatsoever.

4. Kevin M. Guskiewicz, PhD (hereinafter "Defendant Guskiewicz") is the Chancellor of the UNC-CH is being sued in both his official and individual capacities. Upon information and belief, Defendant Guskiewicz is a citizen and resident of North Carolina.

5. Richard Y. Stevens (hereinafter "Defendant Stevens") is the Chair of the UNC-CH Board of Trustees and is being sued in both his official and individual

Case 1:20-cv-01050-LCB-JLW   Document 1   Filed 11/20/20   Page 2 of 39

capacities. Upon information and belief, Defendant Stevens is a citizen and resident of North Carolina.

6. Randall C. Ramsey (hereinafter "Defendant Ramsey") is the Chair of the UNC Board of Governors and is being sued in both his official and individual capacities.

7. Timothy C. Elston, PhD (hereinafter "Defendant Elston") is a Professor of Pharmacology, Associate Director of the Curriculum in Bioinformatics and Computational Biology, and Co-Director of Computational Medicine at UNC-CH and is being sued in his official and individual capacity. Upon information and belief, Defendant Elston is a citizen and resident of North Carolina.

8. Beverly J. Errede, PhD (hereinafter "Defendant Errede") is a Professor of Biophysics and Biochemistry at UNC-CH and is being sued in her official and individual capacity. Upon information and belief, Defendant Errede is a citizen and resident of North Carolina.

9. Eric T. Everett, PhD (hereinafter "Defendant Everett") is the Institutional Research Integrity Officer for UNC-CH and is being sued in his official and individual capacity. Upon information and belief, Defendant Everett is a citizen and resident of North Carolina.

10. Henrik G. Dohlman, PhD (hereinafter "Defendant Dohlman") is a Professor of Biochemistry & Biophysics at UNC-CH and is being sued in his official and

individual capacity. Upon information and belief, Defendant Dohlman is a citizen and resident of North Carolina.

11. Shawn Gomez, PhD (hereinafter "Defendant Gomez") is an Associate Professor of the Joint Department of Biomedical Engineering at UNC-CH and North Carolina State University. Defendant Gomez is being sued in his official and individual capacity. Upon information and belief, Defendant Gomez is a citizen and resident of North Carolina.

12. Cara Marlow (hereinafter "Defendant Marlow") is the Business Manager for the Department of Genetics and Curriculum in Bioinformatics and Computational Biology at UNC-CH. Upon information and belief, Defendant Gomez is a citizen and resident of North Carolina.

13. Steven Matson, PhD (hereinafter "Defendant Matson") is the Dean of the Graduate School at UNC-CH and is being sued in both his official and individual capacities. Upon information and belief, Defendant Matson is a citizen and resident of North Carolina.

14. Laura Miller, PhD (hereinafter "Defendant Miller") is an Associate Professor of Mathematics and Biology at UNC-CH and is being sued in her official and individual capacity. Upon information and belief, Defendant Miller is a citizen and resident of North Carolina.

Case 1:20-cv-01050-LCB-JLW   Document 1   Filed 11/20/20   Page 4 of 39

15. William Valdar, PhD (hereinafter "Defendant Valdar") is an Associate Professor of Genetics at UNC-CH and is being sued in her official and individual capacity. Upon information and belief, Defendant Valdar is a citizen and resident of North Carolina.

16. Hoi Ning Ngai, PhD (hereinafter "Defendant Ngai") is the Associate Dean of Student Affairs at UNC-CH and is being sued in her official and individual capacity. Upon information and belief, Defendant Ngai is a citizen and resident of North Carolina.

17. Leslie Parise, PhD (hereinafter "Defendant Parise") is the Chair of the Biochemistry and Biophysics Department at UNC-CH and is being sued in her official and individual capacity. Upon information and belief, Defendant Parise is a citizen and resident of North Carolina.

18. Alan Jones, PhD (hereinafter "Defendant Jones") is a Professor of Biology and Pharmacology at UNC-CH and is being sued in his official and individual capacity. Upon information and belief, Defendant Jones is a citizen and resident of North Carolina.

19. Sara Kimiko Suzuki-McGirr, PhD (hereinafter "Defendant Suzuki-McGirr") is a former doctoral student at UNC and is being sued in her individual capacity. Upon information and belief, Defendant Suzuki-McGirr is a citizen and resident of North Carolina.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 (federal question jurisdiction), 42 U.S.C. §1983 (civil action for deprivation of rights), 28 U.S.C. §1343 (civil rights and elective franchise) and 28 U.S.C. §1367 (supplemental jurisdiction).

21. Venue is proper as this complaint seeks damages and injunctive relief for civil rights violations pursuant to Title VI of the Civil Rights Act of 1964, the Fourteenth Amendment of the United States Constitution, various tortious acts pursuant to the state and common laws of North Carolina.

22. Venue is proper pursuant to 28 U.S.C. 1391 (b)(c) and (d) as a substantial part of the events, if not all of the events, giving rise to this complaint occurred in Chapel Hill, North Carolina, and upon information and belief, all parties resided in North Carolina at the times that the acts and incidents giving rise to this complaint occurred.

