IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| PATRICK C. MCCARTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:20-CV-1050 |
| | ) | |
| THE UNIVERSITY OF NORTH | ) | |
| CAROLINA AT CHAPEL HILL, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

LORETTA C. BIGGS, District Judge.

Plaintiff, a former graduate student at University of North Carolina at Chapel Hill ("UNC-CH" or "the University"), initiated this lawsuit on November 20, 2020, against the University and certain of its administrators, faculty, and staff, alleging that they discriminated against him based on his race. (ECF No. 1.) Before the Court are two motions: Defendants' Motion to Dismiss Plaintiff's Complaint, (ECF No. 25) filed on February 18, 2021; and Plaintiff's Motion for Leave to File an Amended Complaint, (ECF No. 32), filed on April 7, 2021.

Upon reviewing the parties' filings, the Court elects—in the interests of judicial economy, the federal policies of resolving cases on the merits and granting leave to amend freely, and avoiding multiple filings related to the question of which complaint should be the operative complaint here—to begin with the evaluation of Plaintiff's Motion to File his

proposed Amended Complaint. Defendant argues that Plaintiff's motion should be denied as futile. For the reasons below, Plaintiff's motion will be granted in part and denied in part.

# I. BACKGROUND

## A. Parties

Plaintiff is an African American male and former doctoral student in the Bioinformatics and Computational Biology program, and a certificate member of the Molecular and Cellular Biophysics Program, at Defendant UNC-CH. (ECF No. 32-1 ¶ 5.)

Plaintiff has sued several University administrators, officers, and staff, as follows: Defendant Kevin M. Guskiewicz, Chancellor of UNC-CH, (*id.* ¶ 8); Defendant Steven Matson, Dean of the Graduate School, (*id.* ¶ 15); Defendant Hoi Ning Ngai, Associate Dean of Student Affairs, (*id.* ¶ 18); Defendant Eric T. Everett, Institutional Research Integrity Officer, (*id.* ¶ 11); and Defendant Cara Marlow, Business Manager for the Department of Genetics and Curriculum in Bioinformatics and Computational Biology, Plaintiff's former department, (*id.* ¶ 14).

Plaintiff has also sued a number of UNC-CH's faculty members: Defendant Leslie Parlise, Chair of the Biochemistry and Biophysics Department, (*Id.* ¶ 19); Defendant Timothy C. Elston, professor and Director of the Curriculum in Bioinformatics and Computational Biology program, (*Id.* ¶¶ 9, 24); and Defendant Henrik G. Dohlman, professor and Chair of the Pharmacology Department beginning in October 2016, (*Id.* ¶¶ 12, 35.) In addition, Defendants Beverly J. Errede, Shawn Gomez, Laura Miller, William Valdar, and Alan Jones are all professors or associate professors. (*Id.* ¶¶ 10, 13, 16, 17, 20.)

Case 1:20-cv-01050-LCB-JLW   Document 35   Filed 09/30/21   Page 2 of 50

Finally, Plaintiff sues one former graduate student: Defendant Sara Kimiko Suzuki-McGirr. (*Id.* ¶ 21.)

**B.    Proposed Amended Complaint (Allegations of Discrimination)**

In the proposed Amended Complaint, Plaintiff alleges the following as the basis for his lawsuit:

Plaintiff was a Ph.D. student at UNC-CH and had attended the University from August 2011 to September 2017. (*Id.* ¶ 22, 157.) According to Plaintiff, his Ph.D. program had several requirements for graduation: he was required to pass certain required courses and candidacy exams, publish a co-first authored and peer-reviewed scientific manuscript, and write and defend a dissertation. (*Id.* ¶ 38 n.1.) Plaintiff pursued these requirements by working in research labs supervised by Defendants Dohlman and Errede. (*Id.* ¶¶ 29, 30.) Plaintiff was the only African American PhD student in either lab. (*Id.* ¶ 31.) Plaintiff's research was funded by a research grant he obtained in July 2015 from the National Institute of Health ("NIH"). (*Id.* ¶ 32.) Defendants Dohlman and Elston sponsored Plaintiff's grant. (*Id.*) By October 2016, Plaintiff had completed all graduation requirements except for completion of his dissertation. (*Id.* ¶ 38 n.1.)

To ensure that he was on track to graduate, Plaintiff met annually with his dissertation committee. (*Id.* ¶ 36.) On October 4, 2016, he presented a summary of his research at his annual meeting with his dissertation committee, composed of Defendants Dohlman, Elston, Errede, Gomez and Miller. (*Id.* ¶¶ 36, 37.) The meeting did not go well. Plaintiff was asked to leave the room at the conclusion of his presentation for 15 minutes, and then reentered. (*Id.* ¶ 37.) Defendants Dohlman and Miller exited the meeting prior to it ending without

providing feedback. (*Id.* ¶ 38.) It was unusual and unexpected for members of a dissertation committee to leave without providing feedback. (*Id.*) The remaining three members then informed Defendant that, while he met the traditional requirements to write and defend his dissertation and graduate from the program, Plaintiff would now be required to author a *second* manuscript before he could schedule his dissertation defense. (*Id.*) This added requirement was unique to Plaintiff. (*Id.*) No other Ph.D. student was required to author two manuscripts before writing and defending their dissertation. (*Id.*) Indeed, at least one student was allowed to graduate before publishing his *first* manuscript. (*Id.* ¶¶ 39, 42.)

Eager to graduate in December 2016, Plaintiff worked quickly to draft the new manuscript. (*Id.* ¶¶ 44–48.) Plaintiff repeatedly emailed sections of his draft to his advisors for feedback as follows: to Defendants Dohlman on October 6; Elston on October 17; Errede on October 19; Elston again on October 26; and both Dohlman and Elston again on November 2. (*Id.*) Only Defendant Errede responded quickly with feedback. (*Id.* ¶ 46.) In contrast, Defendants Dohlman and Elston—who were Plaintiff's official advisors—were "very busy" providing feedback to other students and did not respond to Plaintiff with feedback for over a month. (*Id.* ¶¶ 48–51.) The two advisors then demanded on December 13, 2016, that Plaintiff split his manuscript and share half of his research with Matthew Martz, a non-African American student, despite Plaintiff's and Martz's objections. (*Id.* ¶¶ 53, 54.) When Plaintiff met with Defendant Dohlman the next day, Dohlman insisted he "did not like to help graduate students write manuscripts." (*Id.* ¶ 55.) This statement appeared specific to Plaintiff, since Defendant Dohlman was "actively engaged in providing feedback and editing" for non-minority students. (*Id.*) As a consequence of the unique writing assignment and

4

Defendant Dohlman and Elston's delays providing feedback, Plaintiff was unable to graduate in December 2016.  (*Id.* ¶ 43.)

After refusing to assist Plaintiff for months with his second manuscript, Defendant Dohlman changed his mind on April 7, 2017, and inserted himself into Plaintiff's research. (*Id.* ¶ 63.)  He demanded that Plaintiff include irrelevant research completed by another student in the manuscript.  (*Id.* ¶ 64.)  Plaintiff refused because including the irrelevant research would "significantly diminish the quality of his work."  (*Id.* ¶ 65.)  Defendant Errede later agreed with Plaintiff that the irrelevant research "would damage Plaintiff's manuscript."  (*Id.* ¶ 66.)

Frustrated by delays, Plaintiff sought help from another professor, Barry Lentz, with whom Plaintiff had a better relationship.  (*Id.* ¶ 67.)  On Lentz's recommendation, Plaintiff met with Defendant Elston—Director of Plaintiff's program and one of his two official advisors—"to express his concerns regarding potential loss in salary due to the consistent delay tactics by the advisors."  (*Id.* ¶ 68.)  In response, Defendant Elston threatened that, if Plaintiff went forward with his dissertation, Elston would ensure that Plaintiff could not submit his second manuscript for peer-review at a scientific journal.  (*Id.* ¶ 70.)  Not to be deterred, Plaintiff nevertheless scheduled his dissertation defense.  (*Id.* ¶ 72.)  Defendant Elston then "spread[ ] false information about" Plaintiff to UNC-CH's Director of Diversity Affairs.  (*Id.* ¶ 73.)

Plaintiff's dissertation defense was scheduled for July 7, 2017.  (*Id.* ¶ 84.)  Plaintiff continued to have difficulty with his professors leading up to this date.  On June 16, Plaintiff

5

met with the Dean of Students at the Graduate School, Leslie Lerea,[1] to express a fear of retaliation from his professors. (*Id.* ¶ 74.) On June 21, Defendant Dohlman instructed Plaintiff to seek feedback on his manuscript from Martz, the student Dohlman had attempted to give half of Plaintiff's research to, who had since resigned from Dohlman's lab. (*Id.* ¶ 75.) Defendant Elston contacted Plaintiff on June 23 and attempted to intimidate him into relinquishing the public portion of his dissertation defense that candidates traditionally enjoy. (*Id.* ¶ 76.) Plaintiff relayed his email to Dean Lerea. (*Id.* ¶ 77.)

Plaintiff met again with Dean Lerea on June 27, 2017. (*Id.* ¶ 78.) Dean Lerea agreed to add Professor Lentz to Plaintiff's dissertation committee and even allow Professor Lentz to chair the committee if Plaintiff could obtain consent from the other committee members. (*Id.*) Plaintiff requested such consent from each member, but Defendants Elston, Dohlman, and Errede failed to reply. (*Id.*)

On July 3, Defendant Elston invited Defendant Valdar to Plaintiff's dissertation defense without first consulting Plaintiff. (*Id.* ¶ 79.) Defendant Valdar asked Plaintiff to meet with him one-on-one prior to the dissertation defense. (*Id.* ¶ 81.) Defendant Valdar told Plaintiff he "would be attending the dissertation defense as an 'impartial observer.'" (*Id.*) Defendant Valdar threatened to cancel Plaintiff's dissertation defense if he did not attend the one-on-one meeting. (*Id.*) This all appeared to be unique to Plaintiff. Other Ph.D. candidates were not required to meet one-on-one with professors leading up to their dissertation

---

[1] Dean Lerea is not a party to this lawsuit and should not be confused with Defendants Matson, Dean of the Graduate School, or Ngai, Associate Dean of Student Affairs for UNC-CH.

defenses, and other candidates did not have "impartial observers" added last-minute to their dissertation committees.  (*Id.* ¶¶ 80, 81.)

