IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO: 1:20-CV-1050

| | |
|---|---|
| PATRICK C. MCCARTER, )<br>　　　　　　　　Plaintiff, )<br> )<br>v. )<br> )<br>THE UNIVERSITY OF NORTH )<br>CAROLINA AT CHAPEL HILL, )<br>TIMOTHY C. ELSTON, BEVERLY )<br>ERREDE, HENRIK G. DOHLMAN, )<br>STEVEN W. MATSON and, SARA )<br>KIMIKO SUZUKI-MCGIRR, )<br>　　　　　　　　Defendants. ) | FIRST AMENDED COMPLAINT |

　　　　NOW COMES Plaintiff, Patrick C. McCarter, and for his First Amended Complaint against the University of North Carolina at Chapel Hill, Timothy C. Elston, Beverly Errede Henrik G. Dohlman, Steven W. Matson and Sara Kimiko Suzuki-McGirr and alleges and says as follows:

<u>JURISDICTION AND VENUE</u>

1.  This action is brought to remedy discrimination against Plaintiff on the basis of race, the subsequent retaliation he experienced, and the emotional distress Plaintiff experienced due to Defendants' actions.

2.  Plaintiff's Complaint is brought under Title VI of the Civil Rights Act of 1964 (hereinafter "Title VI") as set forth in 42 U.S.C. §2000d, *et. seq.*, and a Deprivation of Civil Rights provided for in 42 U.S.C. §1983

3.  This Court has jurisdiction pursuant to 28 U.S.C. §1331 (federal question), 28 U.S.C. §1343 (civil rights and elective franchise) 42 U.S.C. §2000d (Title VI), and 42 U.S.C. § 1983 (civil action for deprivation of rights).

1

4.  This Court should assume supplemental jurisdiction to Plaintiff's state law claims negligent infliction of emotional distress and civil conspiracy pursuant to 28 U.S.C. 1367 (supplemental jurisdiction).

5.  Venue is proper pursuant to 28 U.S.C. 1391 (b)(c) and (d) as a substantial part of the events, if not all of the events, giving rise to this complaint occurred in Chapel Hill, North Carolina, and upon information and belief, all parties resided in North Carolina at the times that the acts and incidents giving rise to this complaint occurred.

<u>PARTIES</u>

6.  Patrick C. McCarter, PhD (hereinafter "Plaintiff"), an African American male, is a citizen and resident of Mebane, Alamance County, North Carolina. Plaintiff is a former doctoral student in the University of North Carolina at Chapel Hill's Curriculum in Bioinformatics and Computational Biology program, and a certificate member of the Molecular and Cellular Biophysics Program. Plaintiff is a citizen and resident of North Carolina.

7.  Defendant University of North Carolina at Chapel Hill (hereinafter "UNC") is one of the campuses or universities of the University of North Carolina System (hereinafter "UNCS") and is located in Orange County, North Carolina.

8.  Pursuant to N.C. Gen. Stat. § 116-3, The University of North Carolina is a public multicampus university established and operated by the State of North Carolina and is a body politic and corporate, capable in law to be sued in all courts, and Defendant UNC is one of the constituent institutions of the UNCS, capable in law to be sued in all courts whatsoever, with its principal office in Orange County, North Carolina.

9.  Timothy C. Elston, PhD (hereinafter "Defendant Elston"), a white male, is a Professor of Pharmacology, Associate Director of the Curriculum in Bioinformatics and Computational

Biology, and Co-Director of Computational Medicine at UNC and is being sued in his official and individual capacity. Upon information and belief, Defendant Elston is a citizen and resident of North Carolina.

10. Beverly J. Errede, PhD (hereinafter "Defendant Errede"), a white female, is a Professor of Biophysics and Biochemistry at UNC and is being sued in her official and individual capacity. Upon information and belief, Defendant Errede is a citizen and resident of North Carolina.

11. Henrik G. Dohlman, PhD (hereinafter "Defendant Dohlman"), a white male, is a Professor of Biochemistry and Biophysics, and Sanford Steelman Distinguished Professor and Chair of the Department of Pharmacology at UNC and is being sued in his official and individual capacity. Upon information and belief, Defendant Dohlman is a citizen and resident of North Carolina.

12. Steven Matson, PhD (hereinafter "Defendant Matson"), a white male, is the Dean of the Graduate School at UNC. Defendant Matson is being sued in his official and individual capacities. Upon information and belief, Defendant Matson is a citizen and resident of North Carolina.

13. Sara Kimiko Suzuki-McGirr, PhD (hereinafter "Defendant Suzuki-McGirr") is a former doctoral student at UNC and is being sued in her individual capacity. Upon information and belief, Defendant Suzuki-McGirr is a citizen and resident of North Carolina.

<u>FACTUAL ALLEGATIONS</u>

<u>*Background Information (2011 – 2015)*</u>

14. In August 2011, Plaintiff, an African American male, enrolled at UNC as a PhD student in the Curriculum in Bioinformatics and Computational Biology program (hereinafter "the Program").

3

15. Initially, Defendants Elston, Dohlman, Errede were Plaintiff's advisors and served on his dissertation committee. Defendants Elston, Dohlman, and Errede, as advisors to Plaintiff, were responsible for providing feedback and edits of Plaintiff's manuscripts while he was enrolled in the Program.

16. At all times relevant to this action, Defendant Elston was the Director of the Program. Upon information and belief, he is currently the Associate Director of the Program.

17. At all times relevant to this action, Defendant Dohlman was a Professor of Biochemistry & Biophysics and Pharmacology at UNC. At all times relevant to this action, Defendant Dohlman was also the Chair of the Pharmacology Department.

18. At all times relevant to this action, Defendant Errede was a Professor of Biophysics and Biochemistry at UNC.

19. Plaintiff began conducting research in Defendant Dohlman's and Defendant Elston's research labs in 2012.

20. Defendants Elston and Dohlman were Plaintiff's primary advisors, while Defendant Errede was his secondary advisor. Plaintiff worked in all three labs during his tenure in the Program.

21. Plaintiff was the only African American PhD student in these research labs.

22. On or about July 10, 2015, Plaintiff obtained a research grant from the National Institute of Health (hereinafter "NIH"), identified as grant number F1GM115224, to fund his research. Plaintiff was the Principal Investigator for the grant. Defendants Elston and Dohlman were the sponsors for Plaintiff's grant. Defendant Errede provided a letter of reference to NIH on Plaintiff's behalf.

23. On or about July 8, 2015, Plaintiff and Michal Nagiec, (hereinafter "Nagiec"), published a co-first author research manuscript with senior authors Defendants Dohlman and Elston entitled

"Signal Inhibition by a Dynamically Regulated Pool of Monophosphorylated MAPK" to Molecular Biology of the Cell (MBOC).

    a. Nagiec, a similarly situated, non-African American and non-Black appearing male was a postdoctoral researcher at Harvard Medical School.

    b. Nagiec was previously a PhD student in Defendant Dohlman's research laboratory who earned his PhD from The Pharmacology Department at UNC in 2011.

