IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CASE NO. NO: 1:20-CV-1050

| | |
|---|---|
| PATRICK C. MCCARTER,<br>   Plaintiff, | )<br>)<br>) |
| v. | )    PLAINTIFF'S TRIAL BRIEF |
| THE UNIVERSITY OF NORTH<br>CAROLINA AT CHAPEL HILL, *et. al,*<br>   Defendants. | )<br>)<br>)<br>) |

## INTRODUCTION

  Obtaining a PhD, particularly in a niche field, is one of the crowning achievements of a scientist, particularly one with a personal interest in advancing research. In this case, Patrick McCarter, PhD, has always had an interest in various scientific principles. His doctoral research, which focused on yeast, could ultimately assist with developing a cure for diseases. One of Plaintiff's close family members lost his battle with Lewy Body Dementia. Being notified of his family member's diagnosis, observing their physical and mental decline, and ultimate death, served as a supplementary catalyst for Plaintiff's research.

  Title VI prohibits discrimination based on "race, color, or national origin …under any program or activity receiving federal financial assistance." 42 U.S.C. § 2000d. The purpose of Title VI is to ensure that public funds are not spent in a way that encourages, subsidizes, or results in discrimination against members of protected classes. Agency regulations implementing Title VI also prohibit intentional discrimination based on race, color, or national origin, covering any disposition, service, financial aid, or other benefits provided under the recipient's program, the determination of the site or location of facilities, or other aspects of program operations. *See, e.g.,* 28 C.F.R. § 42.104(b).

1

This case involves a public university that is the recipient of federal funds. The University intentionally treated Plaintiff differently and/or otherwise knowingly caused harm to Plaintiff due to his race, actual or perceived. As a result of the University's actions, Plaintiff suffered irreparable harm both professionally and personally.

FACTS

Plaintiff enrolled in The University of North Carolina at Chapel Hill's ("UNC") Bioinformatics and Computational Biology PhD Program ("the Program") in August 2011. (*McCarter Depo., P. 12, McCarter Affidavit, ¶ 3*). Plaintiff is an African American male. (*ECF No. 36, ¶6; ECF No. 40, ¶6*). Defendant UNC is a federally funded educational institution subject to Title VI's prohibition against racial discrimination. (*ECF No. 36, ¶¶7, 171; ECF No. 40, ¶¶7, 171*).

Defendant Elston is a white male, a Professor in the Department of Pharmacology and the Co-Director of the Program. (*ECF No. 36, ¶9; ECF No. 40, ¶9*). When Plaintiff was enrolled in the Program, Defendant Elston was the Director of the Program (*ECF No. 36, ¶16;* ECF No. 40, ¶16). Defendant Errede, a white female, was a Professor of Biophysics and Biochemistry at UNC. (*ECF No. 36, ¶10; ECF No. 40, ¶10; Errede Depo. p.9*). Defendant Dohlman, a white male, is a Sanford Steelman Distinguished Professor and Chair of the Department of Pharmacology at UNC. (*ECF No. 36, ¶11; ECF No. 40, ¶11*).

Plaintiff's research while enrolled at Defendant UNC investigated stress activated protein kinase pathways, particularly the Hog pathway in yeast, using computational and mathematical modeling coupled with experimental studies. (*McCarter Depo. pp. 108-109*). Since Elston had the most expertise in Plaintiff's research topic he served as his primary thesis advisor. (*ECF No. 36, ¶15; Dohlman Depo.* p. 39). Defendant Dohlman was a co-advisor. (*ECF No. 36, ¶15; ECF No.*

*40, ¶15; Dohlman Depo. p. 39*). Defendant Errede was a member and an informal advisor on Plaintiff's thesis committee. (*ECF No. 36, ¶15; ECF No. 40, ¶15; Errede Depo. p. 59; Dohlman Depo. p. 42*).

Plaintiff worked in Defendants' Elston, Dohlman, and Errede's laboratories during his tenure in the Program. ( *ECF No. 36, ¶¶19-20; ECF No. 40, ¶¶19-20*). Defendants Elston, Dohlman, and Errede did not serve as the primary advisor or primary co-advisor for any other African American PhD students, although Defendant Dohlman had a student of African descent in his lab. (*ECF No. 36, ¶21; ECF No. 40, ¶21*).