## FACTUAL ALLEGATIONS

*BACKGROUND INFORMATION*

23. In August 2011, Plaintiff, an African-American male, enrolled at UNC-CH as a PhD student in the Curriculum in Bioinformatics and Computational Biology program (hereinafter "Program").

6

24. Defendants Elston, Dohlman, Errede, Gomez, and Miller were the initial advisors on Plaintiff's dissertation committee. Barry Lentz, PhD (hereinafter "Lentz") joined as an advisor on Plaintiff's dissertation committee during the course of Plaintiff's tenure in the Program.

25. At all times relevant to this action, Defendant Elston was the Director of the Program. Upon information and belief, he is currently the Associate Director of the Program.

26. On or about July 10, 2015 Plaintiff obtained a research grant from the National Institute of Health (hereinafter "NIH") which was distributed to UNC-CH who subsequently distributed the funds to Plaintiff.

27. On the NIH grant, Plaintiff is listed as the Principal Investigator. Defendants Elston and Dohlman are listed as his grant sponsors

28. Defendant Errede provided a letter of reference for Plaintiff during the application phase.

*DEFENDANTS' DISCRIMINATION AGAINST PLAINTIFF*

29. Plaintiff began conducting research in Defendant Dohlman's research lab in 2012.

30. While Defendants Elston and Dohlman were Plaintiff's officially recognized advisors, his research was also conducted in Defendant Errede's research lab, under her advisement, in 2012 and again in 2014.

31. Plaintiff was the only African-American PhD student in these research labs.

32. The equipment Plaintiff used to conduct the research contained in the manuscript Plaintiff drafted belonged jointly to Defendants Elson, Errede and Dohlman. Additionally, Defendant Errede was heavily involved in Plaintiff's research as evidenced by Defendant's Errede's recognition in the author list of Plaintiff's original research manuscript.

33. On or about October 4, 2016, Plaintiff conducted his annual committee meeting with his dissertation committee. Shortly after, and at various important stages of his tenure at UNC-CH, Plaintiff was repeatedly subjected to discrimination and harassment from several of his advisors and UNC-CH faculty members.

34. On or about October 4, 2016 despite meeting all of the requirements to write and defend his PhD dissertation, Plaintiff was denied approval to schedule his PhD dissertation defense and graduation date.

35. Plaintiff was advised by his PhD committee that an additional assignment was being added for him. Along with his dissertation, he was now required to submit an additional first-author manuscript before he would be granted permission to schedule his dissertation defense and graduation date.

36. Due to this substantial change in the graduation requirements for Plaintiff, he was not permitted to defend his dissertation and graduate in the Fall 2016 semester as planned.

Case 1:20-cv-01050-LCB-JLW   Document 1   Filed 11/20/20   Page 8 of 39

37. Plaintiff witnessed several other similarly situated non-minority classmates in Defendants Dohlman and Elston's research labs be permitted to defend their dissertations and graduate on time and prior to submitting the required manuscript.

38. It was customary for Defendant Elston to permit students to publish their research after completing their studies at UNC.

39. It was customary for Defendant Errede to permit students to publish their research after completing their studies at UNC.

40. It was customary for Defendant Dohlman to permit students to publish their research after completing their studies at UNC.

*DEFENDANT DOHLMAN AND DEFENDANT ELSTON CONTINUALLY IGNORING PLAINTIFF'S REQUEST FOR ADVISEMENT*

41. On or about October 6, 2016 Plaintiff emailed a section of this newly required manuscript to Defendant Dohlman for editing and feedback, which is part of Defendant Dohlman's duties as an advisor to Plaintiff. Defendant Dohlman did not respond.

42. On or about October 17, 2016 Plaintiff emailed a section of this newly required manuscript to Defendant Elston for editing and feedback. Defendant Elston did not respond.

43. On October 26, 2016, Plaintiff sent a follow up email to Defendant Elston seeking feedback on his manuscript and received no response. He subsequently sent

follow up emails to both Defendants Elston and Dohlman again with an updated version of his manuscript draft and requested that they provide feedback.

44. On November 19, 2016, forty-four (44) days after the original request was made, Defendant Dohlman responded with feedback on the draft manuscript.

45. On November 23, 2016, thirty-seven (37) days after the original request was made, Defendant Elston responded with feedback.

46. The delayed responses by Defendants Elston and Dohlman were clear attempts to continue to delay Plaintiff's graduation date and his ability to begin post-PhD employment.

47. On or about December 13, 2016 Defendants Elston and Dohlman demanded that Plaintiff split his manuscript into two separate manuscripts and assign colleague Matthew Martz (hereinafter "Martz") as the first author on one of them. This was a further attempt to discriminate against, harass and delay Plaintiff's graduation.

48. Both Plaintiff and his colleague, Martz, objected to this demand from Defendants Elston and Dohlman.

*A SIMILARLY SITUATED CAUCASIAN STUDENT FACED NO DISCRIMINATION OR HARASSMENT FROM DEFENDANTS*

49. James Shellhammer (hereinafter "Shellhammer"), a similarly situated Caucasian male student, was also in Defendant Dohlman's research laboratory alongside Plaintiff. Shellhammer had a vastly different experience than Plaintiff did while matriculating through the Program.