Plaintiff shared Defendant Valdar's threats with Dean Lerea.  (*Id.* ¶ 82.)  Dean Lerea responded by instructing Defendants Elston and Dohlman to "cease all harassment of Plaintiff."  (*Id.* ¶ 83.)

Plaintiff conducted his dissertation defense on July 7, 2017.  (*Id.* ¶ 84.)  Traditionally, dissertation defenses had two parts: one open to the public, and one attended only by dissertation committee members.  (*Id.*)  During the public portion, a candidate's advisors welcome him and introduce him to the audience.  (*Id.*)  The candidate then defends his dissertation, and committee members take turns asking questions and providing feedback.  (*Id.* ¶ 85.)  After the defense, the supervisor of the candidate's research lab organizes a celebration in the candidate's honor.  (*Id.* ¶ 87.)

Plaintiff's dissertation defense proceeded differently.  First, Plaintiff's advisors, Defendants Elston and Dohlman, refused to introduce him to the public.  (*Id.* ¶ 84.)  Second, Elston and Dohlman remained silent throughout Plaintiff's presentation and refused to ask questions or provide feedback.  (*Id.* ¶ 85.)  Third, unlike every preceding student in Elston or Dohlman's research labs, Plaintiff received no post-defense celebration from his supervisors. (*Id.* ¶ 87.)  Instead, Professor Lentz and a friend took Plaintiff out for a celebratory lunch later that month.  (*Id.* ¶ 108–09.)

In order to graduate, Plaintiff was required to obtain signatures from five of his committee members by July 20, 2017, demonstrating completion of his dissertation defense. (*Id.* ¶ 88.)  This was a routine graduation requirement.  (*Id.*)  As of July 18, 2017, Defendant

7

Elston had not signed Plaintiff's form. (*Id.* ¶ 89.) Plaintiff scrambled between offices to obtain outstanding signatures on July 19, 2017. (*Id.* ¶¶ 100–10.) All but Defendant Elston signed his form. (*Id.* ¶ 110.) Plaintiff then turned to Defendant Cara Marlow, the Department's Business Manager, for help tracking Defendant Elston down. (*Id.* ¶¶ 92, 100–02.) Plaintiff initially left his form with Defendant Marlow to obtain Defendant Elston's signature; however, when Defendant Gomez offered to sign the form in Elston's stead, Plaintiff retrieved his form from Marlow's office. (*Id.* ¶¶ 102, 106–08.) By the afternoon of July 19, 2017, Elston still had not replied to Plaintiff's emails or signed his form. (*Id.* ¶ 109.)

The deadline looming, Plaintiff submitted his form without Elston's signature. (*Id.* ¶ 110.) He then contacted Dean Lerea, who replied that she would ensure that Elston signed the form. (*Id.* ¶ 111.) Evidently, Defendant Marlow found out about this exchange and became angry, accusing one of Plaintiff's friends of "babying" him. (*Id.* ¶ 113.) Defendant Marlow then "berate[d]" Plaintiff for submitting his form without Defendant Elston's signature. (*Id.* ¶ 114.)

Nevertheless, Plaintiff's dissertation was officially accepted on August 8, 2017, and he received his degree in the mail in September 2017. (*Id.* ¶ 157.) Due to the various delays, he was unable to participate in UNC-CH's graduation and doctoral hooding ceremonies until May 2018. (*Id.* ¶ 158.) He began working as a postdoctoral researcher in the Eshelman School of Pharmacy at UNC-CH in July 2017 and received a second NIH grant to conduct his research. (*Id.* ¶ 155.)

After graduation, Plaintiff continued to pursue publication of the second manuscript. (*Id.* ¶ 118.) Publication was customary for Ph.D. students and is an important achievement

8

that "greatly enhance[s]" a student's competitiveness for employment opportunities and grants. (*Id.*) Plaintiff contacted Defendants Elston, Dohlman, and Errede—the professors who supervised the research described in his manuscript—to have his manuscript published. (*Id.*) Defendants Elston and Dohlman ignored his requests. (*Id.* ¶ 119.) Defendant Errede instructed Plaintiff to remove "the best and most impactful scientific result" from the manuscript, without explanation. (*Id.* ¶ 117.) It was later speculated that Defendant Errede made this request so that Plaintiff's data could be used by a different student. (*Id.*) Plaintiff then requested a meeting with the three professors to finalize the submission process for his manuscript. (*Id.* ¶ 121.) Defendants Elston and Dohlman did not show up. (*Id.*) Defendant Errede did attend but had not read enough of the manuscript to provide substantive feedback. (*Id.*)

On August 29, 2017, Plaintiff contacted the Special Assistant to the Vice-Chancellor for Research-Diversity and Inclusion about his continued difficulties with his professors. (*Id.* ¶ 122.) She encouraged Plaintiff to speak with Defendant Eric Everett, UNC-CH's Institutional Research Integrity Officer. (*Id.*) Meanwhile, on September 1, Defendant Elston removed Plaintiff from a longstanding research collaboration Plaintiff had been working on between Defendants Elston and Jones. (*Id.* ¶ 123.) When Plaintiff asked Defendant Elston about publishing his manuscript, Elston responded that he had "no idea what paper you are talking about." (*Id.* ¶ 124.) Plaintiff then contacted Defendant Everett as instructed on September 11, 2017, but Everett refused to intervene to help Plaintiff. (*Id.* ¶ 125–26.)

9

Case 1:20-cv-01050-LCB-JLW   Document 35   Filed 09/30/21   Page 9 of 50

On September 19, 2017, Defendant Suzuki-McGirr, another of Defendants Elston's and Dohlman's graduate students, contacted Plaintiff and requested his analysis software and data sets. (*Id.* ¶ 128.) Plaintiff did not respond. (*Id.*)

On December 19, 2017, Plaintiff again enlisted the help of Professor Lentz. (*Id.* ¶ 130.) Professor Lentz reported witnessing continued harassment and hostility toward Plaintiff from his colleagues. (*Id.*) He contacted Defendant Steven Matson, Dean of the Graduate School, to implore the Dean to reign in the unprofessional conduct. (*Id.*) Professor Lentz also informed the Dean that another minority student had reported similar acts of hostility and harassment from Defendants Elston and Errede, and that a third student of color had recently resigned from Defendant Dohlman's lab due to this same harassment and discrimination. (*Id.* ¶ 131.) Defendant Matson refused to intervene. (*Id.* ¶ 132.) Professor Lentz informed Plaintiff of this refusal in February 2018. (*Id.*)

In August 2018, Plaintiff began seeking counseling with a professional psychologist. (*Id.* ¶ 134.) Plaintiff was later diagnosed with Post-Traumatic Stress Disorder ("PTSD") specifically resulting from the trauma he faced while a student at UNC-CH. (*Id.*)

In February 2019, Plaintiff discovered through social media that another UNC-CH student, Defendant Suzuki-McGirr, was pursuing a research project "nearly identical" to the research results that Plaintiff had previously submitted in his manuscript and dissertation. (*Id.* ¶ 135.) Another student informed Plaintiff of an "extreme similarity" between the two projects. (*Id.* ¶ 136.) This episode made Plaintiff "increasingly anxious as a result of the continual distress that his advisors were imposing upon him and the use of his research without permission by other students." (*Id.* ¶ 137.)

10

On March 5, 2019, Plaintiff issued a "Cease-and-Desist notice" to UNC-CH instructing them to stop all attempts to "defraud him of his research" and formally informing the university of the discrimination he had faced from Defendants Elston, Dohlman, and Errede. (*Id.* ¶ 138.) UNC-CH's counsel's office responded on April 11, 2019, stating it had investigated Plaintiff's allegations of plagiarism but found no basis for those claims. (*Id.* ¶ 139.) As for Plaintiff's complaints of discrimination, the response stated that UNC-CH's office of Equal Opportunity and Compliance ("EOC") would follow up with him on his allegations. (*Id.* ¶ 140.) No one from that office, however, ever contacted Plaintiff. (*Id.*)

Defendant Suzuki-McGirr presented a talk on three "of the exact focus areas of Plaintiff's previously submitted research" in May 2019, November 2019, and February 2020. (*Id.* ¶¶ 144, 149, 150.) On April 21, 2020, Defendants Suzuki-McGirr, Errede, Elston, and Dohlman published Defendant Suzuki-McGirr's manuscript. (*Id.* ¶ 151.) This paper was largely identical to Plaintiff's work. Defendants "merely reworded several portions of Plaintiff's previously submitted manuscript" without giving him credit. (*Id.* ¶ 152.) Plaintiff asserts that his work was plagiarized. (*Id.*)

### C.     Proposed Amended Complaint (Causes of Action)

In Plaintiff's proposed Amended Complaint, he asserts seven causes of action: Racial Harassment and Discrimination in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d) (Count I); violation of the Equal Protection Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 (Count II); Racial Harassment and Discrimination in violation of § 1983 (Count III); Retaliation in violation of Title VI (Count IV); Civil

Conspiracy (Count V); Intentional Infliction of Emotional Distress ("IIED") (Count VI); and Negligent Infliction of Emotional Distress ("NIED") (Count VII). *Id.*

Defendants argue that Plaintiff's motion to file this proposed Amended Complaint should be denied as futile. (ECF No. 33 at 3.) Specifically, Defendants argue that some or all of Plaintiff's proposed claims fail to state a claim for which relief can be granted or are barred by qualified immunity, sovereign immunity, or the applicable statute of limitations. (ECF No. 33 at 1; *see also* ECF Nos. 26, 31.) Therefore, according to Defendants, because Plaintiff's proposed claims would not survive a motion to dismiss, his motion for leave to file the proposed Amended Complaint should be denied. (ECF No. 33 at 3.)