24. The equipment Plaintiff used to conduct the research contained in the manuscript Plaintiff drafted belonged jointly to Defendants Elston, Errede and Dohlman. Additionally, Defendant Errede was heavily involved in Plaintiff's research as evidenced by Defendant's Errede's recognition in the author list of Plaintiff's original research manuscript.

*2016*

25. On or about October 1, 2016, Defendant Dohlman became the Chair of the Pharmacology Department.

26. On or about October 4, 2016, Plaintiff conducted his annual committee meeting with his dissertation committee, which included Defendants Elston, Dohlman, and Errede.

27. Plaintiff presented a summary of his research in progress to his dissertation committee in a power point presentation. At the conclusion of his presentation, Plaintiff was sent out into the hall for more than 15 minutes.

28. Plaintiff was summoned back into the room. Defendants Dohlman and another advisor exited the meeting despite it not being completed which was unusual and unexpected. The remaining committee members, including committee chair Shawn Gomez, Defendant Elston, and Defendant Errede, acknowledged that Plaintiff met the requirements to write/defend his

5

dissertation and graduate from the program.[1] However, they informed Plaintiff, he was now going to be required to submit an additional first-author manuscript before he would be granted permission to schedule his dissertation defense and graduation date. Upon information and belief, none of the other students in the Program were required to submit an additional manuscript.

29. Plaintiff witnessed several other similarly situated non-African American and non-Black appearing classmates in Defendants Dohlman and Elston's labs proceed with defending their dissertations, and graduate on time.

30. In at least one case, a similarly situated student was permitted to defend his dissertation and graduate on time and prior to submitting the *first* required manuscript.

31. The similarly situated students included, *inter alia*, Michael Pablo (hereinafter "Pablo"), Alberto Giaretta (hereinafter "Giaretta")[2], James Shellhammer (hereinafter "Shellhammer"), Vinal Lakhani (hereinafter "Lakhani") and Sai Phanindra Venkatapurapu (hereinafter "Venkatapurapu").

32. The similarly situated postdoctoral researchers included, *inter alia*, Samuel Ramirez (hereinafter "Ramirez"), Richard Allen (hereinafter "Allen"), Nambirajan Rangarajan (hereinafter "Rangarajan"), Claire L. Gordy (hereinafter "Gordy"), and Callie Miller (hereinafter "Miller").

33. Moreover, it was customary for Defendants Elston, Errede and Dohlman to permit students to publish their research *after* completing their studies at UNC, including, upon information and

---

[1] Specifically, Plaintiff had passed all required courses, passed all required candidacy exams, and had one co-first authored peer-reviewed and published scientific manuscript entitled "*Signal Inhibition by a dynamically regulated pool of monophosphorylated MAPK*." Nagiec, McCarter et al. Molecular Biology of the Cell.
[2] Alberto Giaretta was an exchange student from an Italian university and did not receive his degree from UNC

6

belief, Allen, Giaretta, Gordy, Lakhani, Miller, Nagiec, Pablo, Shellhammer, Venkatapurapu and Matthew Peña.[3]

34. The substantial and unexpected graduate requirement imposed on Plaintiff by Defendants Elston, Errede and Dohlman led to Plaintiff not being allowed to defend his dissertation or graduate in the Fall 2016 semester as planned.

35. On or about October 6, 2016, Plaintiff emailed a section the newly required manuscript to Defendant Dohlman for editing and feedback. Defendant Dohlman did not respond to Plaintiff.

36. On or about October 17, 2016, Plaintiff emailed a section the newly required manuscript to Defendant Elston for editing and feedback. Defendant Elston did not respond.

37. On or about October 19, 2016, Plaintiff emailed a section of this newly required manuscript to Defendant Errede for editing and feedback. Defendant Errede responded with feedback on or about October 20, 2016.

38. On October 26, 2016, Plaintiff sent a follow up email to Defendant Elston seeking feedback on his manuscript and received no response. He subsequently sent follow up emails to both Defendants Elston and Dohlman again with an updated version of his manuscript draft and requested that they provide feedback.

39. On November 2, 2016, after not receiving any feedback from Defendants Elston or Dohlman on the newly required manuscript Plaintiff drafted, Plaintiff sent a subsequent e-mail to them both. Plaintiff advised that his co-authors, Lior Vered (hereinafter "Vered") and Matthew Martz, PhD, (hereinafter "Martz"), both similarly situated non-African American and non-Black appearing students, had provided feedback on Plaintiff's manuscript draft. Defendants

---

[3] Peña left the lab in 2014. In February 2021, he published a co-first author manuscript with Amy E. Pomeroy. Originally, the manuscript that Peña published was assigned to Plaintiff as confirmed by Elston and Errede confirmed via email in the fall of 2016.

Case 1:20-cv-01050-LCB-JLW   Document 36   Filed 11/01/21   Page 7 of 37

Elston and Dohlman told Plaintiff they were "very busy with fellowships, manuscripts, and other responsibilities" and thus could not provide Plaintiff with feedback despite providing feedback to similarly situated students. Plaintiff requested that Defendant Elston and Dohlman provide him with feedback or recommend another scientist who could.

40. Defendant Dohlman acknowledged receipt of Plaintiff's e-mail and confirmed that the other students received feedback, and that he was busy. Neither Defendant Dohlman, nor Defendant Elston, offered any edits or feedback to Plaintiff.

41. On November 19, 2016, thirty-seven (37) days after the original request was made, Defendant Dohlman responded with feedback on the draft manuscript.

42. On November 23, 2016, forty-four (44) days after the original request was made, Defendant Elston responded with feedback.

43. The delayed responses by Defendants Elston and Dohlman regarding Plaintiff only were clear attempts to continue to delay Plaintiff's dissertation defense, graduation date and ability to begin post-PhD employment.

44. On or about December 13, 2016, Defendants Elston and Dohlman demanded that Plaintiff split his manuscript into two separate manuscripts and assign colleague Martz as the first author on one of them. This was a further attempt to discriminate against, harass and delay Plaintiff's graduation.

45. Both Plaintiff and his colleague, Martz, objected to this demand from Defendants Elston and Dohlman.

46. On or about December 14, 2016, Plaintiff met with Defendant Dohlman to discuss the research manuscript. Defendant Dohlman was actively engaged in providing feedback and editing for

Shellhammer and other non-minority students; nonetheless, Defendant Dohlman informed Plaintiff that he "did not like to help graduate students write manuscripts."

47. These sentiments expressed by Defendant Dohlman made Plaintiff feel as if he could no longer seek feedback from him, despite the fact that Defendant Dohlman was one of his advisors and was required to advise and provide constructive feedback for Plaintiff.

*2017*

48. On or about February 19, 2017, Defendant Dohlman changed his position and advised Plaintiff that he wanted to contribute to the writing and editing of his manuscript.

49. On or about February 22, 2017, Plaintiff presents a scientific talk titled "Toward a Comprehensive Model of a Yeast Stress Pathway", at the 2017 Winter Q-Bio Quantitative Biology on the Hawaiian Islands conference in Kauai, Hawaii.