Plaintiff applied for and was awarded the highly competitive Ruth L. Kirschstein National Research Service Award ("NRSA") for Individual Predoctoral Fellowships ("F31") to Promote Diversity in Health-Related Research, which also recognized as the Principal Investigator for this National Institutes of Health ("NIH") grant, application number F31 GM115224. (*ECF No. 36, ¶22; ECF No. 40, ¶22, Errede Depo. p. 32*). Plaintiff proposed the same research topic that was the subject of his dissertation in the F31 application. (*McCarter Depo. pp. 109-110*). Defendants Dohlman and Elston were the sponsors of the grant. (*Id.*). This training grant was supposed to provide Plainitff with financial support (e.g. tuition, stipend, fees, insurance, and other costs associated with his research) while he was enrolled in the program. *(Dohlman Depo. pp. 24, 48-49*).

As the Director of the Program during Plaintiff's tenure, Defendant Elston was best positioned to determine whether a student satisfied the requirements from the program and had the ability to approve a student to graduate without the student having met certain requirements. (*Elston Depo. p. 102-103*). Defendant Elston confirmed that with the publishing of his co-first author manuscript in 2015, Plaintiff had successfully completed all program

3

requirements necessary to be eligible approach his committee and secure their permission to write his dissertation, defend his dissertation, and subsequently graduate with his Ph.D. (*Elston Depo. p. 108*).

When Plaintiff requested to defend his dissertation, he already had published five manuscripts (*Dohlman Depo. p. 80; Elston Depo. pp. 59-60*). The committee did not think Plaintiff was ready to write or defend his dissertation and decided to impose an additional requirement on Plaintiff to complete another first author manuscript. (*Dohlman Depo. pp. 79-80*; El*ston Depo. pp. 81-82*). The committee's rationale for imposing the additional requirement is that it would have "been in [Plaintiff's] best interest to complete the manuscript before graduation" even though Plaintiff had already satisfied the formal publication requirement of the Program. (*Dohlman Depo. pp. 124,134; Elston Depo. pp. 59, 108*). Therefore, Plaintiff's dissertation committee exceeded its authority by imposing the drafting of an additional first-author manuscript as a barrier to Plaintiff's rightfully earned ability to write and defend his dissertation and subsequently graduate with his Ph.D. (*Matson Depo. p. 32-33*).

Defendant Elston was not pleased when Plaintiff added Dr. Barry Lentz to his dissertation committee (*Elston Depo. p. 114, 117, ECF No. 36, ¶79, ECF No. 40, ¶78.*) The Associate Director of the Program indicated that he approved Dr. Lentz's addition to Plaintiff dissertation committee, but only with the caveat that he speak with the Plaintiff first and serve as an "impartial observer". (*ECF No. 36, ¶80.*) This dispute ultimately, and Defendants' actions in the wake of the same, led to Plaintiff reported the actions of his program's administrators to the Dean of Students at the UNC-Chapel Hill Graduate School (*ECF No. 36, ¶¶ 80-81*).

It was well established during Plaintiff's tenure in Defendants research laboratories, that both Defendants Dohlman and Elston routinely permitted their students to pursue publication of

4

their research manuscripts after completing their Ph.D. (*Dohlman Depo. pp. 111 – 112, 120 – 122, 144 – 145, Elston Depo. p. 102*). However, instead of allowing Plaintiff to publish his additionally required manuscript, Defendant Elston advised other students to "take-over" McCarter's research, to utilize McCarter's research methods, and to contact Plaintiff about his research findings. (*Elston Depo. pp. 87-89, ECF No. 36, ¶128, ECF 40, ¶137*). Furthermore Defendant's Elston, Errede, and Dohlman actively advised and collaborated with one of the students to publish a manuscript that described research that substantially duplicated much of Plaintiff's original research and findings, without any providing any attribution to McCarter at all. (*Elston Depo. pp. 87-89; Errede Depo. p. 61; Dohlman Depo. p. 104*).

If a dissertation committee determines that a student is not ready to defend their dissertation, they will not allow a student to schedule a defense. (*Dohlman Depo. P. 32*) This is "extremely rare", and, once a student defends their dissertation, the only thing standing between the student and graduation is "some paperwork." (*Dohlman Depo. Pp. 32-33*). The University process of copywriting a student's dissertation is "automatic" (*Dohlman Depo. P. 35-36*). Other students were permitted to complete their publication requirements after they graduated. (*Dohlman Dep. Pp. 36-37, 112; Errede Depo. P. 77*). In fact, students regularly graduate without actually having a publication, so long as the students committee is assured that there will be a publication. (*Dohlman Depo. P. 37; Errede Depo. P. 77*).