50. On or about December 14, 2016 Plaintiff met with Defendant Dohlman to discuss the research manuscript. Despite the fact that Defendant Dohlman was actively engaged in providing feedback and editing for Shellhammer and other non-minority students, Defendant Dohlman informed Plaintiff that he "did not like to help graduate students write manuscripts."

51. These sentiments expressed by Defendant Dohlman made Plaintiff feel as if he could no longer seek feedback from him, despite the fact that Defendant Dohlman was one of his advisors and was required to advise and provide constructive feedback for Plaintiff.

52. Defendant Dohlman later changed his position and advised Plaintiff that he wanted to contribute to the writing and editing of his manuscript.

53. In further attempts to harass Plaintiff and delay his graduation, Defendant Dohlman demanded that Plaintiff include research completed by his colleague Anay Reddy (hereinafter "Reddy") into his manuscript, despite the fact that Reddy's research was not relevant to Plaintiff's manuscript.

54. Plaintiff refused to add Reddy, stating that there was no scientific justification for him to do so considering that their research was unrelated, and doing so would significantly diminish the quality of his work. Defendant Errede agreed that adding research by Reddy would damage Plaintiff's manuscript.

55. Plaintiff subsequently contacted Lentz to discuss the consistent problems that he was having with his advisors, Defendants Elston and Dohlman, and to ask him to join his advisory committee as an unbiased party.

56. Upon receiving advice from Lentz, Plaintiff met with Defendant Elston to express his concerns regarding potential loss in salary due to the consistent delay tactics by the advisors.

57. On or about March 27, 2017, Shellhammer, defended his dissertation, prior to submitting his manuscript. Shellhammer did not submit his manuscript until on or about April 5, 2017 and he graduated on May 13, 2017, without any delay or harassment from Defendants.

58. On or about May 29, 2017 Plaintiff met with Defendant Elston who informed him that if he set his dissertation defense date, he would ensure that Plaintiff would not be able to submit his research manuscript for peer-review at a scientific journal.

59. On or about May 30, 2017 Plaintiff spoke with advisor Defendant Gomez and obtained approval to schedule his dissertation defense date.

60. On the same date, Shellhammer's research was published in PLOS[1] Genetics with the assistance and advice of Defendant Dohlman, without delay or harassment.

---

[1] PLOS is a nonprofit open-access science, technology and medicine publisher with a library of open-access journals and other scientific literature under an open-content license.

61. On or about June 7, 2017, Defendant Elston continued to harass Plaintiff by spreading false information about him to Ashalla Magee Freeman, PhD, the Director of Diversity Affairs and the Initiative for Maximizing Student Diversity, by stating that Plaintiff did not trust him and refused to accept his feedback, when in fact, Defendant Elston had refused to provide substantive feedback and advice to Plaintiff.

62. On or about June 16, 2017, Plaintiff met with Leslie Lerea (hereinafter "Lerea"), Dean of Students at the Graduate School of UNC-CH and expressed his concerns with his advisors regarding the continuing delays and harassment. He further expressed that he would have contacted her sooner if not for his fear of the repercussions that doing so may have caused for him.

63. On or about June 21, 2017, instead of providing specific direct feedback on Plaintiff's manuscript directly to Plaintiff, Defendant Dohlman replied to Plaintiff's updated feedback request by informing him to reach out to Martz, who had previously resigned his position from Defendant Dohlman's research laboratory, to obtain Defendant Dohlman's comments/feedback. This was a further attempt to harass Plaintiff and delay his process.

64. On or about June 23, 2017, instead of providing specific direct feedback on Plaintiff's manuscript directly to Plaintiff, Defendant Elston replied to Plaintiff's updated feedback request by attempting to intimidate Plaintiff into relinquishing

the public portion of his dissertation defense. This was a further attempt to harass Plaintiff and delay his process.

65. On or about June 24, 2017, Plaintiff emailed his dissertation to his dissertation research committee. Plaintiff then emailed Lerea to inform her of the threatening email he had received from Defendant Elston.

66. On or about June 27, 2017, Plaintiff met with Lerea. Plaintiff obtained permission from Lerea to have Lentz added as the sixth member of his dissertation committee.[2] Plaintiff also obtained permission to have Lentz substitute as chairman for Gomez, who was out on vacation, contingent upon him receiving consent from his other dissertation committee members. Plaintiff requested consent to have Lentz added to his dissertation committee from each of his dissertation committee members, he did not receive a response from Defendants Elston, Dohlman, or Errede.

67. On or about July 3, 2017 Defendant Elston invited Defendant Valdar to Plaintiff's dissertation defense. Defendant Elston stated "I have also asked Will to attend your defense. I think his feedback on the parameter estimation and model selection methods will be valuable."

---

[2] The Curriculum in Bioinformatics and Computational Biology requires no less than five dissertation committee members, and as many as six dissertation committee members

68. Plaintiff responded that this was not customary and stated his preference to only defend his dissertation in front of his advisory committee as the rest of his classmates had done.