## II.    STANDARD OF REVIEW

The determination of whether to grant or deny a motion to amend a pleading lies within the sound discretion of the district court. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Deasy v. Hill*, 833 F.2d 38, 40 (4th Cir. 1987). Under Rule 15(a) of the Federal Rules of Civil Procedure, courts should freely grant leave to amend a pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2). "This liberal rule gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006). Indeed, motions to amend are "[s]o useful . . . and of such service in the efficient administration of justice that they ought to be allowed as a matter of course, unless some particular reason for disallowing them appears." *New Amsterdam Cas. Co. v Waller*, 323 F.2d 20, 28–29 (4th Cir. 1963).

"[L]eave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or

the amendment would be futile." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986) (citing *Foman*, 371 U.S. at 182). A plaintiff's request to amend a complaint is futile if the proposed amended complaint could not satisfy the appropriate requirements of the Federal Rules of Civil Procedure, including Rule 12(b)(6). *See United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008). Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In considering whether a plaintiff has stated a claim, a court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the non-moving party's favor, *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

## III.    DISCUSSION

### A.    FEDERAL CLAIMS (COUNTS I, II, III, & IV)

#### i.    Plaintiff's federal claims are not barred by the statute of limitations

Defendants first argue that each of Plaintiff's proposed federal claims are barred by the relevant statute of limitations and, therefore, his proposal to assert those claims should be denied as futile. (ECF No. 33 at 3–5.) Plaintiff counters that: (1) his action did not accrue until "his cease and desist letter was ignored, and Defendant UNC's EOC failed to follow up with him"; (2) the statute of limitations should be equitably tolled; or (3) his claims fall within the continuing violations exception to the statute of limitations. (ECF Nos. 34 at 3–4; 28 at 6–8.)

A motion to amend a complaint is futile if, taking all alleged facts as true, the claims accrued outside of the statute of limitations. *Wilkins v. Montgomery*, 751 F.3d 214, 223, 226 (4th Cir. 2014). This is a question of law for the court to decide. *Id.* "[T]here is no federal statute of limitations applicable to suits under § 1983" or Title VI. *Nat'l Adver. Co. v. City of Raleigh*, 947 F.2d 1158, 1161 (4th Cir. 1991); *Franks v. Ross*, 313 F.3d 184, 194 (4th Cir. 2002). The applicable statute of limitations must consequently "be borrowed from the analogous state statute of limitations." *Nat'l Aver. Co.*, 947 F.2d at 1161. In North Carolina, analogous claims must be brought within three years. *Id.* at 1162 (citing N.C. Gen. Stat. § 1-52(5)).

1. <u>Plaintiff's claims generally accrued as the adverse actions occurred</u>

While North Carolina's three-year statute of limitations governs Plaintiff's claims, federal law determines when his federal law claims accrued. *Id.* ("[T]he time of accrual of a civil rights action is a question of federal law."). Under federal law, a claim accrues "when it is sufficiently ripe that one can maintain suit on it." *Franks*, 313 F.3d at 194. Discrimination claims accrue "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." *Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995) (en banc) (citing *United States v. Kubrick*, 444 U.S. 111, 122–24 (1979)).

Here, Plaintiff alleges discrimination that began in his dissertation presentation in 2016, continued through his graduation in 2017, and included the plagiarism of his work in 2019. Plaintiff argues that he "did not have the sufficient facts about the complete harm done to him until his cease-and-desist letter was ignored, and [UNC-CH's Equal Opportunity and Compliance office] failed to follow up with him" in April 2019. (ECF No. 34 at 4.) It appears clear from his Amended Complaint, however, that Plaintiff was fully aware of the alleged harm

long before 2019.  For example, Plaintiff reported "continuing delays and harassment from his advisors regarding the publication of his research manuscript" to his Dean on June 16, 2017.  (ECF No. 32-1 ¶ 74.)  He similarly reported "concerns regarding his inability to submit his research manuscript for publication in a scientific journal" due to "the discrimination that he had faced" to the Special Assistant to the Vice-Chancellor for Research-Diversity and Inclusion, and the Director for Postdoctoral Affairs in August 2017.  (*Id.* ¶ 122.)  Plaintiff sought counseling in August 2018.  (*Id.* ¶ 134).  Finally, he "informed UNC-CH of the discrimination he had faced" in his Cease-and-Desist notice on March 5, 2019.  (*Id.* ¶ 138.)  In sum, Plaintiff was fully aware of the alleged discrimination and its harmful effects throughout his time at UNC-CH.  Because he "possesse[d] sufficient facts about the harm done to him that reasonable inquiry" would have "reveal[ed] his cause of action," *Nasim*, 64 F.3d at 955, Plaintiff's claims arising out of his experience as a student at UNC-CH accrued while he was a student there.

There is one important exception to this general conclusion.  Plaintiff alleges that Professor Lentz informed Defendant Matson, Dean of the Graduate School, about the alleged discrimination.  Plaintiff learned in February 2018 that Defendant Matson would not take any action to remedy the discrimination.  Taking all facts alleged as true, Plaintiff did not become reasonably aware of the harm done to him by Defendant Matson until February 2018.  Thus, Plaintiff's causes of action accrued against Defendant Matson at that time.

Plaintiff filed his suit on November 20, 2020.  Thus, Plaintiff's claims arising from Defendant Matson's conduct accrued in February 2018 and are therefore not barred.  Plaintiff's claims arising from the alleged plagiarism of his research, which occurred in April

15

2020, are similarly not barred. However, any claims arising from his time as a student at UNC-CH, which ended in September 2017, are barred by the statute of limitations unless otherwise exempt under a theory of equitable tolling or continuing violations as discussed below.

2.     The statute of limitations cannot be equitably tolled in this case

Plaintiff next argues that the three-year statute of limitations should be equitably tolled during the time he was allegedly waiting on UNC-CH to contact him regarding his allegations of discrimination. (ECF Nos. 32-1 ¶¶ 140; 34 at 3–4.)

"Equitable tolling is reserved for those rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result." *Battle v. Ledford*, 912 F.3d 708, 718 (4th Cir. 2019) (internal quotations omitted). "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). Equitable tolling requires "reasonable diligence, not maximum feasible diligence." *Holland v. Florida*, 560 U.S. 631, 653 (2010) (internal quotation and citation omitted).

A statute of limitations may be tolled while a plaintiff is required to exhaust administrative remedies. *See Battle*, 912 F.3d at 720. In contrast, equitable tolling generally does not apply if exhaustion of administrative remedies was voluntary and not required. *See Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 465–66 (1975) (declining to toll limitations for § 1981 claims during exhaustion required for separate Title VII remedy); *Ott v. Md. Dep't of Pub. Safety & Corr. Servs.*, 909 F.3d 655, 661 (4th Cir. 2018) (declining to toll limitations for

Rehabilitation Act claims where litigant "could have timely filed [those] claims without completing the administrative process as to her [Americans with Disabilities Act] claims"). Here, Plaintiff was not required to exhaust any administrative or internal remedies under either Title VI or § 1983. *Patsy v. Bd. of Regents of St. of Fla.*, 457 U.S. 496, 501 (1982) ("[E]xhaustion is not a prerequisite to an action under § 1983."); *Cannon v. Univ. of Chi.*, 441 U.S. 677, 706–08 n. 41 (1979) (noting that exhaustion of Title IX administrative remedies is not required before one files a private action, and that Title IX and Title VI are similarly interpreted and applied). Thus, his attempt to seek an internal or administrative remedy through UNC-CH's Equal Opportunity and Compliance office cannot be the basis for equitable tolling.

Equitable tolling may also apply "where, despite the plaintiff's knowledge of the facts, the defendant engages in intentional misconduct to cause the plaintiff to miss the filing deadline." *English v. Pabst Brewing Co.*, 828 F.2d 1047, 1049 (4th Cir. 1987). Under this theory, a plaintiff must show: (1) defendant "attempted to mislead" plaintiff, and (2) he "reasonably relied on the misrepresentation by neglecting to file a timely charge." *Id.* To show an attempt to mislead, plaintiff must show either a "deliberate design" to delay or "actions that the [defendant] should unmistakably have understood would cause the [plaintiff] to delay filing his charge." *Id.*; *Price v. Litton Bus. Sys., Inc.*, 694 F.2d 963, 965 (4th Cir. 1982).

Here, Plaintiff has failed to adequately allege that UNC-CH attempted to mislead him or that his decision to wait for word from the office was reasonable. Plaintiff alleges merely that, on April 11, 2019, UNC-CH represented that "the University office of Equal Opportunity and Compliance . . . would contact him regarding his allegations of discrimination from his advisors," but the office never did so. (ECF No. 32-1 ¶ 140.) The

17

Court finds that this lone allegation is insufficient to allege UNC-CH deliberately mislead Plaintiff in order to prevent him from filing his suit, or that UNC-CH should unmistakably have understood that its failure to follow up with Plaintiff would cause him to delay filing his charge. Further, even if Plaintiff alleged that UNC-CH mislead him, Plaintiff has failed to allege that his reliance on this misrepresentation was reasonable. Plaintiff's letter appears to have sought prospective relief from continued use of his research, not relief for the discrimination he had already suffered. His notice "informed" UNC-CH of discrimination and harassment but did not assert any claims against UNC-CH. Plaintiff may have hoped that UNC-CH would remedy the alleged discrimination, but such wishful thinking is insufficient to justify the "rare" remedy of equitable tolling.

Thus, the statute of limitations cannot be equitably tolled in this case.

3. <u>Plaintiff has alleged a continuing course of racially discriminatory conduct</u>

When there is a "continuing course of racially discriminatory conduct, the date of the last discriminatory act determines a suit's timeliness." *Bradley v. Carydale Enters.*, 707 F. Supp. 217, 220 (E.D. Va. 1989) (internal quotations omitted) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 381–82 (1982)). Where racial harassment creates a hostile educational environment, the serial harassment constitutes one unlawful practice for purposes of timeliness. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.*

"[T]o establish a continuing violation . . . the plaintiff must establish that the unconstitutional or illegal act was a . . . fixed and continuing practice." *Nat'l Advert. Co.*, 947 F.2d at 1166. A fixed and continuing practice exists where "the same alleged violation" is repeated by the same actor in "a series of separate acts." *Id.* at 1167 (quoting *Perez v. Laredo Junior Col.*, 706 F.2d 731, 733 (5th Cir. 1983)). A subsequent act does not establish a fixed and continuing practice if the act is an "entirely new violation," *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 348 (4th Cir. 2011), or each "discrete act . . . was not repeated by the individual actor," *Maisha v. Univ. of N.C.*, 641 F. App'x 246, 249 (4th Cir. 2016). Two acts may be the same "violation" of federal discrimination laws even where the facts giving rise to the violation are quite different. *See, e.g.*, *Bradley*, 707 F. Supp. at 219, 221 (finding a landlord's refusal to intervene to protect a tenant from racial harassment and subsequent effort to force her to vacate her home were a single violation of Title VI).