50. Shellhammer, a similarly situated Caucasian male student, was also in Defendant Dohlman's research laboratory alongside Plaintiff. Shellhammer had a vastly different experience than Plaintiff did while matriculating through the Program.

51. On or about March 27, 2017, Shellhammer, defended his dissertation, prior to submitting his research manuscript and having a first or co-authored first publication.

52. On or about April 5, 2017, Shellhammer, *et. al.*, and senior author Defendant Dohlman submitted a research manuscript "*Amino Acid Metabolites That Regulate G Protein Signaling During Osmotic Stress*" to a scientific journal for peer-review and eventual publication.

53. On or about April 5, 2017, Shellhammer's research was submitted for peer-review with the assistance and advice of Defendant Dohlman, without delay or harassment.[4]

---

[4] PLOS is a nonprofit open-access science, technology and medicine publisher with a library of open-access journals and other scientific literature under an open-content license.

9

54. On or about April 7, 2017, in further attempts to harass Plaintiff and delay his dissertation defense, graduation, and post-graduation employment, Defendant Dohlman demanded that Plaintiff include research completed by his colleague Anay Reddy (hereinafter "Reddy") into his manuscript. Upon information and belief, Reddy's research was not relevant to Plaintiff's manuscript.

55. Plaintiff refused to add Reddy, stating that there was no scientific justification for him to do so considering that their research was unrelated, and doing so would significantly diminish the quality of his work.

56. On April 10, 2017, Defendant Errede agreed that adding research by Reddy would damage Plaintiff's manuscript.

57. On or about May 10, 2017, Plaintiff contacted Barry Lentz, PhD (hereinafter "Lentz") to discuss the consistent problems he was experiencing with Defendants Elston and Dohlman.

58. On or about May 10, 2017, acting upon the advice from Lentz, Plaintiff emailed Shawn Gomez (hereinafter "Gomez"), an Associate Professor of the Joint Department of Biomedical Engineering at UNC and North Carolina State University (hereinafter "NCSU"), a professor of Pharmacology at UNC and the Chair of Plaintiff's dissertation committee, to describe the difficulties he experienced scheduling his dissertation defense date. Plaintiff requested that Gomez aid Plaintiff in getting the issues resolved. Gomez did not respond to Plaintiff's email.

59. On or about May 10, 2017, Shellhammer's article was accepted for publication.

60. On or about May 12, 2017, Lentz met with Defendant Elston to discuss his concerns about Plaintiff's progress in the Program.

61. On or about May 12, 2017, Defendant Elston responded to Lentz and advised him that all Plaintiff had to do is to finish writing his research manuscript.

62. On or about May 14, 2017, Plaintiff, due to discrimination and harassment, is unable to graduate with his PhD in the Curriculum in Bioinformatics and Computational Biology from UNC.

63. On or about May 15, 2017, Lentz instructed Plaintiff to email a current version of his manuscript to Defendants Dohlman, Elston, and Errede, so that Lentz could measure how long it took for Plaintiff to receive feedback from Defendants Dohlman, Elston, and Errede.

64. On or about May 15, 2017, Plaintiff emailed a draft of his research manuscript to Defendants Dohlman, Elston, and Errede.

65. On or about May 15, 2017, Defendant Elston emailed a response to Plaintiff explaining that he would work on Plaintiff's research manuscript draft.

66. On or about May 19, 2017, Defendant Errede provided Plaintiff with feedback on his research manuscript draft.

67. On or about May 22, 2017, again acting upon advice received from Lentz, Plaintiff met with Defendant Elston to express his concerns regarding potential loss in salary due to the consistent delay tactics by the advisors.

68. On or about May 22, 2017, Gomez responded to Plaintiff's May 10 email. Gomez gave Plaintiff permission to schedule his dissertation defense.

69. On or about May 29, 2017, Plaintiff met with Defendant Elston who informed him that if he set his dissertation defense date, he would ensure that Plaintiff would not be able to submit his research manuscript for peer-review at a scientific journal.

70. On or about May 30, 2017, Shellhammer's research was published in PLOS Genetics with the assistance and advice of Defendant Dohlman, without delay or harassment.

11

71. On or about May 30, 2017, Plaintiff spoke with Gomez and obtained approval to schedule his dissertation defense date for July 7, 2017.

72. On or about June 7, 2017, Defendant Elston continued to harass Plaintiff by spreading false information about him to Ashalla Magee Freeman, PhD, the Director of Diversity Affairs, and the Initiative for Maximizing Student Diversity, by stating that Plaintiff did not trust him and refused to accept his feedback, when in fact, Defendant Elston had refused to provide substantive feedback and advice to Plaintiff.

73. On or about June 16, 2017, Plaintiff met with Leslie Lerea (hereinafter "Lerea"), Dean of Students at the Graduate School of UNC. Plaintiff advised that his dissertation defense date had already been scheduled and that he was reaching out to her specifically regarding the continuing delays and harassment from his advisors regarding the publication of his research manuscript. Plaintiff informed Lerea that he would have contacted her sooner if not for his fear of the repercussions that doing so may have caused for him.

74. On or about June 21, 2017, instead of providing specific direct feedback on Plaintiff's manuscript directly to Plaintiff, Defendant Dohlman replied to Plaintiff's updated feedback request by informing him to reach out to Martz, who had previously resigned his position from Defendant Dohlman's research laboratory, to obtain Defendant Dohlman's comments/feedback. This was a further attempt to harass Plaintiff and delay his process.

75. On or about June 23, 2017, instead of providing specific direct feedback on Plaintiff's manuscript directly to Plaintiff, Defendant Elston replied to Plaintiff's updated feedback request by attempting to intimidate Plaintiff into relinquishing the public portion of his dissertation defense. This was a further attempt to harass Plaintiff and delay his process.

76. On or about June 24, 2017, Plaintiff emailed his dissertation to his dissertation research committee. Plaintiff then emailed Lerea to inform her of the threatening email he had received from Defendant Elston.

77. On or about June 27, 2017, Plaintiff met with Lerea. Plaintiff obtained permission from Lerea to have Lentz added as the sixth member of his dissertation committee.[5] Plaintiff also obtained permission to have Lentz substitute as chairman for Gomez, who was out on vacation, contingent upon him receiving consent from his other dissertation committee members. Plaintiff requested consent to have Lentz added to his dissertation committee from each of his dissertation committee members, he did not receive a response from Defendants Elston, Dohlman, or Errede.

78. On or about July 3, 2017 Defendant Elston invited William Valdar, PhD (hereinafter "Valdar"), an Associate Professor of Genetics at UNC, to Plaintiff's dissertation defense. Defendant Elston stated "I have also asked Will to attend your defense. I think his feedback on the parameter estimation and model selection methods will be valuable."

79. Plaintiff responded that this was not customary and stated his preference to only defend his dissertation in front of his advisory committee as the rest of his classmates had done.