While the NIH funds a student's research, "anything of value" is "owned by the university". (*Dohlman Depo. pp. 33-34*). A student's ideas are not considered "public domain" unless and until they write their thesis and give their public seminar. (*Dohlman Depo. p. 34*). A thesis is usually an assembly of published and unpublished manuscripts written, in whole or in part, by the PhD student. (*Dohlman Depo. p. 34*). Publications are beneficial in the pursuit of

5

funding from the NIH. (*Dohlman Depo. p. 52*). Ph.D. advisors are capable of influencing the careers of the former students, long after the student has matriculated from the advisor's research laboratory. (*Elston, Depo. pp. 124–- 126*)

According to Defendant Dohlman, who has served as both an editor and on the board of review editors for scientific journals, it almost never happens that a manuscript is derailed due to a person objecting to who is considered a first author or co-author. (*Dohlman Depo. pp. 64-65, Dohlman Depo. 131*). However, Defendnat Elston recently had a research manuscript accepted for publication retracted from publication due to an "author-dispute", acknowledging that the offended author complained that the author list of that manuscript did not accurately reflect their respective contributions to the research. (*Dohlman Depo. p. 131; Elston Depo. pp. 134–- 135*). This student was also a student of color, and, upon information and belief is the only similarly situated student to experience anything close to what Plaintiff experienced with Defendants.

Plaintiff's research was excellent, he had successfully combined computational models and experimental studies to achieve research results that provided "slam dunk, black and white proof of what he wanted to accomplish". Plaintiff achieved "the gold standard of a good, meaningful modeling paper" (*Errede Depo. pp. 51, 54 - 55*). Plaintiff research was believed to be substantial enough to be submitted to the some of the top scientific journals for consideration. (*Elston Depo. p. 75*)

<u>Arguments</u>

Claims of Racial Discrimination brought under Title VI are analyzed under a test announced in <u>McDonnell Douglas Corp. v. Green</u> by the U.S. Supreme Court. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802–05 (1973)). To state a prima facie case of racial discrimination, a plaintiff must allege he: (1) is a member of a protected class, (2) qualified to

6

continue in the educational program; (3) suffered an adverse action; and (4) was treated differently from similarly situated students who were not members of the protected class. Elliott v. Del. St. Univ., 879 F. Supp. 2d 438, 443 (D. Del. 2012); *see also* Sanders v. Tikras Tech. Sols. Corp., 725 F. App'x 228, 230 (4th Cir. 2018) (per curiam) (applying the *McDonnell Douglas* test to racial discrimination in employment). The burden of establishing a prima facie case under this test "is not onerous." Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 253 (1981). Even without a direct admission or express policy, a plaintiff may prove intentional discrimination with other forms of direct evidence demonstrating that the "decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring).

Plaintiff is an African American male, who was qualified to publish and defend his dissertation several months before Defendants actually permitted him to do so. The only remaining questions are whether he suffered adverse action when the Defendants unlawfully published his research and whether the adverse action was made with discriminatory intent.

1. Plaintiff suffered adverse action due to Defendants' use and publication of his manuscript

An adverse action is any action that adversely affects the terms and conditions of an educational program; this includes any significant changes in status or benefits. *See,* Hoyle v. Freightliner, LLC, 650 F.3d 321, 337 (4th Cir. 2011); Tabb v. Bd. of Educ. of the Durham Pub. Sch., 1:17CV730, *14-15 (M.D. N.C. Feb 19, 2019)(citing Von Gunten v. Maryland, 243 F.3d 858, 865 (4th Cir. 2001)).

Defendants would not sign off on Plaintiff submitting his manuscript to an academic journal for peer review and publication. Defendants' saddled Plaintiff with additional requirements that were not a part of his program. When Plaintiff refused to comply with those

7

orders, the Defendants' reminded him, in essence, that they owned him. If he refused to do as they ordered, they would refuse to perform their duties as advisors. Moreover, Defendants gave Plaintiff's research to another student, encouraged her to use it as her own, and sanctioned that student to publish the findings as if they were her own with them listed as secondary or contributing authors. This is tantamount to failing to transfer or promote an employee, demoting an employee, or terminating an employee. *See* Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002). Plaintiff had been working on the research contained in his manuscript for years. Defendants did not even thank him for his contributions. Instead, Defendants presented the work as if it were their own.