69. Defendant Valdar requested a one-on-one meeting with Plaintiff without any other committee members present and informed Plaintiff that he would be attending the dissertation defense as an "impartial observer." Plaintiff declined stating there was no need for a private conversation, and further advised that there did not appear to be a need for "impartial observer." Defendant Valdar responded by threatening to cancel Plaintiff's scheduled dissertation defense if he did not come to meet with him.

70. Plaintiff emailed Lerea to inform her of the threat that he had received from Defendant Valdar which demonstrated further harassment from faculty members. Plaintiff was growing weary at this point and exclaimed, "I just want to graduate, and not have to deal with a new issue every day."

71. Lerea instructed Defendant Elston and Defendant Dohlman to cease all harassment of Plaintiff.

72. On July 7, 2017, Plaintiff conducted his dissertation defense. The first portion was opened to the public and the second portion was reserved solely for members of his dissertation committee. Unlike Plaintiff's classmates, at the beginning of his public presentation, his advisors refused to introduce him to the audience.

73. Unlike the rest of his dissertation research committee members, neither Defendant Elston nor Defendant Dohlman provided any feedback or commentary during or after Plaintiff's presentation, further discriminating against him.

74. Unlike what was done for all of the immediately preceding students who were in Defendants Elston or Dohlman's research labs, no post defense celebration was held for Plaintiff.

75. After completing the dissertation defense, PhD students are required to have dissertation defense forms signed by at least five of their dissertation research committee members in order to graduate; the signatures demonstrate completion of the defense which is required to graduate. In order for Plaintiff to graduate on time, the signed form must have been turned into the graduate school by July 20, 2017. As of July 18, 2017, Defendant Elston refused to sign off on Plaintiff's forms.

76. Plaintiff decided to submit his committee and dissertation forms to the graduate school without Defendant Elston's signature to ensure that he would graduate on time. Plaintiff was subsequently yelled at and chastised by Defendant Marlow, for submitting the form without all of the signatures.

77. Defendants Marlow, Elston and Valdar continued to harass Plaintiff during his efforts to have Defendant Elston sign Plaintiff's dissertation defense forms. At the time, Plaintiff was also attempting to start his postdoctoral research

appointment. Defendants Marlow, Elston and Valdar's actions frustrated Plaintiff's ability to start this appointment.

*DISCRIMINATION BY DEFENDANT ERREDE*

78. Defendant Errede instructed Plaintiff to remove the best and most impactful scientific result, which also constituted a significant contribution to the research field, from his written manuscript. As a result, Plaintiff met with several other faculty members and colleagues to discuss methods to show that his data was convincing. It was later speculated that Defendant Errede made this request so that this data could be used by a different candidate.

79. Upon completing the research paper, Plaintiff contacted Defendant Elston, Defendant Dohlman and Defendant Errede requesting to have his paper published, as this was customary practice for PhD students. It was imperative to Plaintiff that he have his research published in a scientific journal because doing so would greatly enhance his competitiveness and likelihood of obtaining a research professorship, as well as obtaining federal funding for future independent research projects.

80. Instead of complying with their official duty as Plaintiff's advisors to submit his research manuscript for publication, they ignored each of his publication requests.

81. Plaintiff informed Lerea that his advisors were preventing him from publishing his manuscript.

82. Plaintiff requested a meeting with Defendants Elston, Errede and Dohlman to finalize the submission process for his manuscript. Defendant Errede was the only advisor that showed up to the meeting but had not read enough of the finalized manuscript to provide any substantive feedback on next steps. Plaintiff never heard anything further from neither Defendant Elston nor Defendant Dohlman regarding his manuscript publication.

83. On or about August 29, 2017, Plaintiff, discontent with the discrimination that he had faced, contacted Sibby Anderson (hereinafter "Anderson"), The Special Assistant to the Vice-Chancellor for Research-Diversity and Inclusion, and the Director for Postdoctoral Affairs. He expressed his concerns regarding his inability to submit his research manuscript for publication in a scientific journal. Anderson advised that Plaintiff she seek assistance from Professor Eric Everett (hereinafter "Everett") who is the Institutional Research Integrity Officer for UNC-CH.

84. On or about September 11, 2017, Anderson contacted Everett on Plaintiff's behalf and informed him that Plaintiff was continuing to have issues over his research manuscript with his PhD advisors. Anderson requested that Everett assist Plaintiff with guidance on navigating his authorship issues.

85. Everett and his office refused to intervene to ensure that Plaintiff was able to publish his manuscript and suffer no further discrimination from his advisors.

86. Plaintiff began to stress and worry about how his negative treatment from his professors and other faculty members would negatively impact him moving forward in his career, especially with future research and publishing opportunities.

87. In September 2017, Plaintiff followed up with Defendant Elston regarding his manuscript and Defendant responded, "I have no idea what paper you are talking about." This was clearly a further attempt to chastise Plaintiff.

88. On or about December 19, 2017, Plaintiff informed Lentz about his inability to submit his research for publication due to the failures of his other advisors. Lentz contacted Defendant Matson to inform him of the continued harassment and hostility that he had witnessed from his co-advisors in hopes that they would intervene and stop the unprofessional conduct of his colleagues.