Courts consider two factors to determine whether an act was a fixed and continuing practice, including "(1) the harm to the plaintiff and whether that harm has been compounded by further governmental actions and (2) whether unfairness results from finding the continuing wrong exception inapplicable." *Miller v. King George Cty.*, 277 F. App'x 297, 299 (4th Cir. 2008); *see Nat'l Advert. Co.*, 947 F.2d at 1167–68. It is continual unlawful acts, not continual ill effects from an original violation, that constitutes a continuing course of racially discriminatory conduct. *A Soc'y Without A Name*, 655 F.3d at 348.

Here, Plaintiff has alleged sufficient facts against certain Defendants to support a finding of a fixed and continuing practice. Starting in his annual dissertation meeting in October 2016, Plaintiff alleges that Defendants Elston, Dohlman, and Errede engaged in a

string of racially discriminatory acts designed to delay his graduation and prevent publication of his manuscript, including assigning him a second manuscript, delaying approval of that manuscript, tinkering with this dissertation defense at the last-minute, silently protesting his dissertation presentation, encouraging him to share his research with other students, refusing to submit his research for publication, removing him from a longstanding collaboration project, and coauthoring a paper that plagiarized his research. Each action, he alleges, constituted racial discrimination in violation of the same laws: 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment. Similarly, Plaintiff accuses UNC-CH of repeatedly violating Title VI by allowing these and other discriminatory acts, culminating with its decision to prevent Plaintiff from publishing his work and to "substitute a student of Asian descent to take credit for the work." (ECF No. 32-1 ¶ 166.c.) Because Plaintiff has alleged that the same actors engaged in a series of actions that each violated the same laws, he has sufficiently alleged that these Defendants engaged in a continuing violation. *See Nat'l Advert. Co.*, 947 F.2d at 1166.

Defendant argues that Plaintiff's plagiarism allegations are "separate and distinct from his claims of pre-graduation harassment and discrimination." (ECF No. 26 at 9.) Plaintiff plainly, however, asserts that the plagiarism was part of a years-long campaign to prevent Plaintiff from publishing his manuscript, and that each action during this campaign, including the alleged plagiarism, were motivated by racial discrimination. Further, there is no more distance between allegations of (1) refusing to publish a manuscript and (2) plagiarizing that manuscript than there is between (1) refusing to discipline a tenant for race-based harassment and (2) forcing the victim of that harassment to vacate her home, the allegations made in

*Bradley*. Taking all facts alleged in the light most favorable to Plaintiff, the Court finds that Plaintiff has alleged a fixed and continuing practice of racial discrimination.

Thus, the final act of Defendants UNC-CH, Elston, Dohlman, and Errede—publishing the allegedly plagiarized work on April 21, 2020—determines timeliness for any claims arising from that conduct. Since Plaintiff's suit was filed within three years of that date, his federal claims against those Defendants are timely.

On the other hand, Plaintiff has failed to allege any acts by Defendants Everett, Gomez, Marlow, Miller, Valdar, Parise, or Jones that occurred within three years of November 20, 2020. It appears from Plaintiff's allegations that their adverse actions toward Plaintiff ended when he graduated from UNC-CH. To the extent Plaintiff alleges that the *effects* of their actions continued into and beyond November 2017, the continuing violations doctrine applies only to continued *acts*, not continued *effects*. For example, even taking all facts alleged in the light most favorable to Plaintiff, it appears that Defendants decided not to submit Plaintiff's manuscript for publication prior to September 2017. Defendants' adherence to that decision in later years is not a continuing violation, but the continued effect of their original violations. Thus, Plaintiff's federal claims against these Defendants are barred by the statute of limitations.

In sum, Plaintiff's federal claims against Defendants UNC-CH, Elston, Errede, Dohlman, and Matson are not barred by the statute of limitations, and therefore—subject to the analysis below—these claims are not futile. On the other hand, Plaintiff's federal claims against Defendants Everett, Gomez, Marlow, Miller, Valdar, Parise, and Jones are barred by the statute of limitations and therefore will be denied as futile.

21

## ii.    Plaintiff has stated claims for Racial Discrimination and Harassment under Title VI (Count I)

In Count I of Plaintiff's proposed Amended Complaint, Plaintiff asserts claims under Title VI for Racial Harassment and Discrimination against Defendant UNC-CH and other Defendants in their official capacities.  (ECF No. 32-1 ¶¶ 160–72.)  Defendants first argue that Plaintiff has failed to allege sufficient facts to state a claim for Racial Discrimination under Title VI against Defendant UNC-CH.  (ECF No. 33 at 7–11.)  Defendants next argue that Plaintiff's claim for Racial Harassment against Defendant UNC-CH similarly fails.  (*Id.*) Finally, Defendants argue that Plaintiff's claims under Title VI against Defendants in their official capacities are duplicative.  (*Id.* at 6–7.)  For these reasons, they argue, his proposal to assert Title VI claims should be denied as futile.  (*Id.* at 7–11.)  The Court will address these arguments in turn.

### 1.    Plaintiff has alleged a prima facie case of Racial Discrimination

Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  Claims of Racial Discrimination brought under Title VI are analyzed under a test announced in *McDonnell Douglas Corp. v. Green* by the U.S. Supreme Court.  *Maisha*, 641 F. App'x at 250 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973)).  To state a prima facie case of racial discrimination, a plaintiff must allege he: (1) is a member of a protected class, (2) qualified to continue in the educational program; (3) suffered an adverse action; and (4) was treated differently from similarly situated students who were not members of the protected class.  *Elliott v. Del. St.*

22

*Univ.*, 879 F. Supp. 2d 438, 443 (D. Del. 2012); *see also Sanders v. Tikras Tech. Sols. Corp.*, 725 F. App'x 228, 230 (4th Cir. 2018) (per curiam) (applying the *McDonnel Douglas* test to racial discrimination in employment). The burden of establishing a prima facie case under this test "is not onerous." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

Here, the first element is not in dispute. As an African American man, Plaintiff is a member of a protected class. *See Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994). Next, with respect to the second element, Defendants argue that Plaintiff was not qualified to publish his manuscript, defend, and graduate on time. Defendants argue that this Court should defer to the educational institution's judgment, since "[t]he court has neither the insight nor the expertise to make decisions concerning student termination, absent proof of intentional discrimination." (ECF No 26 at 23 (quoting *Love v. Duke Univ.*, 776 F. Supp. 1070, 1074 (M.D.N.C. 1991)).) At the present stage in this case, however, the Court must view all alleged facts in the light most favorable to Plaintiff. As alleged, Plaintiff had passed all courses and exams by October 2016. Defendants did not dispute these qualifications, but instead added a *new* qualification that no other student was required to complete. Further, as alleged, Defendants did not oppose publication of Plaintiff's manuscript on its merits, but because it was *his* manuscript. If the manuscript was not publish-ready, it was because Defendants refused to provide Plaintiff the feedback necessary to prepare the manuscript for publication. Indeed, Plaintiff alleges that Defendants did eventually publish his research—but under a different name. In *Love*, cited by Defendants, the "evidence adduced in discovery" demonstrated plaintiff had failed two courses and failed to complete his preliminary examination. *Love*, 776 F. Supp. at 1073–74. No such evidence is available on a motion for

23

leave to file an amended complaint. Thus, Plaintiff has sufficiently alleged that he was qualified to publish his manuscript, defend his dissertation, and graduate on time, satisfying the second element of his prima facie case.

Third, Plaintiff alleges that Defendants delayed his graduation, removed him from a longstanding research project, refused to publish his manuscript, and plagiarized his work. The Court finds that, taken together, these allegations constitute an adverse action. An adverse action is a "significant change" in status or benefits. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011). Refusal to graduate a student on time is akin to failure to promote an employee, which is "easy to identify" as an adverse action; as is terminating or transferring an employee, which is not dissimilar from removing Plaintiff from a longstanding research project. *Nat'l R.R. Passenger Corp.*, 536 U.S. at 114. Similarly, Plaintiff alleges that publication of his work was an important and expected benefit of his Ph.D. program that would have improved his access to future employment. Defendants routinely aided other students in earning this benefit but blocked Plaintiff's publication and plagiarized his work. Given that the standard for establishing a prima facie case of discrimination is "not onerous," the Court finds that this, too, was an adverse action.

Fourth, Defendants argue that Plaintiff was not treated differently from similarly situated students. Plaintiff's proffered similarly situated students, they argue "were working under different conditions, at different times, on different projects." (ECF No. 33 at 10.) Plaintiff has alleged, however, that he was the *only* African American man in his department and the *only* student singled out for the alleged adverse treatment. For example, Plaintiff alleges that his advisors silently protested his dissertation defense by refusing to introduce him to the

audience, provide him with feedback, or celebrate completion of his defense. Plaintiff alleges that *no* other student was subjected to such unprofessional conduct. Plaintiff similarly alleges that the last-minute addition of a second manuscript requirement, Defendants' refusal to provide meaningful feedback, their complete refusal to publish his research, and the plagiarism of his work were either rare or unique to him. Plaintiff details how these Defendants worked closely with a number of non-African American students to publish their manuscripts while simultaneously refusing to work with Plaintiff at all. Taken together, Plaintiff has alleged sufficient facts to give rise an inference that Plaintiff was singled out for mistreatment by Defendants Elston, Dohlman, and Errede while members of other races were not.

In sum, Plaintiff has alleged sufficient facts to support each of the four elements necessary to establish a prima facie claim of discrimination under Title VI against Defendant UNC-CH.