80. Valdar requested a one-on-one meeting with Plaintiff without any other committee members present and informed Plaintiff that he would be attending the dissertation defense as an "impartial observer." Plaintiff declined stating there was no need for a private conversation, and further advised that there did not appear to be a need for "impartial observer." Valdar responded by threatening to cancel Plaintiff's scheduled dissertation defense if he did not come to meet with him.

---

[5] The Curriculum in Bioinformatics and Computational Biology requires no less than five dissertation committee members, and as many as six dissertation committee members

81. Plaintiff emailed Lerea to inform her of the threat that he had received from Valdar which demonstrated further harassment from faculty members. Plaintiff was growing weary at this point and exclaimed, "I just want to graduate, and not have to deal with a new issue every day."

82. Lerea instructed Defendant Elston and Defendant Dohlman to cease all harassment of Plaintiff.

83. On July 7, 2017, Plaintiff conducted his dissertation defense. The first portion was opened to the public and the second portion was reserved solely for members of his dissertation committee. Unlike Plaintiff's classmates, at the beginning of his public presentation, his advisors refused to introduce him to the audience.

84. Unlike the rest of his dissertation research committee members, neither Defendant Elston nor Defendant Dohlman provided any feedback or commentary during or after Plaintiff's presentation, further discriminating against him.

85. Unlike the rest of his dissertation research committee members, neither Defendant Elston nor Defendant Dohlman provided any feedback or commentary on Plaintiff's dissertation, further discriminating against him.

86. Unlike what was done for all of the immediately preceding students who were in Defendants Elston or Dohlman's research labs, no post defense celebration was held for Plaintiff.

87. After completing the dissertation defense, PhD students are required to have dissertation defense forms signed by at least five of their dissertation research committee members in order to graduate; the signatures demonstrate completion of the defense which is required to graduate. In order for Plaintiff to graduate on time, the signed form was required to be turned into the graduate school by July 20, 2017.

88. On or about July 14, 2017, Defendant Errede instructed Plaintiff to remove the best and most impactful scientific result, which also constituted a significant contribution to the research

field, from his written manuscript. As a result, Plaintiff met with at least one faculty member, Jeremy Purvis, and several colleagues to discuss the methods used in his dissertation and to confirm that his data was convincing. It was later speculated that Defendant Errede made this request so that this data could be used by a different candidate.

89. As of July 18, 2017, Defendant Elston refused to sign off on Plaintiff's forms.

90. Rose Thorp (hereinafter "Thorp") requested that Plaintiff have his Department Chair email a signed letter stating that he had completed the requirements to graduate from the Program.

91. Previously, Defendant Elston directed Plaintiff to conduct business related to his dissertation defense and subsequent graduation through Cara Marlow, the Business Manager for the Department of Genetics and Curriculum in Bioinformatics and Computational Biology at UNC. Based on this advice, Plaintiff forwarded the request from Thorp to Defendant Marlow.

92. Plaintiff informed Marlow that Valdar had been acting as Plaintiff's "Program Director" in place of Defendant Elston, and that due to the same, Valdar, as earlier designated by Lerea, should be responsible for signing off on Plaintiff's completion of the Program.

93. In or about mid-July 2017, Marlow responded to Thorp, and advised she would send Thorp the requested letter of completion for Plaintiff on the following Monday which was July 17, 2017.

94. Upon learning that Defendant Elston, despite Lerea's command that Defendant Elston cease all harassment, hostility and retaliation of Plaintiff, had refused to sign off on Plaintiff's dissertation defense forms and final committee meeting forms at Plaintiff's dissertation defense on July 7, 2017, Marlow and Valdar engaged in a campaign of harassment, hostility, and retaliation against Plaintiff.

95. Plaintiff met with Marlow and Valdar. Valdar said that he would not sign the forms without consent.

96. Plaintiff's dissertation defense forms were due to UNC's Graduate School on July 20, 2017.

97. On or about July 18, 2017, Plaintiff emailed Defendant Elston inquiring as to whether Defendant Elston would sign off on Plaintiff's dissertation forms during the morning of July 19, 2017. Plaintiff advised Defendant Elston that he would be sitting at his laboratory bench in Defendant Errede's research laboratory, and that he planned to turn the forms into John Cornett (hereinafter "Cornett") in the morning.

98. Marlow emailed Thorp and advised that Cornett would provide the letter she requested regarding Plaintiff on July 18, 2017.

99. Defendant Elston responded to Plaintiff and instructed him to leave the forms with Cornett stating: "I will sign them when I have time."

100.    On the morning of July 19, 2017, Plaintiff walked to Cornett's office.  Cornett was not in his office. Plaintiff then walked to Marlow's office.  Marlow informed Plaintiff that in order to obtain the signed letter requested by Thorp, Plaintiff would be required to leave his dissertation defense forms with her.

101.    Marlow advised Plaintiff that she would get Defendant Elston to sign the forms, and informed Plaintiff that Defendant Elston would also be leaving for vacation and would not be around to sign the forms on July 20, 2017, the day the forms were due to the Graduate School to ensure Plaintiff qualified for summer graduation.

102.    As required, Plaintiff left his dissertation defense and final committee forms with Marlow.

103.    Marlow subsequently unlocks Cornett's office and retrieves the letter, signed by Valdar, for Thorp. Marlow gives the signed letter to Plaintiff.

104. Plaintiff informed Marlow that he would return to get his dissertation defense forms so that Gomez, who was absent during Plaintiff's dissertation defense, could sign off on his dissertation defense and final committee meeting forms.

105. Plaintiff walked the signed letter across campus to Thorp's office.

106. On the way back from Thorp's office, Plaintiff stopped by Gomez's office. Gomez informed Plaintiff that he could sign Plaintiff's dissertation defense and committee forms right then if Plaintiff could bring them to his office.

107. Plaintiff returns to Marlow's office to retrieve his dissertation defense forms. Plaintiff notices that, despite Marlow's promises to have Defendant Elston sign his dissertation defense forms, his dissertation defense forms were still not signed by Defendant Elston.

108. Plaintiff took the forms to Gomez, who signed them. Plaintiff left the office of Gomez office and received a call from Lisa Phillippie informing him that she and Lentz, who were planning to take Plaintiff to lunch to celebrate his dissertation defense, had just arrived on campus.

109. Lentz was aware, that unlike similarly situated, non-African American and non-Black appearing students, neither Defendants Elston, Dohlman or Errede held a celebration for Plaintiff after his dissertation defense.

110. Plaintiff, Phillippie and Lentz go to lunch to celebrate. Later that afternoon, Plaintiff checked his email and still had not received an email from Defendant Elston.

111. With a looming deadline, Plaintiff turned in his dissertation defense forms absent Defendant Elston's signature.

112.   Plaintiff informed Lerea that Defendant Elston refused to sign Plaintiff's dissertation defense forms.  Lerea then informed Plaintiff that she would ensure that Defendant Elston signed Plaintiff's dissertation defense and final committee forms.

113.   Plaintiff left campus and returned home. Later, he received a text from Phillippie that Marlow wanted him to call her office.  Phillippie advised Plaintiff that Marlow was upset with Plaintiff for turning in his dissertation defense and final committee forms into The Graduate School absent Defendant Elston's signatures.