      Defendant UNC's copyright policy provides that copyright protection automatically exists from the time the work is created in fixed form. (Exhibit A, Copyright Policy of UNCCH). There is no requirement that the work be published or registered to obtain protection under copyright law. *Id*. The copyright of any work immediately becomes the property of the author who created the work, unless one of the following exceptions apply: 1) Traditional or non-directed work involving exceptional use of university resources, 2) Directed work; sponsored or externally contracted work requiring university ownership of copyright, or 3) work for hire *Id.*

2. <u>Plaintiff was treated differently than similarly situated students who were not members of the protected class.</u>

      Defendants' refusal to permit the Plaintiff to publish his dissertation, defend his dissertation, and graduate was race based discrimination as evidenced by the fact that no other similarly situated student, with the exception of another student of color, experienced anything similar to Plaintiff.

8

A plaintiff need not present direct evidence of discrimination, but must only present sufficient evidence that racial (or other illegal) discrimination motivated the Defendants' adverse decisions. Jones v. Southcorr, L.L.C., 324 F. Supp. 2d 765, 774 (M.D.N.C.), aff'd, 117 F. App'x 291 (4th Cir. 2004) Even without a direct admission or express policy, a plaintiff may prove intentional discrimination with other forms of direct evidence demonstrating that the "decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring).

Discriminatory intent exists if similarly-situated students outside the protected class received more favorable treatment. See White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004) (applying *McDonnell Douglas* to plaintiff's age discrimination claim). Moreover, discriminatory intent exists because the evidence supports that Defendants were motivated to take adverse action against Plaintiff due to his race. *See* Holley v. N.C. Dep't of Admin., 846 F.Supp.2d 416, 427 (E.D. N.C. 2012) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151-52 (2000)). Discriminatory intent can even be inferred when there are multiple motives behind a program's actions; that is discrimination need not be the *only* motivation, but it must have been a *motivating factor*. Desert Palace, Inc. v. Costa, 539 U.S. 90, 101 (2003)(emphasis added); Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 317 (4th Cir. 2005).

The undisputed facts in this case support Plaintiff's reasonable inference that Defendants' refusal to permit him to publish and defend his dissertation or graduate due to racial animus and discriminatory motivation. Only one other student, Lior Vered, is a person of color, and had an experience even remotely similar to Plaintiff's. Defendants Elston, Errede and Dohlman took

9

Ms. Vered's research and manuscript, gave it to another student and collectively published it in an academic journal. (D.E. 80-2).

## **CONCLUSION**

For these reasons, Plaintiff respectfully requests that this Court declare that Defendant UNC violated Title VI by wrongfully using Plaintiff's draft manuscript and that Defendants Dohlman, Elston, and Errede, in their individual capacities, by wrongfully using Plaintiff's draft manuscript, and award Plaintiff reasonable compensatory damages.

This is the 11th day of March, 2024.

/s/ Neubia L. Harris
Neubia L. Harris
N.C. Bar No.: 42069
The Law Office of Neubia L. Harris, PLLC
312 W. Millbrook Road, Ste. 141
Raleigh, NC 27609
(919) 526-0500 (telephone)
(919) 589-3935 (facsimile)
neubia@neubiaharrislaw.com
*Attorneys for Plaintiff*

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing TRIAL BRIEF was served on the following via the CM/ECF electronic filing system:

    Kari R. Johnson
    Special Deputy Attorney General
    N.C. State Bar No. 16033
    E-mail: kjohnson@ncdoj.gov
    NC Department of Justice
    PO Box 629
    Raleigh, NC 27602

This is the 11th day of March, 2024.

    /s/ Neubia L. Harris
    Neubia L. Harris
    N.C. Bar No.: 42069
    The Law Office of Neubia L. Harris, PLLC
    312 W. Millbrook Road, Ste. 141
    Raleigh, NC 27609
    (919) 526-0500 (telephone)
    (919) 589-3935 (facsimile)
    neubia@neubiaharrislaw.com
    *Attorneys for Plaintiff*