89. Lentz also informed the Dean of the Graduate School that another minority student, a woman of color, had reported similar acts of hostility and harassment from Defendant Elston and Defendant Errede. A third student of color had also recently resigned from Defendant Dohlman's lab due to this same harassment and discrimination in his research lab.

90. In February 2018, Lentz informed Plaintiff that the graduate school refused to intervene on his behalf.

*PLAGIARISM, FRAUD AND CONVERSION*

91. On or about September 19, 2017 Defendant Suzuki-McGirr, Plaintiff's lab mate and a graduate student of Defendants Elston and Dohlman, contacted Plaintiff requesting that he send her his analysis software and data sets because they would be informative for her project.

92. On or about September 26, 2017, she followed up on this request.

93. On or about February 28, 2018, Plaintiff accepted a LinkedIn request from Defendant Suzuki-McGirr and realized that her banner showed that her research project was nearly identical to the research results that Plaintiff had previously submitted to his advisors in his manuscript and dissertation.

94. Kevin Knight (hereinafter "Knight"), a former lab mate and colleague of Plaintiff in Defendant Dohlman's research lab, informed Plaintiff of the extreme similarity between Defendant Suzuki-McGirr's research and that which Plaintiff had previously submitted.

95. Plaintiff became increasingly anxious as a result of the continual distress that his advisors were imposing upon him. In August 2018, he began seeking counseling with a professional psychologist and later received a diagnosis of Post-Traumatic

Stress Disorder (hereinafter "PTSD") specifically caused by the trauma that he was facing while at school.

96. On March 5, 2019, Plaintiff issued a Cease and Desist notice to the University, requesting that they stop all attempts to defraud him of his research, as it was protected by the University Copyright policy. He also informed UNC-CH of the discrimination he had faced from Defendants Elston, Dohlman and Errede when compared to the treatment of other similarly situated students.

97. On April 11, 2019, Lee Bollinger from the Office of University Counsel responded to Plaintiff's Cease and Desist demand stating that the university had investigated and found no basis for the claims being made.

98. The letter advised Plaintiff that the University office of Equal Opportunity and Compliance (hereinafter "UNC-CH EOC") would contact him regarding his allegations of discrimination from his advisors. No one from the UNC-CH EOC office ever contacted Plaintiff.

99. On or about May 10, 2019 Defendant Suzuki-McGirr presented a talk entitled "Finding Feedback Circuitry Underlying Adaptation to Hyperosmotic Stress." This topic was one of the exact focus areas of Plaintiff's previously submitted research.

100. On or about November 18, 2019 Defendant Suzuki-McGirr presented another talk entitled "Model Driven Experimental Design Identifies Unique

Feedback Regulation of a Yeast MAPK Pathway." This was also a main focus area of Plaintiff's research that his advisors prevented him from publishing.

101.    On or about February 20, 2020 Defendant Suzuki-McGirr presented a talk entitled "Model Driven Experimental Design Identifies counter-acting feedback regulation driving MAPK dynamics" at the Hawaii 2020 Winter Q-Bio research retreat. This was also a main focus area of Plaintiff's research that his advisors prevented him from publishing, and also the focus of a research talk presented by Plaintiff at the Hawaii 2017 Winter Q-Bio research retreat.

102.    On or about April 21, 2020 Defendant Suzuki-McGirr, Defendant Errede, Defendant Elston and Defendant Dohlman published Defendant Suzuki-McGirr's research manuscript entitled "Model-driven Experimental Design Identifies Counter-Acting Feedback Regulation in the Osmotic Stress Response of Yeast" to a scholarly article.

103.    The paper that was submitted was plagiarized from Plaintiff. Defendants merely reworded several portions of Plaintiff's previously submitted manuscript. No credit was given to Plaintiff in the published article despite the fact that it was based entirely on his research and findings.

104.    Plaintiff was never afforded the opportunity to publish his research.

105.     After being delayed by his advisors, Plaintiff's dissertation was officially accepted on August 8, 2017, ten (10) months after his original expected graduation date. Plaintiff received his degree in the mail in September 2017.

106.     Plaintiff was not allowed to participate in the UNC-CH graduation ceremonies until December 2017. However, because doctoral hooding ceremonies are only held in the Spring graduations, Plaintiff had to wait until May 2018 to attend his graduation ceremony.

107.     On or about July 24, 2017 Plaintiff began working as a postdoctoral researcher in the Eshelman School of Pharmacy at UNC-CH with research advisor Yanguang Cao. He received a second NIH grant to conduct this research.

108.     Despite being completely done with Defendant Dohlman's research lab, the harassment continued, and ultimately Plaintiff was forced to resign from his postdoctoral research position thus forfeiting the remainder of his NIH grant.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF: NEGLIGENCE

<u>Defendant Dohlman and Defendant Elston</u>

109.     Plaintiff hereby incorporates by reference the allegations contained in the previous paragraphs.

110.     As professors and PhD advisors to Plaintiff, Defendant Dohlman and Defendant Elston both had affirmative duties to advise and provide timely

constructive feedback to Plaintiff on his research, manuscript, dissertation, and dissertation defense. They also bore the duty to ensure that Plaintiff was able to conduct research in their lab and publish research without undue hardship, discrimination, and harassment.