### 2. Plaintiff has alleged a prima facie case of Racial Harassment

To state a claim for Racial Harassment under Title VI, a plaintiff must claim (1) defendant is "an educational institution receiving federal funds," (2) plaintiff "was subjected to harassment based on" his race, (3) "the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity," and (4) "there is a basis for imputing liability to the institution." *DJ ex rel. Hughes v. Sch. Bd. of Henrico Cty.*, 488 F. Supp. 3d 307, 332 (E.D. Va. 2020) (quoting *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (per curium)). Under the second element, a plaintiff may show he was harassed "based on" his race by showing that he was treated differently than similarly situated students. *Causey v. Balog*, 162 F.3d 795, 801–02 (4th Cir. 1998) (citing *Carter*, 33 F.3d at 461–62). Under

25

the third element, harassment is sufficiently severe or pervasive "when it creates 'an environment that a reasonable person would find hostile or abusive' and that the victim herself 'subjectively perceive[s] . . . to be abusive.'" *Jennings*, 482 F.3d at 696 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Under the fourth element, Liability can be imputed to a university when "an official who . . . has authority to address the alleged discrimination and to institute corrective measures . . . has actual knowledge of discrimination in the [institution's] programs and fails adequately to respond" or displays "deliberate indifference." *Id.* at 700 (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)).

Here, under the first element, the parties agree that UNC-CH receives federal funds. (ECF Nos. 32-1 ¶ 164; 33 at 5–6.) Under the second, Plaintiff has sufficiently alleged that he treated differently than similarly situated students as the only African American man in the department and the only one singled out for mistreatment. While Defendants argue that each doctoral student is unique and works on different research in different laboratories, at the current stage in the litigation where the Court must view all alleged facts and reasonable inferences in Plaintiff's favor, Plaintiff has alleged with sufficient particularity the names and details of similarly situated students who were not subjected to mistreatment. Thus, Plaintiff has sufficiently alleged that he was subjected to harassment "based on" his race.

Third, Plaintiff subjectively perceived his environment to be abusive and sought psychological counseling. Further, taking all alleged facts in the light most favorable to Plaintiff, this perception was reasonable. For nearly a year, his advisors—the professors tasked with guiding and supporting Plaintiff—refused to meaningfully interact with him. They ignored his emails and dropped meetings. During his dissertation defense, they publicly

26

shamed him by refusing to introduce him or engage at all with his presentation, and thereafter refused to sign the form that would allow him to graduate. They allegedly made threats, refused to publish his work, and then plagiarized his research. While Defendants Elston and Dohlman appear to be the most serious offenders, other faculty and staff—with one exception—also allegedly expressed hostility toward Plaintiff or otherwise acquiesced to Elston and Dohlman's behavior. Thus, taking all alleged facts as true, a reasonable person would have found Plaintiff's educational environment hostile and abusive.

Fourth and finally, there is a basis to impute liability to UNC-CH. Plaintiff made the university's Dean of Students aware of the harassment as early as June 2017, and the Dean of the Graduate School, Defendant Matson, was notified by Dean Lentz in December 2017. Both officials had authority to address the alleged discrimination, and while the Dean of Students did attempt to intervene, neither official's response was sufficiently adequate to bring the harassment to an end. Thus, Plaintiff has sufficiently alleged that Defendant UNC-CH's officials with "authority to address" the alleged harassment had "actual knowledge" that it was ongoing but "fail[ed] to adequately respond." *See Jennings*, 482 F.3d at 700.

Plaintiff has stated a claim against UNC-CH for Racial Harassment under Title VI.

3. Plaintiff's Title VI claims against individual Defendants in their official capacities are duplicative

"Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (internal quotation omitted). Where a plaintiff has sued a state entity, claims against that entity's agents in their official capacities are "wholly duplicative" and "redundant." *Johnson v. North Carolina*, 905 F. Supp. 2d 712, 721 (W.D.N.C. 2012).

27

Here, Plaintiff has sued UNC-CH under Title VI. Plaintiff's claims against remaining Defendants in their official capacities are therefore redundant.

In sum, Plaintiff has sufficiently alleged claims of discrimination and harassment in violation of Title VI (Count I) against Defendant UNC-CH. Plaintiff's motion for leave to file these claims will be granted. On the other hand, Plaintiff's proposed Title VI claims against individual Defendants in their official capacities are redundant. Consequently, Plaintiff's motion for leave to file these claims will be denied as futile.

### iii. Plaintiff has stated claims for Racial Discrimination under § 1983 (Counts II and III)

In Counts II and III of Plaintiff's proposed Amended Complaint, Plaintiff asserts claims for Racial Discrimination arising under § 1983 against Defendant UNC-CH and several individual Defendants in their individual and official capacities. (ECF No. 32-1 ¶¶ 173–84.) Plaintiff's § 1983 claims against several Defendants are barred by the statute of limitations. *See* Part III.A.i, *supra*. Only Plaintiff's § 1983 claims against Defendants UNC-CH, Elston, Errede, Dohlman, and Matson remain. *Id.*

Defendants argue that Plaintiff's § 1983 claims are futile. (ECF No. 33 at 18–20.) Specifically, they argue: (1) Plaintiff has failed to allege a prima facie case for Racial Discrimination under § 1983 and the Equal Protection Clause against Defendants Dohlman, Elston, or Errede; (2) Plaintiff has failed to state a claim against Defendant Matson under a theory of supervisory liability; (3) Plaintiff's claims are barred by qualified immunity; and (4) Plaintiff's claims are barred by the Eleventh Amendment.

28

1.  Plaintiff has alleged a prima facie case of Racial Discrimination under the Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment provides "nor shall any State . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. Section 1983 of the Civil Rights Act of 1871 allows suits for damages against any person who, under color of law, subjects another "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

Claims of Racial Discrimination, whether brought under Title VI or § 1983, are analyzed under a single proof scheme. *Middlebrooks v. Univ. of Md.*, 166 F.3d 1209, at *5 (4th Cir. 1999) (unpublished) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802–05); *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003) ("[D]iscrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI."). As above, to state a prima facie case of racial discrimination, a plaintiff must allege he: (1) is a member of a protected class, (2) qualified to continue in the educational program; (3) suffered an adverse action; and (4) was treated differently from similarly situated students who were not members of the protected class. *Elliott*, 879 F. Supp. 2d at 443; *see also Tikras Tech. Sols. Corp.*, 725 F. App'x at 230; *McDonnell Douglas Corp.*, 411 U.S. at 802.

As discussed in Part III.B.i, *supra*, Plaintiff has alleged sufficient facts to establish each of the four elements against Defendants Elston, Dohlman, and Errede. As an African American man, Plaintiff is a member of a protected class. He alleges that he met the typical requirements to publish his manuscript, defend his dissertation, and graduate on time. His allegations that Defendants delayed his graduation, removed him from a longstanding research

29

project, refused to publish his manuscript, and plagiarized his work constituted adverse actions. And as the *only* African American man in his department and the *only* student singled out for the alleged adverse treatment, he has alleged that he was treated differently than similarly situated students. Thus, Plaintiff has sufficiently stated claims for unlawful discrimination against Defendants Elston, Dohlman, and Errede under § 1983.

2.    Plaintiff has stated a claim of supervisory liability under § 1983

"[S]upervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). Such liability "is not premised upon *respondeat superior* but upon a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Id.* (internal quotation omitted). Supervisory liability is determined "by pinpointing the persons in the decisionmaking chain whose deliberate indifference permitted the constitutional abuses to continue unchecked." *Id.* Under § 1983, supervisory liability is established by alleging:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Id.* at 799 (quotations omitted).

Here, Plaintiff alleges that Professor Lentz informed Defendant Matson of ongoing racial harassment of Plaintiff and two other students of color. Defendant Matson responded by taking no action whatsoever against Defendants Elston, Errede, and Dohlman. Taking all

facts alleged in the light most favorable to Plaintiff, this failure to intervene constitutes deliberate indifference. Finally, as alleged, Defendant Matson's failure to intervene formally ended his last hope of publishing his manuscript. As a consequence, Plaintiff missed out on an opportunity afforded to non-African American students. Defendant Matson's alleged failure to intervene and tacit endorsement of unprofessional and discriminatory behavior toward Plaintiff also allowed for Defendants to plagiarize his work, since they were empowered by their supervisor to treat him poorly without recourse from their supervisor. Thus, Plaintiff has stated a claim of supervisor liability under § 1983 against Defendant Matson.[2]

3.      <u>Plaintiff's § 1983 claims are not barred by qualified immunity</u>

Defendant next argues that Plaintiff's § 1983 claims against Defendants Dohlman, Errede, Elston, and Matson are barred by qualified immunity. (ECF No. 33 at 18–20.)

"Qualified immunity protects officials who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 537–38 (4th Cir. 2017) (internal quotations omitted). To overcome qualified immunity, a plaintiff must allege (1) defendant infringed on his constitutional right, and (2) the violated right was "clearly established at the time of the official's conduct." *Id.* at 538. A right is "clearly established" only when it is "settled law,

---

[2] Plaintiff includes Defendant Guskiewicz among named Defendants in his proposed Amended Complaint but has not specifically alleged any claims against him. (*See generally* ECF No. 32-1 ¶¶ 8, 160–210.) To the extent Plaintiff claims that Defendant Guskiewicz is liable under § 1983 for the acts of his subordinates, the Court finds that Plaintiff has not alleged sufficient facts to support such a claim. Plaintiff has not alleged that Defendant Guskiewicz had any actual knowledge of discrimination or that he responded with deliberate indifference. Taking Plaintiff's alleged facts as true, Defendant Matson, not Defendant Guskiewicz, was "the person[ ] in the decisionmaking chain whose deliberate indifference permitted the constitutional abuses to continue unchecked." *See Shaw*, 13 F.3d at 798.