114.   Upon information and belief, Defendant Marlow accused Phillippe of "babying" Plaintiff.

115.   Plaintiff called Marlow who immediately begins to berate Plaintiff for turning his dissertation defense and final committee forms into The Graduate School.

116.   Plaintiff responds by summarizing the events of the past several days including Defendant Marlow's failure to have Defendant Elston sign Plaintiff's dissertation defense and final committee forms while they were in her possession earlier in the day.

117.   Marlow, Valdar and Defendant Elston continued to harass Plaintiff during his efforts to have Defendant Elston sign Plaintiff's dissertation defense forms. At the time, Plaintiff was also attempting to start his postdoctoral research appointment. Marlow, Valdar and Defendant Elston's actions frustrated Plaintiff's ability to start this appointment.

118.   Upon completing the research paper, Plaintiff contacted Defendants Elston, Dohlman and Errede requesting to have his paper published, as this was customary practice for PhD students. It was imperative to Plaintiff that he have his research published in a scientific journal because doing so would greatly enhance his competitiveness and likelihood of obtaining a research professorship, as well as obtaining federal funding for future independent research projects.

Case 1:20-cv-01050-LCB-JLW   Document 36   Filed 11/01/21   Page 18 of 37

119.    Instead of complying with their official duty as Plaintiff's advisors to submit his research manuscript for publication, they ignored each of his publication requests.

120.    On or about July 24, 2017 Plaintiff began working as a postdoctoral researcher in the Eshelman School of Pharmacy at UNC with research advisor Yanguang Cao. He received a second NIH grant to conduct this research.

121.    After being delayed by his advisors, Plaintiff's dissertation was officially accepted on August 8, 2017, ten (10) months after his original expected graduation date. Plaintiff received his degree in the mail in September 2017.

122.    On or about August 8, 2017, Plaintiff meets with Lentz and further demonstrates the scientific validity of the best and most impactful scientific result included in his research manuscript.

123.    On or about August 8, 2017, Plaintiff receives a text message from Vered describing an argument that Defendant Errede was having with Lentz regarding Plaintiff's research manuscript. Vered describes Defendant Errede as angry and passionate and upset at something Plaintiff did not do. Plaintiff speculates that Defendant Errede at Plaintiff's refusal to remove the best and most impactful scientific result from his research manuscript.

124.    On or about August 11, 2017, Plaintiff received a phone call from Lentz asserting that he had just had an argument with Defendant Errede about Plaintiff's research manuscript. Lentz states that Defendant Errede did not want Lentz to continue to assist Plaintiff with his research manuscript.

125.    On or about August 11, 2017, Plaintiff informed Lerea that his advisors were preventing him from publishing his manuscript and described Defendant Errede's hostility towards Lentz.

19

126.    On or about August 11, 2017, Lerea instructed Plaintiff to schedule a meeting with all authors of his research manuscript so that plans for submission could be finalized and implemented. Lerea also instructed Plaintiff to offer the authors a selection of dates and times to meet, and to include in the meeting request a summary of the submission requirements for scientific journals that would be candidates to receive submission of his research manuscript.

127.    Upon receiving the instructions from Lerea, Plaintiff requested a meeting with Defendants Elston, Errede and Dohlman to finalize the submission process for his manuscript. Defendant Errede was the only advisor that showed up to the scheduled meeting but had not read enough of the finalized manuscript to provide any substantive feedback on next steps.  While Defendant Dohlman provided minor feedback after the meeting that neither he nor Defendant Elston attended, Defendant Elston never provided any response or feedback.

128.    On or about August 29, 2017, Plaintiff, discontent with the discrimination that he had faced, contacted Sibby Anderson (hereinafter "Anderson"), The Special Assistant to the Vice-Chancellor for Research-Diversity and Inclusion, and the Director for Postdoctoral Affairs. He expressed his concerns regarding his inability to submit his research manuscript for publication in a scientific journal. Anderson advised that Plaintiff she would seek assistance from Professor Eric Everett (hereinafter "Everett") who is the Institutional Research Integrity Officer for UNC.

129.    On or about September 1, 2017, Plaintiff was informed by Defendant Elston and Jeffrey Snell (hereinafter "Snell"), a PhD student in Elston's research laboratory, that Plaintiff had been removed from a long-standing research collaboration between Defendant Elston and Alan Jones, a Professor of Biology and Pharmacology.  Plaintiff was ordered to turn over all research materials to Snell.

130.    On or about September 1, 2017 September 2017, Plaintiff followed up with Defendant Elston regarding his manuscript and Defendant Elston responded, "I have no idea what paper you are talking about." This was clearly a further attempt to chastise and retaliate against Plaintiff. Plaintiff later informed Defendant Dohlman of Defendant Elston's comment.

131.    On or about September 11, 2017, Anderson contacted Everett on Plaintiff's behalf and informed him that Plaintiff was continuing to have issues over his research manuscript with his PhD advisors. Anderson requested that Everett assist Plaintiff with guidance on navigating his authorship issues.

132.    Defendant Everett and his office refused to intervene to ensure that Plaintiff was able to publish his manuscript and suffer no further discrimination from his advisors.

133.    Plaintiff began to stress and worry about how his negative treatment from his professors and other faculty members would negatively impact him moving forward in his career, especially with future research and publishing opportunities.

134.    On or about September 19, 2017 Defendant Suzuki-McGirr, Plaintiff's lab mate and a graduate student of Defendants Elston and Dohlman, contacted Plaintiff requesting that he send her his analysis software and data sets because they would be informative for her project. On or about September 26, 2017, she followed up on this request.  Plaintiff did not respond.

135.    On or about September 20, 2017, Pablo, Ramirez, and senior author Defendant Elston submitted a research manuscript, "*Particle-Based Simulations of Polarity Establishment Reveal Stochastic Promotion of Turing Pattern Formation*", to a scientific journal for peer-review and eventual publication.

a. Pablo, who was a similarly situated, non-African American and non-Black appearing male, joined Defendant Elston's research laboratory as a PhD student in 2015, three years after Plaintiff.

b. Ramirez also joined Defendant Elston's research laboratory as a postdoctoral scholar after Plaintiff.

c. Defendant Elston provided sufficient feedback on Pablo and Ramirez's research manuscript thus enabling them to submit the research manuscript for publication.

136. On December 19, 2017, Desirée Salazar informed Yanguang Cao that his request for a Diversity Supplement for Plaintiff was approved for funding, effective December 1, 2017. The funding was specifically to aid in Plaintiff's continued training.

137. On or about December 19, 2017, Plaintiff informed Lentz about his inability to submit his research for publication due to the failures of his other advisors. Lentz contacted Defendant Matson to inform him of the continued harassment and hostility that he had witnessed from his co-advisors in hopes that they would intervene and stop the unprofessional conduct of his colleagues.

138. Lentz also informed the Dean of the Graduate School that another minority student, a woman of color, had reported similar acts of hostility and harassment from Defendant Elston and Defendant Errede. A third student of color had also recently resigned from Defendant Dohlman's lab due to this same harassment and discrimination in his research lab.