111.    Both Defendant Dohlman and Defendant Elston breached their duty by consistently failing to respond to Plaintiff's request for advice and feedback in a timely manner. They further breached their duty by refusing to assist Plaintiff with the publication of his research.

~~112.~~    They further breached by facilitating undue delay and hardship for Plaintiff during the final ten months of his tenure as a student under their leadership.

113.    After several attempts to obtain revisions on his manuscript from Defendant Elston, he lied to Plaintiff by responding "I have no idea what paper you are talking about."

114.    In order to graduate, all PhD candidates are required to have their advisors sign their graduation forms. This has been a customary standard practice for years. Defendant Elston breached his duty to Plaintiff by refusing to sign his graduation form.

Case 1:20-cv-01050-LCB-JLW   Document 1   Filed 11/20/20   Page 24 of 39

115.     Both Defendants failed to attend Defendant's manuscript advising conference. And they both made unreasonable demands for him to add other student's research to his manuscript to further delay his process.

116.     As a result of Defendants' breach Plaintiff suffered substantial harm. His graduation was delayed by ten months resulting in a delay in his postdoctoral employment. He lost his right to publish his research manuscript. He was forced to resign from his postdoctoral research position, thereby forfeiting the rest of his NIH grant. He also faced substantial mental trauma as a result of their actions.

Defendant Laura Miller and Defendant Shawn Gomez

117.     As professors and advisors to Plaintiff, Defendant Miller and Defendant Gomez owed Plaintiff the duty to act as reasonably prudent professors would in that situation.

118.     They were both aware of the harassment and discrimination that Plaintiff was suffering from.

119.     In this case, a reasonably prudent professor would have at least attempted to intervene to stop the unprofessional conduct of their co-advisors.

120.     Instead of intervening, they were passively complicit regarding the harassment and discrimination that Plaintiff suffered as a result of the actions that they witnessed from their co-advisors.

121.     As a result of their complicity, Plaintiff suffered damages in excess of $75,000.00.

Defendant Eric Everett

122.     As the university's official research integrity officer, it was Professor Everett's duty to intervene and provide assistance to Plaintiff with his research and publication issues.

123.     According to the university "his responsibilities include evaluating allegations of research misconduct, protecting the rights of complainants and whistleblowers, and providing guidance and support regarding inquiries into misconduct allegations."

124.     Upon meeting with Plaintiff and learning of the misconduct that was being facilitated by Plaintiff's PhD professors with his research, Defendant Everett breached his duty of care by refusing to intervene.

125.     This breach resulted in Plaintiff losing his right to publication, suffering continued harassment and discrimination.

126.     As a result of this breach, Plaintiff suffered damages in excess of $75,000.00.

SECOND CLAIM FOR RELIEF: GROSS NEGLIGENCE

Defendant Dohlman, Defendant Errede and Defendant Elston

127.    As Plaintiff's PhD advisors, Defendant Dohlman, Defendant Errede and Defendant Elston had an affirmative duty to assist Plaintiff with the publication of his research to a scholarly journal. They were responsible for signing off on Plaintiff's graduation forms.

128.    They breached their duty of care by refusing to allow Plaintiff to submit his research for publication.

129.    This conduct by Defendants was wanton and reckless without regard to Plaintiff's rights as a PhD student because not only did they refuse to publish his work, they also completely plagiarized Plaintiff's dissertation and research manuscript and subsequently published it as their own, along with Defendant Suzuki-McGirr.

130.    As a result of Defendants' gross negligence, Plaintiff was robbed of his ability to publish his research, which is essential to the career of PhD candidates. Plaintiff's graduation date was delayed, resulting in delay in post-graduation employment opportunities. Furthermore, as a result of their actions Plaintiff suffered bouts of anxiety and was subsequently diagnosed with PTSD.

### THIRD CLAIM FOR RELIEF:
### RACE BASED DISCRIMINATION IN VIOLATION OF TITLE IV, 42 U.S.C. §200D

131.    Plaintiff hereby incorporates by reference the allegations contained in the previous paragraphs.

Case 1:20-cv-01050-LCB-JLW   Document 1   Filed 11/20/20   Page 27 of 39

132. Title VI of the Civil Rights Act of 1964 (42 USC §2000d) prohibits discrimination on the bases of race, color, and national origin in programs and activities receiving federal financial assistance.

133. As an African American male, Plaintiff is a member of a protected class under Title VI.

134. Defendant UNC-CH is a federally funded educational institution, thus is subject to Title VI which prohibits discrimination.

135. UNC-CH was responsible for ensuring that Plaintiff was able to obtain his education void of harassment and discrimination.