31

which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Feminist Majority*, 911 F.3d at 704 (quoting *District of Columbia v. Wesby*, 138 S.Ct. 577, 589–90 (2018)). A court need not have addressed the exact factual scenario to clearly establish a right, since "defendants 'can still be on notice that their conduct violates established law even in novel factual circumstances,' so long as the law provided 'fair warning' that their conduct was unconstitutional." *Booker*, 855 F.3d at 538 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Here, under the first element, the Court found above that Plaintiff sufficiently alleged that Defendants Elston, Errede, and Dohlman discriminated against and harassed him on the basis of his race, and Defendant Matson was deliberately indifferent to said discrimination. Under the second element, Plaintiff has not addressed Defendants' qualified immunity defenses. (*See generally* ECF Nos. 28, 34.) Nevertheless, the Court finds that Defendants were on notice that their alleged conduct violated clearly established law. The U.S. Supreme Court has long held that a public university cannot afford a graduate student "different treatment from other students solely because of his race." *McLaurin v. Okla. St. Regents for Higher Ed.*, 339 U.S. 637, 638 (1950); *see Billings v. Madison Metro. Sch. Dist.*, 259 F.3d 807, 816–17 (7th Cir. 2001) (finding this right clearly established by *McLaurin*). It was similarly well established before 2016 that public university faculty may be held personally liable for intentional racial discrimination against their students. *See, e.g., Middlebrooks*, 166 F.3d 1209, at *5; *see also Billings*, 259 F.3d at 812. Finally, this Circuit has applied the same *McDonnell Douglas* burden shifting test to assess allegations of intentional discrimination under § 1983 since at least 1985. *Gairola v. Com. of Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285–86 (4th Cir. 1985). Here, Plaintiff alleges

32

that Defendants changed his graduation criteria, ignored his manuscript, removed him from a research collaboration, and plagiarized his work all because of his race. Taking these allegations as true, Defendants Elston, Dohlman, and Errede could not have reasonably believed that their intentional discrimination against Plaintiff on the basis of race was lawful.

As for Defendant Matson, it was also "well settled" in this Circuit prior to 2016 that a supervisor may be held personally liable for responding to known unlawful harassment by a subordinate with deliberate indifference. *Jennings*, 482 F.3d at 701 (quoting *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001)); *Shaw*, 13 F.3d at 798 (calling supervisory liability under § 1983 "firmly entrenched"). In *Jennings*, the Fourth Circuit held that UNC-CH's Assistant Chancellor could be held liable under § 1983 if a jury found that she "had actual knowledge" of her subordinate's sexual harassment of plaintiff; that her response was "so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and that there exists an affirmative causal link between [her] inaction and [plaintiff's] constitutional injury." *Jennings*, 482 F.3d at 701–02. Here, Plaintiff alleges that Defendant Matson was expressly told that professors were engaged in racially discriminatory conduct but took no corrective action whatsoever. In light of clearly established law, Defendant Matson could not have reasonably believed that his alleged failure to respond to known racial discrimination was lawful.

Thus, Defendants Elston, Errede, Dohlman, and Matson are not entitled to qualified immunity.

4.    UNC-CH and all other Defendants in their official capacities are protected
      by Eleventh Amendment immunity

Defendant argues that Plaintiff's § 1983 claims against UNC-CH and other Defendants

in their official capacities are barred by Eleventh Amendment immunity.  (ECF No. 33 at 16–

18.)

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall

not be construed to extend to any suit in law or equity, commenced or prosecuted against one

of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign

State."  U.S. Const. amend. XI.  This immunity "extends beyond the literal text of the Eleventh

Amendment to prevent a state from being sued by one of its own citizens without its consent."

*Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 329 (4th Cir. 2001).  Simply put, "Eleventh

Amendment immunity protects the States, their agencies, and officials from suit in federal

court."  *Allen v. Cooper*, 895 F.3d 337, 347 (4th Cir. 2018) (emphasis omitted), *aff'd*, 140 S. Ct.

994, 206 L. Ed. 2d 291 (2020).  Ultimately, the "guarantee of the Eleventh Amendment is that

nonconsenting States may not be sued by private individuals in federal court."  *Bd. of Trs. of

Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001).

While 42 U.S.C. § 1983 does allow for suits for damages against state officials in their

individual capacities, it does not allow for suits for money damages against state agencies

considered "arms of the State" or state officials in their official capacities.  *Will v. Michigan

Dep't of State Police*, 491 U.S. 58, 70–71 (1989).  "Numerous courts have decided whether public

state universities are 'arms of the state.'  Almost universally, the answer has been in the

affirmative."  *Md. Stadium Auth. v. Ellerbe Becket, Inc.*, 407 F.3d 255, 262 (4th Cir. 2005); *see also

Huang v. Bd. of Govs. of Univ. of N.C.*, 902 F.2d 1134, 1138 (4th Cir. 1990) (finding that North

34

Carolina State University was an arm of the state and, therefore, entitled to Eleventh Amendment immunity).

Here, Plaintiff has alleged § 1983 claims against numerous Defendants in their official capacities. These claims are barred by Eleventh Amendment immunity. Eleventh Amendment immunity also bars Plaintiff's claims against UNC-CH, a public university that the Court finds is an arm of the state. *See McAdoo v. Univ. of N.C. at Chapel Hill*, 248 F. Supp. 3d 705, 719 (M.D.N.C. 2017) ("Considering the four factors articulated by the Fourth Circuit, UNC, and its constituent institutions, including UNC-Chapel Hill, are arms and alter egos of the State of North Carolina.").

In sum, Plaintiff has sufficiently stated claims under § 1983 against Defendants Elston, Errede, Dohlman, and Matson. Those claims are not barred by qualified immunity. Thus, Plaintiff's motion for leave to assert these claims in his proposed Amended Complaint will be granted. On the other hand, Plaintiff's § 1983 claims against Defendant UNC-CH and all other Defendants in their official capacities are barred by the Eleventh Amendment. Thus, Plaintiff's motion for leave to assert these claims will be denied as futile.

### iv. Plaintiff has sufficiently alleged retaliation in violation of Title VI (Count IV)

In Count IV, Plaintiff proposes to allege that UNC-CH retaliated against him in violation of Title VI. (ECF No. 32-1 ¶¶ 185–91.) Defendants argues that this proposal is futile because Plaintiff's Title VI retaliation claim against UNC-CH would not survive a motion to dismiss. (ECF No. 33 at 11–16.)

To state a claim for Title VI retaliation, a plaintiff must show "(1) that she engaged in protected activity;" (2) that defendant took an adverse action against her, and (3) "that there

was a causal link between the two events." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015); *see Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003). A person engages in a protected activity by reporting unlawful discrimination that she "reasonably believed had occurred or was occurring." *See Boyer-Liberto*, 786 F.3d at 282 (quoting *Peters*, 327 F.3d at 320). The reasonableness of a reporter's belief is measured with reference to "the severity of the harassment." *Id.* at 284. As above, an action is adverse if it "adversely affect[s] the terms, conditions, or benefits" of plaintiff's education. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007). The causal connection requires but-for causation. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

Here, Plaintiff alleges that he first reported the harassment to UNC-CH's Dean of Students in June 2017 to complain of "delays and harassment," and expressed a fear of retaliation. (ECF No. 32-1 ¶ 74.) At this time, Defendants had allegedly singled him out for an additional graduation requirement and threatened not to publish his manuscript. Plaintiff then continued to report harassment to the Dean of Students in June, July, and August, as Defendants' attitudes toward Plaintiff became more pronounced. It appears from his allegations that Plaintiff subjectively believed he was discriminated against based on his race. Further, making all inferences in Plaintiff's favor, this belief was objectively reasonable because Plaintiff was the *only* African American student and the *only* student singled out for mistreatment. Thus, his reports to the Dean of Students was protected activity. Later, Plaintiff explicitly complained about racial discrimination to the university's Special Assistant to the Vice-Chancellor for Research-Diversity and Inclusion in August 2017; that same

36

discrimination was reported to Defendant Matson in December 2017; and Plaintiff included complaints of discrimination in his cease-and-desist notice in March 2019.

Under the second element, Plaintiff suffered a number of adverse actions after July 2017. In September 2017, he was removed from a longstanding research project. He was then effectively barred from publishing his manuscript. Finally, Defendants allegedly plagiarized his research. As discussed above, viewing the facts alleged in the light most favorable to Plaintiff, these actions were "adverse."

Third, the Court finds that Plaintiff has alleged but-for causation. In July 2017, after speaking with Plaintiff, the Dean of Students instructed Defendants Elston and Dohlman to "cease all harassment of Plaintiff." (*Id.* ¶ 83.) Those Defendants seemed to escalate their behavior in response to that command. For example, Defendants silently protested Plaintiff's dissertation defense and seemingly ended all communication with Plaintiff from then on. A few weeks later, the Dean of Students intervened to obtain Defendant Elston's signature for Plaintiff's dissertation form. This elicited Defendant Marlow to yell at Plaintiff. Again, Defendant Elston and Errede's behavior changed soon after this intervention. Defendant Errede encouraged Plaintiff to give a portion of his research to another student and Defendant Elston removed Plaintiff from a longstanding collaboration. Finally, Defendants Elston, Errede, and Dohlman allegedly plagiarized Plaintiff's research. Defendant argues that this action was too far removed from Plaintiff's protected activity to have been "caused" by them. Taking all inferences in Plaintiff's favor, however, it appears as though Defendants refused to work with Plaintiff to edit his manuscript because he had complained about them to the Dean of Students. If Defendants had not retaliated against him in this way and had instead helped

37

him publish his work, then Defendants likely would not have worked with Defendant Suzuki-McGirr to publish the same research in her name.  Thus, but-for Plaintiff's protected activity, Defendants would not have taken his research and given it to another student.

Plaintiff has alleged facts supporting all three elements of his retaliation claim. Accordingly, Plaintiff's motion for leave to file this claim against Defendant UNC-CH in his Amended Complaint will be granted.

## B.    STATE CLAIMS (COUNTS V, VI, & VII)

### i.    Plaintiff's state law claims are not barred by the statute of limitations

Plaintiff proposes to allege violations of state law against Defendants Elston, Dohlman, Errede, Valdar, and Suzuki-McGirr.  (*Id.* ¶¶ 192–210.)  Defendants argue that Plaintiff's state law claims would be barred by the relevant statute of limitations; therefore, his proposal to reassert those claims should be denied as futile.  (ECF No. 33 at 3–5.)  Plaintiff counters that his state law claims fall within North Carolina's continuing violations exception to the statute of limitations.  (ECF No. 34 at 3–4.)