139. Plaintiff was not allowed to participate in the UNC graduation ceremonies until December 2017. However, because doctoral hooding ceremonies are only held in the Spring graduations, Plaintiff had to wait until May 2018 to attend his graduation ceremony.

Case 1:20-cv-01050-LCB-JLW   Document 36   Filed 11/01/21   Page 22 of 37

140.    In February 2018, Lentz informed Plaintiff that the graduate school refused to intervene on his behalf.

141.    Vered graduated from the Program at UNC in May of 2018, *prior* to submitting her first author manuscript.  Defendants Elston and Errede communicated with Vered post-graduation and worked with her on the submission on her first author manuscript. Upon information and belief, the most recent communication was in the fall of 2019.

142.    In June 2018, Plaintiff resigned from his post-doctoral research position and left UNC without having his research manuscript submitted for publication in June 2018.

143.    In August 2018, Plaintiff began seeking counseling with a professional psychologist and later received a diagnosis of Post-Traumatic Stress Disorder (hereinafter "PTSD") specifically caused by the trauma that he was facing while at school.

*2019*

144.    On or about February 28, 2019, Plaintiff accepted a LinkedIn request from Defendant Suzuki-McGirr and realized that her banner showed that her research project was nearly identical to the research results that Plaintiff had previously submitted to his advisors in his manuscript and dissertation.

145.    Kevin Knight (hereinafter "Knight"), a former lab mate and colleague of Plaintiff in Defendant Dohlman's research lab, informed Plaintiff of the extreme similarity between Defendant Suzuki-McGirr's research and that which Plaintiff had previously submitted to Defendants Dohlman, Elston and Errede (who refused to submit the same for publication).

146.    Plaintiff became increasingly anxious as a result of the continual distress that his advisors were imposing upon him and the use of his research without permission by other students.

23

147.     On March 5, 2019, Plaintiff issued a Cease-and-Desist notice to the University, requesting that they stop all attempts to defraud him of his research, as it was protected by the University Copyright policy. He also informed UNC of the discrimination he had faced from Defendants Elston, Dohlman and Errede when compared to the treatment of other similarly situated students.

148.     On April 11, 2019, Lee Bollinger from the Office of University Counsel responded to Plaintiff's Cease and Desist demand stating that the university had investigated and found no basis for the claims being made.

149.     The letter advised Plaintiff that the University office of Equal Opportunity and Compliance (hereinafter "UNC EOC") would contact him regarding his allegations of discrimination from his advisors. No one from the UNC EOC office ever contacted Plaintiff.

150.     On or about April 25, 2019, Shellhammer, and Amy E. Pomeroy (hereinafter "Pomeroy"), a white female, completing her PhD in Defendants Dohlman's and Elston's research laboratories, publish a scientific manuscript titled "*Quantitative Analysis of the Yeast Pheromone Pathway*", with senior authors Defendants Dohlman and Elston.

   a. Shellhammer graduated from UNC with his PhD in May 2017 and left the University.

   b. The research that forms the basis of the published manuscript had not been completed when Shellhammer completed his PhD.

151.     The publication of Shellhammer's manuscript was given precedence over Plaintiff's completed research and manuscript draft, which was submitted on several occasions to Defendant's Elston, Errede, and Henrik Dohlman, for final revisions.

152. Despite being absent from Defendant Dohlman's research laboratory for several years, by retaining lead-authorship on this publication, Shellhammer was able to receive full credit for his research contributions.

153. On or about May 10, 2019 Defendant Suzuki-McGirr presented a talk entitled "*Finding Feedback Circuitry Underlying Adaptation to Hyperosmotic Stress*." This topic was one of the exact focus areas of Plaintiff's previously submitted research that his advisors prevented him from publishing.

154. On or about July 31, 2019, C. Miller, a white female, published a lead author manuscript titled, "*Emergent Spatiotemporal Dynamics of the Actomyosin Network in the Presence of Chemical Gradients*" with Defendant Elston, as senior author.

    a. Miller was post-doctoral researcher member of Defendant Elston's laboratory during the 2015 through 2016 academic years.

    b. Miller resigned from Defendant Elston's laboratory in 2016.

    c. Nonetheless, the manuscript was submitted for publication on May 31, 2019.

155. Despite being absent from Defendant Elston's research laboratory, by retaining lead-authorship on this publication, Miller was able to receive full credit for her research contributions.

156. On or about August 9, 2019, Rangarajan and Gordy published a scientific manuscript titled "*Systematic Analysis of F-Box Proteins Reveals a New Branch of the Yeast Mating Pathway*", with senior authors Defendants Dohlman, Elston, and Errede.

    a. In August 2016, Gordy had resigned her postdoctoral appointment in Defendant Dohlman's research laboratory to start a faculty position.

25

Case 1:20-cv-01050-LCB-JLW   Document 36   Filed 11/01/21   Page 25 of 37

b. In June 2017, Rangarajan and Defendant Dohlman emailed Plaintiff and demanded that Plaintiff assist them with conducting the research published in the above manuscript.

c. The publication of the above manuscript was given precedence over Plaintiff's completed research and manuscript draft, which was submitted on several occasions to Defendant Elston, Defendant Errede and Defendant Dohlman for final revisions.

d. Despite being absent from Defendant Dohlman's research laboratory for several years, by retaining lead-authorship on this publication, Gordy was able to receive full and due credit for her research contributions.

157. On or about October 28, 2019, visiting scholar Giaretta, an Italian citizen who is neither African American, nor appears African American, published a lead author manuscript, "*Stochastic Modeling of Human Papillomavirus Early Promoter Gene Regulation*" with Defendant Elston as senior author.

a. Giaretta visited the laboratory of Defendant Elston during the summer and fall of 2015.

b. Giaretta's research manuscript was submitted for publication on May 31, 2019.

c. By retaining lead-authorship on this publication, Giaretta was able to receive full and due credit for his research contributions.

158. On or about November 18, 2019 Defendant Suzuki-McGirr presented another talk entitled "*Model Driven Experimental Design Identifies Unique Feedback Regulation of a Yeast MAPK Pathway*." This was also a main focus area of Plaintiff's research that his advisors prevented him from publishing.

*2020*

159. On or about February 20, 2020 Defendant Suzuki-McGirr presented a talk entitled "*Model Driven Experimental Design Identifies Counter-Acting Feedback Regulation Driving MAPK*

26

*Dynamics*" at the Hawaii 2020 Winter Q-Bio research retreat. This was also a main focus area of Plaintiff's research that his advisors prevented him from publishing, and the focus of a research talk presented by Plaintiff at the Hawaii 2017 Winter Q-Bio research retreat.

160.    On or about April 21, 2020 Defendants Suzuki-McGirr, Errede, Elston and Dohlman published Defendant Suzuki-McGirr's research manuscript entitled *"Model-driven Experimental Design Identifies Counter-Acting Feedback Regulation in the Osmotic Stress Response of Yeast"* to a scholarly journal.