136. The following activities of Defendant UNC-CH are evidence of Defendant UNC-CH's violation of Title VI:

    a. The continued discrimination and harassment of Plaintiff which adversely affective his educational and post-doctoral opportunities when compared to similarly situation Caucasian colleagues seeking a PhD;

    b. The pattern and practice of discrimination and harassment by advisors that minority students seeking a PhD in the Curriculum in Bioinformatics and Computational Biology faced;

    c. Advisors not allowing Plaintiff to publish his research, and instead, substituting a student of Asian descent to take credit for the work done by

28

Plaintiff, and fraudulently publishing it as their own work without giving any credit to Plaintiff; and

d. Deliberately delaying Plaintiff's dissertation defense and graduation while simultaneously permitting non-minority students to defend their dissertations prior to meeting minimum graduation requirements.

137. But for Defendant's discrimination and harassment against Plaintiff, he would have been able to graduate on time, publish his research and complete his post-doctoral research.

138. Plaintiff has been harmed by Defendant's discriminatory conduct in that his research was plagiarized by his advisors and Defendant Suzuki-McGirr, he forfeited his post-doctoral research position along with an NIH grant, and he suffered mental and emotional distress.

FOURTH CLAIM FOR RELIEF: INTENTIONAL DISCRIMINATION IN VIOLATION OF THE 14TH AMENDMENT TO THE UNITED STATE CONSTITUTION AND 42 U.S.C. §1983

139. Plaintiff hereby incorporates by reference the allegations contained in the previous paragraphs.

140. Plaintiff is an African American male.

141. Plaintiff has been subject to intentional discrimination by Defendants Dohlman, Errede, and Elston, each in their individual capacities; such acts of intentional discrimination include but are not limited to:

a. repeatedly refusing to administer their duties as advisors to provide substantive feedback to Plaintiff with his research, while doing so for his Caucasian colleagues;

b. the improper attribution and wrongful conversion and 2020 publication of his copyrighted dissertation research Defendants Errede, Dohlman and Elston and Defendant Suzuki-McGirr who had not performed the research;

c. refusing to sign Plaintiff's graduation documents;

d. Allowing non-minority students to graduate prior to meeting the minimum requirements, while preventing Plaintiff from graduating after he had completed the minimum requirements;

e. consistently using delay tactics such as demanding that he add non-relevant research to manuscript in attempt to further delay Plaintiff's graduation.

142. These intentional acts of discrimination are in violation of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §1983.

143. Said acts of discrimination have damaged Plaintiff in excess of $75,000.00

FIFTH CLAIM FOR RELIEF: CONVERSION

Defendant Elston, Defendant Errede, and Defendant Dohlman

144.    Plaintiff hereby incorporates by reference the allegations contained in the previous paragraphs.

145.    Defendant Elston, Defendant Errede, and Defendant Dohlman intentionally interfered with the intellectual property of Plaintiff by intermingling with and dispossessing him of his research manuscript.

146.    Plaintiff needed Defendant Elston, Defendant Errede, and Defendant Dohlman to submit his research to a scholarly article for publication and made this request on several occasions.

147.    As his advisors it was their affirmative duty to aid Plaintiff in the publication of his research, instead, they ignored each of his requests for publication, gave his research manuscript to Defendant Suzuki-McGirr, plagiarized it and published it in a scholarly journal as their own.

Defendant Suzuki-McGirr

148.    Defendant Suzuki-McGirr is also responsible for the conversion of Plaintiff's intellectual property.

149.    Defendant Suzuki-McGirr intentionally dispossessed Plaintiff of his research manuscript, plagiarized it, and published it as her own work to a scholarly journal along with the above mentioned Defendants.

150. Plaintiff was in fact the lawful owner of his research manuscript as he originally conducted the research, prepared the written manuscript, and had a copyright.

151. Said actions by Defendants Elston, Errede, Dohlman and Suzuki-McGirr have harmed Plaintiff emotionally, educationally, professionally, and financially.

152. These actions of conversion have damaged Plaintiff in an amount in excess of $75,000.00.

## SIXTH CLAIM FOR RELIEF:
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

153. -Plaintiff hereby incorporates by reference the allegations contained in the previous paragraphs.

154. In their individual capacities, Defendants Elston, Errede, and Dohlman engaged in extreme and outrageous conduct when they stole his research and written manuscript and converted it to their own use, publishing it without attribution to Plaintiff.

155. In his individual capacity, Defendant Valdar engaged in extreme and outrageous conduct when he attempted to assert himself into Plaintiff's dissertation defense and threatened to cancel Plaintiff's dissertation defense (a mere four days before it was scheduled to occur) due to Plaintiff's request to be treated like every other student in the program.

156.    The aforementioned conduct by Defendants Elston, Errede, Dohlman and Valdar caused Plaintiff to suffer several emotional distresses in the form of anxiety and undue worry. Plaintiff was forced to seek mental health treatment and was diagnosed with PTSD as a direct result of Defendants' actions.

157.    As a result of Defendants' actions, Plaintiff suffered damages in excess of $75,000.00.

SEVENTH CLAIM FOR RELIEF:<br>NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

158.    Plaintiff hereby incorporates by reference the allegations contained in the previous paragraphs.

159.    The conduct by Defendants Elston, Errede, and Dohlman in their individual capacities in which they stole Plaintiff's research and published it as their own was so negligent, that Plaintiff suffered severe emotional distress as a result of their actions.