#### 1.    Plaintiff alleges continuing IIED and NIED violations

Tort claims in North Carolina must be brought within three years of when the injury "becomes apparent or ought reasonably to have become apparent to the claimant."  N.C. Gen. Stat. § 1-52(16).  Thus, an IIED or NIED claim accrues when a plaintiff becomes aware, or reasonably should have become aware, of the severe emotional distress.  *Russell v. Adams*, 482 S.E.2d 30, 33 (N.C. Ct. App. 1997) (citing *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 329 S.E.2d 350, 354 (N.C. 1985)).  It is the suffering of emotional distress, not a subsequent medical diagnosis, that "is the triggering event for statute of limitations purposes."  *Spencer v. Town of*

38

*Chapel Hill*, 290 F. Supp. 2d 655, 661 (M.D.N.C. 2003) (citing *Soderlund v. Kuch*, 546 S.E.2d 632, 637 (N.C. Ct. App. 2001)).

Like federal courts, however, North Carolina courts recognize a "continuing wrong" or "continuing violation" doctrine. *Williams v. Blue Cross Blue Shield of N.C.*, 581 S.E.2d 415, 423 (N.C. 2003). "When this doctrine applies, a statute of limitations does not begin to run until the violative act ceases." *Id.* North Carolina courts determine whether a continuing violation existed by applying the same test applied by federal courts—whether "the purported violation is the result of continual unlawful acts . . . [or] is instead merely the continual ill effects from an original violation." *Id.* (internal quotations omitted) (citing *Nat'l Adver. Co.*, 947 F.2d at 1167).

Here, in his proposed Amended Complaint, Plaintiff focuses his IIED and NIED claims on Defendants Elston's, Errede's, Dohlman's, and Suzuki-McGirr's alleged plagiarism of his research. (ECF No. 32-1 ¶¶ 198, 200, 205, 209.) This alleged plagiarism occurred within three years of when Plaintiff initiated this suit. Although it appears Plaintiff began suffering some emotional distress prior to this alleged act, taking all inferences in the light most favorable to Plaintiff, it appears that the alleged plagiarism independently caused him to suffer severe emotional distress. Further, as discussed above, Plaintiff has alleged that the plagiarism was the final act in a single continuous violation that constituted IIED or NIED. Thus, Plaintiff's IIED and NIED claims against Defendants Elston, Errede, Dohlman, and Suzuki-McGirr are not barred by the statute of limitations.

On the other hand, Plaintiff alleges that Defendant Valdar caused him severe emotional distress by inserting himself into—and threatening to cancel—Plaintiff's dissertation defense

39

in 2017. This act occurred more than three years prior to when Plaintiff brought suit, and Plaintiff has not alleged that Defendant Valdar was involved in any of the allegedly tortious conduct that occurred thereafter. Thus, Plaintiff's IIED and NIED claims against Defendant Valdar are barred by the statute of limitations.

Plaintiff's motion for leave to include his IIED and NIED claims against Defendant Valdar in his proposed Amended Complaint will be denied as futile. On the other hand, Plaintiff's proposed IIED and NIED claims against Defendants Elston, Errede, Dohlman, and Suzuki-McGirr are not barred by the statute of limitations.

      2.    <u>Plaintiff's Civil Conspiracy claims are not barred by the statute of limitations</u>

Claims for civil conspiracy must also be brought within three years. *Carlisle v. Keith*, 614 S.E.2d 542, 549 (N.C. Ct. App. 2005). "[T]here is not a separate cause of action for civil conspiracy"—it must be based on some underlying civil violation. *Strickland v. Hedrick*, 669 S.E.2d 61, 73 (N.C. Ct. App. 2008). Therefore, a claim for civil conspiracy is timely only if the underlying claim is timely. *Id.*

Here, Plaintiff predicates his civil conspiracy claim on the actions of Defendants Elston, Errede, and Dohlman "to create obstacles to prevent Plaintiff from publishing his research, findings, and manuscript, receiving first author credit, graduating on time, and completing his post-doctoral fellowship." (ECF No. 32-1 ¶ 193.) Plaintiff has alleged these actions were unlawful because they were discriminatory in violation of the Equal Protection Clause and constituted either intentional or negligent infliction of emotional distress. The Court has found, *supra*, that Plaintiff's discrimination claims (Counts II & III) and emotional distress claims (Counts VI & VII) against Defendants Elston, Dohlman, and Errede are not

barred by the statute of limitations. Thus, Plaintiff's civil conspiracy claims are also not barred by the statute of limitations.

### ii. Plaintiff has not stated a claim for Intentional Infliction of Emotional Distress ("IIED") (Count VI)

In Count VI, Plaintiff asserts IIED claims against Defendants Elston, Errede, Dohlman, Valdar, and Suzuki-McGirr. (*Id.* ¶¶ 196–203.) Plaintiff's IIED claim against Defendant Valdar is barred by the statute of limitations. Part III.B.i, *supra*. Defendants argue that Plaintiff has failed to state IIED claims against the remaining Defendants and, therefore, his request to assert these claims in his proposed Amended Complaint should be denied as futile. (ECF No. 33 at 20–21.)

North Carolina defines the tort of intentional infliction of emotional distress ("IIED") as "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Dickens v. Puryear*, 276 S.E.2d 325, 332 (N.C. 1981). To state a claim, a plaintiff must allege facts sufficient to show three elements: (1) "extreme and outrageous conduct," (2) "which is intended to cause" and does cause or is done with "reckless indifference to the likelihood that [it] will cause" and does cause (3) "severe emotional distress to another." *Id.* at 335.

Conduct is extreme and outrageous if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Smith–Price v. Charter Behavioral Health Sys.*, 595 S.E.2d 778, 782 (N.C. Ct. App. 2004). "Such conduct differs from behavior universally regarded as inappropriate and abhorrent." *Griffin v. Mortier*, 1:18CV98, 2019 WL 8641158, at *4 (W.D.N.C. Apr. 16, 2019) (internal quotations omitted), *aff'd*, 837 F. App'x 166 (4th Cir.

41

2020).  "Extreme and outrageous" is a high bar.  "[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are not enough.  *Johnson v. Bollinger*, 356 S.E.2d 378, 382 (N.C. Ct. App. 1987).  It is for the court to decide in the first instance as a matter of law "whether the conduct complained of may reasonably be found to be sufficiently outrageous as to permit recovery"; the jury must then determine "whether the conduct complained of is, in fact, sufficiently extreme and outrageous to result in liability."  *Hogan v. Forsyth Country Club Co.*, 340 S.E.2d 116, 121 (N.C. Ct. App. 1986).

Discriminatory behavior does not typically constitute extreme and outrageous conduct under North Carolina law unless it "has been extremely egregious."  *Bratcher v. Pharm. Prod. Dev., Inc.*, 545 F. Supp. 2d 533, 545 (E.D.N.C. 2008).  A supervisor's conduct was not extreme and outrageous, for example, where she screamed at employees, called them names, cursed at them, disrupted their work, threw menus at them, refused to grant pregnancy leave, and terminated an employee who left work due to labor pains.  *Hogan*, 340 S.E.2d at 122–23.  An employer's conduct was also not extreme and outrageous when she (1) failed to promote plaintiff while promoting or hiring less qualified younger persons, (2) refused plaintiff's requests for additional training, (3) failed to place her on mentoring status, (4) retaliated against her for complaining about alleged race discrimination, and (5) terminated her employment due to her age, race, and sex.  *Bratcher*, 545 F. Supp. 2d at 545.  Fraud, likewise, generally does not rise to the level of extreme and outrageous conduct.  *See, e.g.*, *Stephens v. Bank of Am. Home Loans, Inc.*, No. 5:16-CV-660-F, 2017 WL 384315, at *8 (E.D.N.C. Jan. 25, 2017) (finding that allegations of fraudulent securitization of a mortgage loan and assignment of deeds of trust did not constitute extreme and outrageous conduct); *Steele v. Cap. One Home Loans, LLC*, Nos.

3:13-CV-704-RJC-DSC, 3:13-CV-705-RJC-DSC, 2014 WL 3748928, at *4 (W.D.N.C. July 30, 2014), *aff'd*, 594 F. App'x 215 (4th Cir. 2015) (finding allegations of fraudulent transfer of a loan note did not sufficiently state an IIED claim).

Here, Plaintiff alleges that Defendants Elston, Errede, Dohlman, and Suzuki-McGirr "engaged in extreme and outrageous conduct when they utilized and published Plaintiff's research and written manuscript . . . without due credit to Plaintiff." (ECF No. 32-1 ¶¶ 198, 200.) Defendants' alleged plagiarism must be viewed in the context of an alleged years-long, discriminatory campaign against Plaintiff described at length above. Nevertheless, this plagiarism does not constitute extreme and outrageous conduct as defined by North Carolina law. Defendants' alleged conduct, though serious, does not exceed in severity the conduct in *Hogan*, wherein verbal abuse of a pregnant employee during labor pains was not considered to rise to the level of "extreme and outrageous." Thus, Plaintiff has not sufficiently alleged facts to establish the first element of IIED.

Because Plaintiff has failed to allege sufficient facts to state IIED claims against any Defendant, motion for leave to reassert these claims will be denied as futile.

### iii.    Plaintiff has stated a claim for Negligent Infliction of Emotional Distress ("NIED") (Count VII)

In Count VII, Plaintiff asserts NIED claims against Defendants Elston, Errede, Dohlman, Valdar, and Suzuki-McGirr. (*Id.* ¶¶ 204–210.) Plaintiff's NIED claim against Defendant Valdar is barred by the statute of limitations. Part III.B.i, *supra*. Defendants argue that Plaintiff has not alleged sufficient facts to support his remaining NIED claims and, therefore, his request to assert these claims should be denied as futile. (ECF No. 33 at 20–21.)

To state a claim for negligent infliction of emotional distress ("NIED"), a plaintiff must allege that "(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress . . . , and (3) the conduct did in fact cause the plaintiff severe emotional distress." *Johnson v. Ruark Obstetrics & Gynecology Assoc., P.A.*, 395 S.E.2d 85, 97 (N.C. 1990).