161.    The paper that was submitted was plagiarized from Plaintiff. Defendants merely reworded several portions of Plaintiff's previously submitted manuscript. No credit was given to Plaintiff in the published article despite the fact that it was based entirely on his research and findings.

162.    Plaintiff was never afforded the opportunity to publish his research.

163.    On July 10, 2020, Richard Allen, a white male, published a lead author research manuscript, *"Stochastic Methods for Inferring States of Cell Migration"*, with senior author Defendant Elston in a scientific journal.

    a.    Allen was a former post-doctoral researcher of Defendant Elston who left Defendant Elston's research laboratory in 2012.

    b.    Despite being absent from Defendant Elston's research laboratory for several years, including the near entirety of Plaintiff's tenure as a PhD student in Defendant Elston's research laboratory, Allen was permitted to publish as a lead author.

    c.    By retaining lead-authorship on this publication, Allen was able to receive full and due credit for his research contributions.

164.    Despite being completely done with Defendant Dohlman's research lab, the harassment continued, and ultimately Plaintiff was forced to resign from his postdoctoral research position thus forfeiting the remainder of his NIH grant.

165.    On December 1, 2020, Ramirez, Pablo, *et. al*., and senior author Defendant Elston publish a research manuscript, "*A Novel Stochastic Simulation Approach Enables Exploration of Mechanisms for Regulating Polarity Site Movement*", to a scientific journal.

    a.    Pablo graduated with his PhD in May of 2020.

    b.    Pablo had left Defendant UNC and begun a postdoctoral appointment prior to the publication of the research manuscript.

    c.    By retaining authorship on this publication, Pablo was able to receive full and due credit for his research contributions.

    d.    Ramirez is a Colombian national, who appears white and was a postdoctoral researcher in Defendant Elston's research laboratory.

    e.    By retaining authorship on this publication, Ramirez was able to receive full and due credit for his research contributions.

166.    On February 1, 2021, Pomeroy, Peña, *et. al*., and senior authors Defendants Dohlman, Elston, and Erred publish a research manuscript, "*A predictive model of gene expression reveals the role of network motifs in the mating response of yeast*", to a scientific journal.

    a.    Pomeroy graduated with her PhD from the Curriculum in Bioinformatics and Computational Biology ("The Program") in 2020 under the advisement of Defendants Dohlman and Elston;

    b.    Peña left Defendant UNC in 2014 and begun a postdoctoral appointment at Rice University prior to the publication of the research manuscript; and

c. By retaining authorship on this publication, Peña and Pomeroy were able to receive full and due credit for their research contributions.

<u>First Claim for Relief: Racial Harassment and Race Discrimination in Violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. §2000d) Against Defendant UNC</u>

167.    Plaintiff hereby incorporates by reference the allegations contained in the previous paragraphs.

168.    The actions of Defendant UNC as set forth herein, constitute harassment and intentional discrimination against Plaintiff on the basis of his race, in violation of Title VI of the 1964 Civil Rights Act, 42 U.S.C. §2000d, *et. seq*.

169.    Title VI of the Civil Rights Act of 1964 (42 USC §2000d) prohibits discrimination on the bases of race, color, and national origin in programs and activities receiving federal financial assistance.

170.    As an African American male, Plaintiff is a member of a protected class under Title VI.

171.    Defendant UNC is a federally funded educational institution subject to Title VI which prohibits discrimination.

172.    Defendant UNC was responsible for ensuring that Plaintiff was able to obtain his education void of harassment and discrimination.

173.    The following activities of Defendant are evidence of their Title VI violations:

a. The continued discrimination and harassment of Plaintiff which adversely effected his educational and post-doctoral opportunities when compared to similarly situated, non-African American colleagues seeking a PhD;

29

b.  The pattern and practice of discrimination and harassment by advisors that minority students seeking a PhD in the Curriculum in Bioinformatics and Computational Biology faced;

c.  Advisors not allowing Plaintiff to publish his research, and instead, substituting a student of Asian descent to take credit for the work done by Plaintiff, and fraudulently publishing it as their own work without giving any credit to Plaintiff; and

d.  Deliberately delaying Plaintiff's dissertation defense and graduation while simultaneously permitting non-minority students to defend their dissertations prior to meeting the minimum graduation requirements and/or program technical standards.

174.  But for Defendant's discrimination and harassment against Plaintiff, he would have been able to graduate on time, publish his research and complete his post-doctoral research.

175.  Plaintiff is entitled to participate in and be given the benefits of the Program including, without limitation, advice on his manuscript, publication of his manuscript, full credit for his contributions to any past, present, and future publications utilizing his research and findings and the remaining financial compensation that was supposed to be administered to Plaintiff pursuant to NIH grants.

176.  Plaintiff is entitled to recover compensatory damages as provided by the 1964 civil Rights Act, 42 U.S.C. §2000d, *et. seq*. ("Title VI") in an amount exceeding $25,000.00 as a proximate result of Defendants' conduct as alleged herein.

177.  Plaintiff is entitled to equitable remedies including, but not limited to, an injunction preventing Defendants from using Plaintiff's research and findings without giving him appropriate credit.

178. Plaintiff is entitled to punitive damages in an amount exceeding $25,000.00 as a proximate result of Defendants' conduct as alleged herein.

179. Plaintiff is further entitled to recover reasonable attorney's fees, the costs, and the expenses of this action, and such interest as may be allowed by law.

SECOND CLAIM FOR RELIEF: VIOLATIONS OF RIGHTS SECURED BY THE EQUAL
PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT AND 42 U.S.C. § 1983
AGAINST DEFENDANTS UNC, ELSTON, ERREDE, DOHLMAN, AND MATSON

180. Plaintiff hereby incorporates by reference the allegations contained in the previous paragraphs.

181. Plaintiff, an African American male, is a member of a protected class and was unlawfully discriminated against because of his race.

182. Plaintiff was similarly situated in all relevant aspects to other non-African American PhD students in the program.

183. Nevertheless, Defendants refused to permit Plaintiff to publish his dissertation, timely graduate, and receive full credit for his research and findings because of his race.

184. All of the actions taken by Defendant UNC or those acting on behalf of Defendant UNC, as alleged and referred to herein, including the interference and deliberate actions taken to restrict Plaintiff's ability to publish his research and graduate on time, were done by Defendant UNC while acting under color or state of law and had the effect of depriving Plaintiff of rights secured by the Constitution and laws of the United States, specifically the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

185. Defendants engaged acts were intentional, malicious, willful, wanton, obdurate, and in gross and reckless disregard of Plaintiff's constitutional rights under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §1983.

## THIRD CAUSE OF ACTION: RACIAL HARASSMENT AND RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. §1983 AGAINST DEFENDANTS UNC, ELSTON, ERREDE, DOHLMAN, AND MATSON

186.   Plaintiff hereby incorporates by reference the allegations contained in the previous paragraphs.

187.   The actions of Defendants Elston, Errede, and Dohlman, as alleged herein, constitute harassment and intentional discrimination on the basis of Plaintiff's race, in violation of 42 U.S.C. §1983.