160.    Defendant Valdar conduct, in his individual capacity, of attempting to insert himself into Plaintiff's dissertation defense and threatening to cancel Plaintiff's dissertation defense (a mere four days before it was scheduled to occur) due to Plaintiff's request to be treated like every other student in the program, was so negligent that Plaintiff suffered sever emotional distress.

161.    It was reasonably foreseeable that Defendants Elston, Errede, and Dohlman's use, publication and conversion of Plaintiff's research and scholarly

33

writing without giving proper credit to Plaintiff would cause severe emotional distress.

162.     It was reasonably foreseeable that Defendant Valdar's threatening to derail the pinnacle of Plaintiff's academic career would cause Plaintiff severe emotional distress.

163.     Defendants Elston, Errede, Dohlman and Valdar caused Plaintiff to experience extreme worry, and anxiety, and was ultimately diagnosed with PTSD as a direct result of their actions.

164.     As a result of Defendants' actions, Plaintiff suffered damages in excess of $75,000.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff hereby prays the Court to enter an order:

1. That Defendants have engaged in acts discrimination against Plaintiff by treating him differently than similarly situated specifically identified Caucasian students in the PhD program;

2. That Defendants request a retraction of the published writing entitled "Model Driven Experimental Design Identifies Counter-acting Feedback Regulation in the Osmotic Stress Response of Yeast" from the scholarly journal;

3. That a preliminary and permanent injunction should issue against Defendants Errede, Dohlman, Elston and Suzuki-McGirr to immediately return the wrongfully converted research and written manuscript to Plaintiff's name and return the works to their original condition for publication purposes, and desist from further actions of conversion;

4. That Defendants be enjoined from all acts of discrimination and harassment against minority students;

5. That Plaintiff have and recover damages in excess of $75,000, as determined at trial from Defendant UNC for said acts of discrimination and harassment;

6. That Plaintiff have and recover damages from Defendants Elston, Errede, Dohlman and Suzuki-McGirr for the wrongful conversion and 2020 publication of Plaintiff's research and written manuscript excess of $75,000;

7. That Plaintiff have and recover damages from all Defendants jointly and severally for intentional infliction of emotional distress in an amount in excess of $75,000.00;

8. That Plaintiff have and recover damages from all Defendants jointly and severally, for negligent infliction of emotional distress in an amount in excess of $75,000.00;

9. That Plaintiff recover attorney's fees for the prosecution of this action; and

10. Such other and further relief as the Court deems just and proper.

11. Plaintiff hereby requests a trial by jury.

Respectfully submitted,

This is the 20th day of November, 2020.

<u>/s/ Neubia L. Harris</u>
Neubia L. Harris
N.C. Bar No.: 42069
The Law Office of Neubia L. Harris, PLLC
203 West Millbrook Road, Suite 101
Raleigh, NC 27609
(919) 526-0500 (telephone)
(919) 589-3935 (facsimile)
neubia@neubiaharrislaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she has served a copy of the foregoing

Complaint on the opposing parties by via U.S. Mail as follows:

Charles Marshall
Vice Chancellor and General Counsel
Office of University Counsel
The University of North Carolina at Chapel Hill
222 East Cameron Avenue, 110 Bynum Hall
Campus Box #9105
Chapel Hill, NC 27599

Thomas C. Shanahan
Senior Vice President and General Counsel
The University of North Carolina
Board of Governors
UNC General Administration
P.O. Box 2688
Chapel Hill, NC 27515

Kevin M. Guskiewicz
803 E. Franklin Street
Chapel Hill, NC 27514

Richard Y. Stevens
132 Lockwood West Drive
Cary, NC 27518

Randall C. Ramsey
2694 Lennoxville Road
Beaufort, NC 28516

Timothy C. Elston
8407 Inverness Way

Chapel Hill, NC 27516

Beverly Errede
512 N. Boundary Street
Chapel Hill, NC 27514

Eric T. Everett
1703 Green Hickory Court
Apex, NC 27523

Henrik G. Dohlman
508 N. Boundary Street
Chapel Hill, NC 27514

Shawn Gomez
4045 Kelly Drive
Durham, NC 27707

Cara Marlow
1807 Stoney Creek Church Road
Burlington, NC 27217

Steven W. Matson
110 Cobblestone Drive
Chapel Hill, NC 27516

Laura Miller
108 Calumet Court
Carrboro, NC 27510

William Valdar
259 Sweet Bay Place
Carrboro, NC 27510

Hoi Ning Ngai
201 Elliott Rd, Apt. 430
Chapel Hill, NC 27514

Leslie Parise
301 Jewell Drive
Chapel Hill, NC 27516

Alan Jones
75 Dover Road
Pittsboro, NC 27312

Sara Kimiko Suzuki-McGirr
136 Purefoy Rd
Chapel Hill, NC 27514

This the 20th day of November, 2020.

/s/ Neubia L. Harris
Neubia L. Harris
N.C. Bar No.: 42069
The Law Office of Neubia L. Harris, PLLC
203 West Millbrook Road, Suite 101
Raleigh, NC 27609
(919) 526-0500 (telephone)
(919) 589-3935 (facsimile)
neubia@neubiaharrislaw.com