The first element is satisfied upon a showing of "ordinary negligence." *Id.* Ordinary negligence is "the breach of a legal duty owed by defendant that proximately causes injury to plaintiff." *Guthrie v. Conroy*, 567 S.E.2d 403, 410 (N.C. Ct. App. 2002). North Carolina courts do not recognize a teacher-student or professor-student special relationship; instead, educators must "exercise [ ] ordinary prudence given the particular circumstances of the situation." *Doe v. United States*, 381 F. Supp. 3d 573, 604 (M.D.N.C. 2019) (emphasis omitted) (quoting *Payne v. N.C. Dep't of Human Res.*, 382 S.E.2d 449, 452 (N.C. Ct. App. 1989); *see also Pinnix v. Toomey*, 87 S.E.2d 893, 898 (N.C. 1955) ("[E]very person is under the general duty to so act, or to use that which he controls, as not to injure another.").

Under the second element, severe emotional distress is foreseeable if it is a "natural and probable consequence[ ]" of defendant's actions. *See Wood v. Carolina Tel. & Tel. Co.*, 46 S.E.2d 717, 719 (N.C. 1948). "[F]actors to be considered on the question of foreseeability . . . include the plaintiff's proximity to the negligent act, the relationship between the plaintiff and the other person for whose welfare the plaintiff is concerned, and whether the plaintiff personally observed the negligent act." *Newman v. Stepp*, 852 S.E.2d 104, 109 (N.C. 2020) (quoting *Johnson*, 395 S.E.2d at 98), *reh'g denied*, 852 S.E.2d 629 (2021).

44

The third element, "severe emotional distress," is met by a showing of "any . . . severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." *Waddle v. Sparks*, 414 S.E.2d 22, 27 (N.C. 1992) (emphasis omitted) (quoting *Johnson*, 395 S.E.2d at 97). Severe anxiety may rise to the level of "severe emotional distress," especially where it is later diagnosed as a symptom of PTSD. *See, e.g.*, *Spencer v. Town of Chapel Hill*, 290 F. Supp. 2d 655, 661 (M.D.N.C. 2003).

Here, although Plaintiff has not shown that any Defendant had a special relationship with him, Defendants Elston, Errede, Dohlman, and Suzuki-McGirr each owed him a general duty not to injure him by stealing his research. Defendants allegedly breached this duty by intentionally using his research without his consent. A reasonable professor or graduate student would not have plagiarized Plaintiff's work. Thus, Plaintiff has alleged ordinary negligence under the first element.

Under the second element, Plaintiff had worked diligently to perfect and publish his manuscript for over two years. He routinely asked Defendants for feedback, pestered them to submit his manuscript for publication, and was exasperated when Defendants stalled or refused. As the only African American student in his department, he also expressed frustration at perceived racial discrimination. He then made Defendants even more aware of his emotional attachment to his manuscript by asking UNC-CH to prevent publication of the allegedly plagiarized work. Thus, it was imminently foreseeable that Defendant would have a severe emotional reaction when Defendants Elston and Dohlman—his advisors—and Errede—one of his research supervisors—stole his research and published his work under Defendant Suzuki McGirr's name. Further, no one was in a better position to know how

45

emotionally troubling it would be to learn that someone had stolen one's research than Defendant Suzuki-McGirr, another graduate student. Thus, Plaintiff's severe emotional distress was foreseeable by all four Defendants.

Finally, Plaintiff alleges that he suffered from anxiety as a result of Defendants' plagiarism and was later diagnosed with PTSD. Plaintiff's emotional distress was therefore sufficiently severe to state an NIED claim. As mentioned above, it appears that Plaintiff began feeling severe emotional distress prior to the plagiarism but became "increasingly anxious as a result of the continual" discrimination and harassment "and the use of his research without permission by other students." (ECF No. 32-1 ¶ 137.) Taking the facts alleged and all reasonable inferences in the light most favorable to Plaintiff, it appears that Defendants' plagiarism of Plaintiff's work independently caused Plaintiff severe emotional distress. Plaintiff will bear the burden at trial to show that Defendants' plagiarism was the legal and factual cause of his severe emotional distress. At this stage, however, his allegations are sufficient to survive a motion to dismiss.

Plaintiff has alleged sufficient facts to establish all three elements of his NIED claims against Defendants Elston, Errede, Dohlman, and Suzuki-McGirr. Therefore, Plaintiff's motion for leave to include these claims in his proposed Amended Complaint will be granted.

### iv. Plaintiff has stated claims for Civil Conspiracy (Count V)

In Count V, Plaintiff asserts civil conspiracy claims against Defendants Elston, Errede, and Dohlman. (*Id.* ¶¶ 192–95.) Defendants argue that Plaintiff has failed to allege facts sufficient to sustain his claims of civil conspiracy and, therefore, Plaintiff's motion to include

these claims in his proposed Amended Complaint should be denied as futile. (ECF No. 33 at 21–23.)

A plaintiff states a prima facie claim of civil conspiracy in North Carolina by alleging: "(1) a conspiracy, (2) wrongful acts done by certain of the alleged conspirators in furtherance of that conspiracy, and (3) injury as a result of that conspiracy." *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 666 S.E.2d 107, 115 (N.C. 2008). A "conspiracy" is defined as "an agreement between two or more individuals to do an unlawful act or to do a lawful act in an unlawful way." *Muse v. Morrison*, 66 S.E.2d 783, 784 (N.C. 1951). Existence of an agreement "may be established by circumstantial evidence," although "the evidence of the agreement must be sufficient to create more than a suspicion or conjecture." *Dove v. Harvey*, 608 S.E.2d 798, 801 (N.C. Ct. App. 2005) (quoting *Henderson v. LeBauer*, 399 S.E.2d 142, 145 (N.C. Ct. App. 1991)).

Here, under the first element, Plaintiff alleges a number of facts that give rise to the inference that Defendants Elston, Errede, and Dohlman agreed to wrongfully obstruct Plaintiff's ability to publish his research. The three Defendants were repeatedly asked to provide Plaintiff with feedback on his manuscript but allegedly failed to provide feedback that was meaningful or timely. Defendants Errede and Dohlman in particular allegedly gave Plaintiff the silent treatment—they refused to respond to his emails, show up for his meetings, or engage in his dissertation defense. Thereafter, all three agreed to co-author and publish Defendant Suzuki-McGirr's work despite allegedly knowing that the work was substantially the same as Plaintiff's. Thus, Plaintiff has alleged that a conspiracy existed under the first element.

47

Under the second element, Plaintiff alleges that Defendants' actions were wrongful in that they were racially discriminatory in violation of the Equal Protection Clause and constituted negligent infliction of emotional distress. Thus, Plaintiff has sufficiently pleaded the second element.

Under the third element, Plaintiff alleges that Defendants' conspiracy prevented him from publishing his manuscript, which would have had both tangible and intangible benefits to Plaintiff. Further, Plaintiff alleges that the conspiracy led to publication of the plagiarized work, which caused him severe emotional distress. Thus, Plaintiff has alleged facts to support the third element.

Plaintiff has sufficiently stated claims for civil conspiracy against Defendants Elston, Errede, and Dohlman. Accordingly, Plaintiff's motion for leave to file this claim in his amended complaint will be granted.

## CONCLUSION

Review of the allegations in Plaintiff's proposed Amended Complaint, taken in the light most favorable to Plaintiff and resolving all reasonable inferences in his favor, leads the Court to conclude that Plaintiff has made sufficient allegations to plausibly allege that he was singled out for adverse treatment by UNC-CH and several individuals associated with the University based on his race as the only African American student in his department. Specifically, he sufficiently alleges that three faculty members—Defendants Dohlman, Elston, and Errede—conspired to treat him differently from his non-African American colleagues by saddling him with an extra graduation requirement, refusing to submit his research for publication, removing him from a longstanding research project, and plagiarizing his work. Plaintiff has

48

also sufficiently alleged that Defendant Matson, Dean of the Graduate School, knew about ongoing discrimination but failed to take any remedial action. When Plaintiff reported the discrimination, UNC-CH allegedly retaliated. Finally, when Defendants Dohlman, Elston, Errede, and Suzuki-McGirr—another doctoral student—plagiarized Plaintiff's research, they negligently caused him severe emotional distress.

Plaintiff's motion for leave to file his proposed Amended Complaint will be granted in part and denied in part. Plaintiff's motion will be granted as to his claims for Racial Discrimination and Harassment under Title VI against Defendant UNC-CH (Count I); for Racial Discrimination in violation of the Equal Protection Clause pursuant to § 1983 against Defendants Elston, Errede, Dohlman, and Matson (Counts II & III); for Retaliation in violation of Title VI against UNC-CH (Count IV); for Civil Conspiracy against Defendants Elston, Errede, and Dohlman (Count V); and for NIED against Defendants Elston, Errede, Dohlman, and Suzuki-McGirr (Count VII). However, the allegations in Plaintiff's proposed Amended Complaint were insufficient to plausibly allege his remaining claims. Accordingly, his motion will be denied as futile as to all other claims.

For the reasons stated herein, the Court enters the following:

## ORDER

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Leave to File an Amended Complaint, (ECF No. 32), is **GRANTED** in part and **DENIED** in part. Plaintiff's motion is **GRANTED** as to claims alleged in the proposed Amended Complaint, (ECF No. 32-1), as follows: Racial Discrimination and Harassment under Title VI against Defendant UNC-CH (Count I); Racial Discrimination in violation of the Equal Protection Clause

pursuant to 42 U.S.C. § 1983 against Defendants Elston, Errede, Dohlman, and Matson (Counts II & III); for Retaliation under Title VI against UNC-CH (Count IV); for Civil Conspiracy against Defendants Elston, Errede, and Dohlman (Count V); and for Negligent Infliction of Emotional Distress ("NIED") against Defendants Elston, Errede, Dohlman, and Suzuki-McGirr (Count VII).

Plaintiff's motion is **DENIED** as to all other claims in Plaintiff's proposed Amended Complaint.

This, the 30th day of September 2021.

/s/ Loretta C. Biggs
United States District Judge