188.   Defendant Matson was notified by Professor Lentz of the ongoing racial harassment Plaintiff experienced.  Defendant Matson did not take any action against Defendants Elston, Errede or Dohlman.

189.   Defendant Matson's failure to intervene constitutes deliberate indifference and supervisor liability under 42 U.S.C. §1983.

190.   Plaintiff is entitled to recover compensatory damages as provided by 42 U.S.C. §1983, in an amount exceeding $25,000.00 as a proximate result of Defendants' conduct as alleged herein.

191.   Plaintiff is entitled to punitive damages as provided as provided by the 42 U.S.C. §1983, in an amount exceeding $25,000.00 as a proximate result of Defendants' conduct as alleged herein.

192.   Plaintiff is further entitled to recover reasonable attorney's fees; the costs and expense of this action and such interest as may be allowed by the law.

193.       Defendants' actions as alleged herein were intentional, malicious, willful, wanton, obdurate, and in gross and reckless disregard of Plaintiff's civil rights under 42 U.S.C. §1983.

## FOURTH CLAIM FOR RELIEF: RETALIATION IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1964 AGAINST DEFENDANT UNC

194.     Plaintiff hereby incorporates by reference the allegations contained in the previous paragraphs.

195.     Plaintiff first reported the harassment he experienced in the Program to Defendant UNC's Dean of Students in June of 2017, and expressed fear that Defendants Elston, Errede and Dohlman would retaliate against him for reporting the harassment.

196.     Plaintiff continued to report Defendants Elston, Errede and Dohlman's harassment as their actions grew more egregious and detrimental to Plaintiff.

197.     Plaintiff was the only student who experienced, *inter alia*, an additional graduation requirement, refusal of advisor in the program to provide advice and feedback on his work, and refusal of advisors to sign off for him to graduate.

198.     Moreover, Plaintiff reported his treatment to Defendant UNC's Vice Chancellor for Research Diversity and Inclusion and Defendant Matson.

199.     Plaintiff is entitled to damages, in an amount to be proven at trial, due to Defendant UNC's retaliation against Plaintiff upon reporting the race-based mistreatment he was subjected to in the Program.

### FIFTH CLAIM FOR RELIEF: CIVIL CONSPIRACY AGAINST DEFENDANTS ELSTON, ERREDE AND DOHLMAN

200.     Plaintiff hereby incorporates by reference the allegations contained in the previous paragraphs.

201.     Defendants Elston, Errede, and Dohlman, whether informal or formal, agreed or assented to create obstacles to prevent Plaintiff from publishing his research, findings, and manuscript, receiving first author credit, graduating on time, and completing his post-doctoral fellowship.

202.     Defendants' actions were unlawful or were lawful and conducted in an unlawful way.

33

203. Plaintiff suffered damages due to Defendants' actions in an amount to be proven at trial.

SIXTH CLAIM FOR RELIEF: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
AGAINST DEFENDANTS ELSTON, ERREDE, DOHLMAN AND SUZUKI-MCGIRR

204. Plaintiff hereby incorporates by reference the allegations contained in the previous paragraphs.

205. Defendants Elston, Errede, and Dohlman engaged in such negligent behavior when they utilized and published Plaintiff's research and written manuscript, provided by Plaintiff to Defendants due to their advisory positions to Plaintiff, without due credit to Plaintiff, that Plaintiff suffered severe emotional distress.

206. It was reasonably foreseeable that Defendants Elston, Errede, and Dohlman's actions would cause Plaintiff severe emotional distress.

207. Defendant Suzuki-McGirr utilization and publication of Plaintiff's research and written manuscript, which was provided by Plaintiff to Defendants, was so negligent that Plaintiff suffered severe emotional distress.

208. It was reasonably foreseeable that Defendant Suzuki-McGirr's actions would cause Plaintiff severe emotional distress.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment against the Defendants as follows:

1. A declaration that the acts and practices complained of herein are in violation of Title VI of the Civil Rights Act of 1964 and 42 U.S.C. §1983.

2. An order that Defendants request a retraction of the published writing entitled "*Model Driven Experimental Design Identifies Counter-acting Feedback Regulation in the Osmotic Stress Response of Yeast*" from the scholarly journal;

3. An order enjoining Defendants from further and future use of Plaintiff's research and written manuscript;

4. An order enjoining Defendants from all further acts of discrimination, harassment, and retaliation on the basis of race;

5. For a money judgment against Defendants UNC for the violation of Title VI of the Civil Rights Act of 1964 in an amount in excess of $25,000.00, to be proven at trial;

6. For a money judgment against Defendants UNC, Dohlman, Elston, and Errede, jointly and severally, for the violation 42 U.S.C. §1983 in an amount in excess of $25,000.00, to be proven at trial;

7. For a money judgment against Defendants UNC, Dohlman, Elston, and Errede, jointly and severally, for the violation The Fourteenth Amendment to the United States Constitution;

8. For a money judgment against Defendants UNC, Dohlman, Elston, and Errede, jointly and severally, for lost educational benefits and privileges, compensatory, punitive, and other damages for an amount in excess of $100,000.00 to be determined specifically at the trial of this action.

9. For a money judgment representing pre-judgment interest.

10. For the court to retain jurisdiction over this action until Defendants have fully complied with the orders of the court and the court require Defendants to file such reports as may be necessary to supervise compliance.

11. For the costs of the suit, including an award of reasonable attorney's fees pursuant to federal law.

12. For any other and further relief as may be just, proper, and necessary to afford complete relief to Plaintiff and to provide Plaintiff that to which he is entitled at the time this action is tried; and

13. Plaintiff hereby request a trial by jury.


Respectfully submitted,


This the 1st day of November, 2021.


                              /s/ Neubia L. Harris
                              Neubia L. Harris
                              N.C. Bar No.: 42069
                              The Law Office of Neubia L. Harris, PLLC
                              203 West Millbrook Road, Suite 101
                              Raleigh, NC 27609
                              (919) 526-0500 (telephone)
                              (919) 589-3935 (facsimile)
                              neubia@neubiaharrislaw.com

CERTIFICATE OF SERVICE

The undersigned hereby certifies served a copy of the foregoing First Amended Complaint on the

following via the CM/ECF electronic filing system:


Kari R. Johnson
Special Deputy Attorney General
N.C. State Bar No. 16033
E-mail: kjohnson@ncdoj.gov
NC Department of Justice
PO Box 629
Raleigh, NC 27602

Vanessa N. Totten
Special Deputy Attorney General
N.C. State Bar No. 27905
E-mail: vtotten@ncdoj.gov
NC Department of Justice
PO Box 629
Raleigh, NC 27602


This the 1st day of November, 2021.

                              /s/ Neubia L. Harris
                              Neubia L. Harris
                              N.C. Bar No.: 42069
                              The Law Office of Neubia L. Harris, PLLC
                              203 West Millbrook Road, Suite 101
                              Raleigh, NC 27609
                              (919) 526-0500 (telephone)
                              (919) 589-3935 (facsimile)
                              neubia@neubiaharrislaw.com