# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

PATRICK C. MCCARTER,       )
                                         )

         Plaintiff,        )
                                         )

         v.              )           1:20CV1050
                                         )

THE UNIVERSITY OF NORTH    )
CAROLINA AT CHAPEL HILL, *et al.*,  )
                                         )

         Defendants.     )
                                         )

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

Before the Court are cross-motions for summary judgment.[1]  (ECF Nos. 66; 73.)  The University of North Carolina at Chapel Hill ("UNC-CH" or "the University"), Timothy Elston, Henrik Dohlman, Beverly Errede, and Steven Matson ("Defendants"), argue they are entitled to summary judgment on all of the remaining claims brought by Patrick C. McCarter ("Plaintiff"), (ECF No. 66 at 1), whereas Plaintiff argues that he is entitled to summary judgment on all his claims, (ECF No. 73 at 1).  For the reasons stated herein, Defendants'

---

[1] Defendants, in their Response to Plaintiff's Motion for Summary Judgment, highlight in a footnote that Plaintiff filed his summary judgment motion after the deadline set by the Magistrate Judge.  (ECF No. 79 at 1 n.1.)  Defendants do not make any arguments about the untimely filing, and upon further investigation, it appears that Plaintiff's motion and supporting brief were filed minutes after the deadline.  This Court takes case deadlines seriously.  In light of the circumstances outlined above, particularly that Defendants did not argue that they were prejudiced in any way and that Plaintiff's motion is fully briefed, this Court finds that Defendants were not prejudiced by Plaintiff's untimely filing.  Therefore, the Court will consider Plaintiff's Motion for Summary Judgment.

motion for summary judgment will be granted in part and denied in part. Additionally, Plaintiff's motion for summary judgment will be denied.

## I.    BACKGROUND

Plaintiff, who is African American, (ECF No. 66-9 at 223:5-8), obtained his Ph.D. from the University of North Carolina at Chapel Hill after enrolling in August 2011 and graduating in August 2017, (*id.* at 12:5, 124:22–125:9). Plaintiff was a student in the Biological and Biomedical Sciences program ("BBSP") pursuing his Ph.D. in Bioinformatics and Computational Biology ("BCB"). (*Id* at 86:25–87:3, 96:11-13.) To complete the Curriculum in Bioinformatics and Computational Biology and graduate, Plaintiff had to complete classes and coursework, form a doctoral committee to serve as advisors, conduct research, meet with his committee annually, publish an article in a peer-reviewed scientific journal as a primary author (*id.* at 95:10-19; ECF No. 66-3 ¶ 12), receive approval from his committee to write his dissertation once they verified that he satisfied the necessary requirements, write a dissertation, defend his dissertation, and submit the dissertation to UNC-CH. (ECF No. 66-9 at 95:23–96:13.)

Plaintiff formed his doctoral committee in or around 2015. (ECF No. 66-1 ¶ 16.) Plaintiff selected as his advisor Defendant Timothy Elston, (ECF No. 66-9 at 91:20-23), and Defendant Elston agreed to serve as Plaintiff's advisor and allow Plaintiff to work in his lab, (ECF No. 66-3 ¶ 17). Plaintiff and Defendant Elston asked Defendant Henrik Dohlman to serve as a co-advisor, and he accepted. (ECF No. 66-3 ¶¶ 18–19.) Defendant Beverly Errede worked with Plaintiff on his experiments and provided Plaintiff with guidance and feedback on a manuscript that he was writing on his research. (ECF No. 66-5 ¶¶ 7–8.) Initially, Plaintiff

2

selected Dr. Shawn Gomez, Defendant Elston, Defendant Dohlman, Defendant Errede, and Dr. Laura Miller to serve on his doctoral committee, with Dr. Gomez serving as the chair of the committee. (ECF No. 66-9 at 101:8-21.)

After Plaintiff completed a co-first author manuscript in 2015, (*id.* at 110:10-18), Defendant Elston told Plaintiff he would support him graduating at any time as Plaintiff "had satisfied the requirements of the curriculum," (ECF No. 74-4 at 108:17-18).

On October 4, 2016, Plaintiff met with his doctoral committee and updated the committee on his research, manuscript, and dissertation preparation. (ECF No. 66-3 ¶ 27.) At the meeting, Plaintiff informed the committee that he thought he could complete his research and dissertation by December 2016 and asked the committee for approval to set a date for his dissertation defense. (*Id.*) Plaintiff indicated that he wanted to finish his manuscript before he graduated and stressed that he wanted to defend his dissertation in December 2016 because several members of his family, who were members of the military, were going to be deployed, and he wanted them to attend his public defense. (*Id.*) The committee members thought Plaintiff's presentation was not well-organized and did not think he was far enough along in his research to prepare a Ph.D.-worthy dissertation. (*Id.* at ¶ 28.) The committee decided in its academic judgment that Plaintiff was not ready to defend his dissertation and obtain his Ph.D. in December 2016. (*Id.*) Although Plaintiff's committee denied his request to set his dissertation defense in December 2016 for the purpose of obtaining his Ph.D., the committee advised Plaintiff that he could present the public portion of his Ph.D. defense in December 2016 so that his family members could attend. (*Id.* at ¶ 30.)

3

Based on its concerns regarding Plaintiff's progress with his research and dissertation, the committee advised Plaintiff that he needed to finish a draft of his manuscript before he scheduled his private committee defense. (*Id.* at ¶ 31.) Plaintiff's manuscript and dissertation were on the same topic. (*Id.*) The committee believed that Plaintiff preparing a manuscript for submission to a scientific journal would help him prepare a tighter, well-organized, readable dissertation. (*Id.*) The committee did not require Plaintiff to submit his manuscript to a journal or publish his manuscript in a journal before graduating, but only required that he finish a draft of the manuscript. (*Id.*) The committee and Plaintiff agreed that February 2017 would be a reasonable target date for Plaintiff's next meeting. (*Id.* at ¶ 36.) The committee anticipated that Plaintiff would be ready to set his committee dissertation defense at that meeting. (*Id.*) Plaintiff did not object during the October 4, 2016, meeting. (*Id.* ¶ 35.) As of October 4, 2016, Plaintiff had published a manuscript as co-first author in 2015 "which technically satisfied BCB's requirement of publishing a first author paper." (ECF No. 66-2 ¶ 31.) However, Plaintiff had not published an article or completed a manuscript on the research that was the main focus of his dissertation work in the BCB program, or the NIH grant he received, despite having published the 2015 manuscript. (*Id.*; ECF No. 66-3 ¶ 31.)

Director of Graduate Studies for the BCB, Dr. Valdar, reported that, "[i]t is not uncommon for students to believe they are ready to defend their [dissertation] before their [dissertation] committee agrees to allow them to do so." (ECF No. 66-2 ¶ 28; *see also* ECF No. 66-3 ¶ 37 (Defendant Elston explaining that "[i]t is not uncommon for committees to deny a student's first request to defend and graduate.").) The chair of Plaintiff's committee, Dr. Gomez, reported that in situations where students believe they are ready to defend their

dissertation and graduate before the committee believes they are ready, "the committee will identify what additional work it would like to see before a defense date is set." (ECF No. 66-1 ¶ 15.) Defendant Dohlman reported that "[i]f the . . . [doctoral] committee judges that the student is not ready to defend . . . they will not allow the student to schedule a defense, which is . . . extremely rare." (ECF No. 74-3 at 32:16-20.)

The record reflects that Plaintiff claims that he met regularly with his advisors, (ECF No. 66-9 at 297:1-5), and that Defendant Elston was consistently available (*id.* at 253:23–254:10). Although Plaintiff had stopped updating Defendant Dohlman on his manuscript in December 2016, (*id.* at 299:9-22), Plaintiff, at the advice of Defendant Elston, resolved his issues with Defendant Dohlman in February 2017, and Defendant Dohlman continued to give Plaintiff feedback, (*id.* at 311:24–317:2). Plaintiff also claims, however, that he was "struggling to get feedback from Dr. Timothy Elston and Dr. Henrik Dohlman about specifically how to write up the research," (*id.* at 188:17-19), that he believed he received less feedback from Defendant Dohlman or Defendant Elston or Defendant Errede than other students, and that he believed the feedback he received was impeding his progress on finishing the draft manuscript, (*id.* at 236:6–239:2). Email exchanges in the record show that between September 2016 and July 2017, Plaintiff received regular feedback from Defendant Elston, Defendant Dohlman, and Defendant Errede when he sought it. (*See generally* ECF No. 66-8.)

Dr. Valdar, Assistant Director of BCB, reports that it is common for students in final stages of obtaining their Ph.D. to become impatient with their advisors. (ECF No. 66-2 ¶ 28.) Dr. Valdar reports that this is because advisors are not always able to provide feedback and attention to a student as quickly as students prefer, as advisors have many other duties

including working with other students, teaching classes, preparing grants, obtaining funding, and writing fellowship and post-doctoral recommendations. (*Id.*)

The record indicates that the microscope in Defendant Elston's lab broke down in or around January 2017, which caused a delay in Plaintiff's and other student's work. (ECF No. 66-3 ¶ 42.) Plaintiff stopped communicating with Defendant Elston as frequently as he had in the past, and the few communications that Plaintiff had with Defendant Elston were through email. (*Id.* ¶ 44.) Defendant Elston explained that Plaintiff appeared to be physically avoiding him. (*Id.*)

Plaintiff did not schedule a meeting with his doctoral committee in February 2017 as discussed at the October 2016 meeting. (ECF No. 66-9 at 124:1-4, 129:2-4.) On May 10, 2017, Plaintiff emailed the chair of the committee, Dr. Gomez, and asked to set a defense date. (ECF No. 66-1 ¶ 32.) Defendant Elston was not aware that Plaintiff was going to email Dr. Gomez on this date, but neither he nor any other committee member objected to Plaintiff's request. (ECF No. 66-3 ¶ 46.) Dr. Gomez responded on May 22, 2017, proposing dates that he was available. (ECF No. 66-1 ¶ 33.) After coordinating with Plaintiff and the committee, the defense was ultimately scheduled for July 7, 2017. (*Id.* ¶ 34.) Although Dr. Gomez had a conflict on this date, Dr. Gomez did not want to delay Plaintiff's defense, and informed Plaintiff that he could move forward with the committee defense without him. (*Id.*) On June 24, 2017, Plaintiff submitted his dissertation to the committee. (*Id.* ¶ 35.) On June 27, 2017, Plaintiff emailed Dr. Gomez, requesting that Dr. Barry Lentz be added to his doctoral committee and serve as chair in Dr. Gomez's absence. (*Id.* ¶ 36.) Plaintiff stated

6

that he was worried about presenting his defense to a committee with an even number of committee members. (*Id.*)

Defendant Elston was concerned about Plaintiff's request to add Dr. Lentz as chair, in part because Dr. Lentz was not BCB faculty, and according to BCB protocol, the chair of a BCB student's dissertation committee must be BCB faculty. (ECF No. 66-3 ¶ 48.) Because Defendant Elston was both Program Director and Plaintiff's advisor, to avoid any appearance of a conflict of interest, he sought assistance from Dr. Valdar, the Assistant Director of BCB, to handle Plaintiff's request to add Dr. Lentz to his doctoral committee. (*Id.* at ¶ 49.) Defendant Elston also asked Dr. Valdar to attend Plaintiff's defense as an impartial observer in light of Plaintiff's frustrations with his advisors and committee. (*Id.*) Defendant Elston also sought assistance from Dr. Ashalla Freeman who was the Director of Diversity Affairs for BBSP and served as a resource and mentor to Plaintiff. (*Id.* ¶ 50.) Defendant Elston talked with Dr. Freeman about Plaintiff in June and July of 2017. (*Id.*) At one point, Defendant Elston, Defendant Errede, and Plaintiff met with Dr. Freeman to discuss Plaintiff's concerns to determine how best to move forward with Plaintiff's dissertation defense and the completion of his manuscript. (*Id.*)

On June 15, 2017, Plaintiff emailed Associate Dean for Student Affairs for the University's Graduate School, Dr. Leslie S. Lerea, requesting a meeting. (ECF No. 66-6 at 1, ¶¶ 2, 10.) In his email, Plaintiff stated that he was having problems with his advisors and dissertation committee, specifically that his dissertation committee did not allow him to set his dissertation defense date during the committee meeting in October and required him to complete a draft of a second first-author manuscript before he could set his defense date, and

that he was having difficulty getting feedback on the manuscript from his advisors. (*Id.* ¶ 10.) Plaintiff met with Dr. Lerea on June 19, 2017. (*Id.* ¶ 12.) Plaintiff emailed Dr. Lerea on June 24, 2017, and described various feedback that he had received from his advisors since the June 19 meeting. (*Id.* ¶ 13.) Plaintiff met with Dr. Lerea on June 27, 2017, and during the meeting indicated that he wanted to add Dr. Lentz to his dissertation committee due to the tension he was experiencing with his advisors and because Dr. Gomez was not able to attend Plaintiff's defense. (*Id.* ¶ 15.) After the meeting, Dr. Lerea contacted Plaintiff's advisors to get additional information, and Defendant Elston suggested that Dr. Lerea also contact Dr. Freeman, which she did. (*Id.* ¶¶ 16-17.) Dr. Lerea reports that neither Plaintiff nor Dr. Freeman voiced or raised any concerns that she believed fell within the definition of prohibited conduct in the University's policy on discrimination, harassment, and retaliation, which prohibit discrimination and harassment based on protected statuses including race. (*Id.* ¶ 25; *see id.* at 56, 59–62.)

On July 5, 2017, Dr. Lerea emailed everyone involved (Plaintiff, Defendant Elston, Defendant Dohlman, Defendant Errede, Dr. Lentz, and Dr. Valdar), summarizing the outcome of her discussions and meetings, including that everyone agreed to add Dr. Lentz as a committee member and Dr. Laura Miller would serve as the chair as she was already on the committee and a BCB faculty member. (*Id.* ¶ 20.) Also, in her email, Dr. Lerea encouraged Plaintiff to contact Dr. Valdar to sign off on the addition. (*Id.*) Dr. Lerea copied Dr. Steve Matson, who was the Dean of the Graduate School at the University, to whom Dr. Lerea reported. (*Id.* ¶ 21.) Dr. Lerea included Defendant Matson on the email to advise him of the situation and let him know how it was resolved in case anyone contacted him about Plaintiff.

(*Id.*)  Dr. Lerea reports that she did not involve Defendant Matson earlier because Plaintiff's concerns did not rise to the level which required his involvement.  (*Id.*)  That same day, Plaintiff replied to Dr. Lerea stating, "I met with Will Valdar this morning.  I believe everyone is now on the same page with regards to the procedure for my defense."  (*Id.*)  The committee agreed that Plaintiff could move forward with his dissertation defense although he had not completed a satisfactory draft of his manuscript.  (ECF No. 66-3 ¶ 52.)  Plaintiff agreed to a plan to work directly with Defendant Errede on his manuscript from that point forward; according to the plan, after Defendant Errede and Defendant Dohlman were satisfied with his manuscript, Defendant Elston would return to the review process and provide final feedback.  (*Id.*)

Plaintiff defended his dissertation, publicly and privately, on July 7, 2017. (*Id.* ¶ 55.) Plaintiff passed his defense after a unanimous vote in his favor by all committee members. (*Id.*)  On July 24, 2017, Plaintiff began a post-doctoral fellowship with the UNC-CH Pharmacy School in Dr. Yanguang Cao's lab.  (ECF No. 66-13 at 1, ¶¶ 3, 12).

Defendant Elston did not provide Plaintiff feedback on his manuscript after Plaintiff obtained his Ph.D. and started his post-doctoral fellowship because Plaintiff and his advisors agreed that Defendant Elston would provide final feedback after Defendant Errede and Defendant Dohlman signed off on the manuscript.  (ECF No. 66-3 ¶ 56.)  The record indicates that Defendant Errede and Defendant Dohlman continued to provide Plaintiff feedback on his manuscript after he obtained his Ph.D.  (ECF No. 66-4 at 1, ¶ 48, 97:4–98:13; ECF No. 66-5 ¶¶ 34-35, 52:21-25).   On September 1, 2017, Defendant Dohlman emailed Plaintiff indicating that he would like to see a complete draft and stated that he would "provide detailed comments. . . within one week of receiving a complete document" and would "copy comments

9

to [Plaintiff], [Defendant Elston] and [Defendant Errede]" with [his] personal request that they respond as soon as possible." (ECF No. 66-4 ¶ 49). However, Plaintiff never responded. (*Id.* ¶ 50). On October 2, 2017, Plaintiff sent Defendant Errede figures and legends, and Defendant Errede responded, "Great. But I still don't have the latest version of the manuscript." (ECF No. 66-5 ¶ 35). Plaintiff never responded to Defendant Errede with a manuscript. (ECF Nos. 66-9 at 352:19-21; 66-5 ¶ 36). Plaintiff never sent a completed draft manuscript to his advisors. (ECF No. 66-9 at 231:1-9, 352:2-21.)

On December 19, 2017, Dr. Lentz sent an email to Defendant Matson with the subject line: "my concern about abuse of a graduate student CONFIDENTIAL." (ECF No. 66-7 at 68.) In the email he stated, "[w]hile I think that simple faculty bullying and not racism is behind his troubles, it would not look good if he has to resort to extreme measures to get his paper submitted." (*Id.*) Dr. Lentz also stated in this email that "[a] complication is that another student in the Biophysics Program approached me about similar problems with these same two faculty members" and that "[a] post-doc of color recently left these labs to work full time in the lab of a collaborator." (*Id.*) Dr. Matson asked Dr. Hoi Ning Ngai, who was Associate Dean for Student Affairs, to follow up with Dr. Lentz, which she did. (*Id.* at 69–80.) The record does not reflect what, if any, subsequent actions were taken by Dr. Ngai, however, the record does reflect that Dr. Ngai never reported to Defendant Matson that further involvement from him was necessary or that racial discrimination was an issue with Plaintiff. (*Id.* at ¶¶ 14–15.)

Ultimately, on June 5, 2018, Plaintiff unexpectedly resigned from his post-doctoral fellowship position after accepting a job in private industry because he would make

significantly more money. (ECF No. 66-13 ¶¶ 14–15). Plaintiff asserts that he "discovered that his innovative research was likely being reattributed to another student" and on March 5, 2019, sent cease-and-desist letters to his advisors and copied UNC's Chancellor, the Dean of the Graduate School, and other relevant administrators and faculty. (ECF Nos. 74 at 2, 17; 66-9 at 158:21–159:4.)

Plaintiff initiated this lawsuit on November 20, 2020, against UNC-CH and certain administrators, faculty, and staff, alleging that they discriminated against him based on his race. (*See generally* ECF No. 1.) With leave from the Court, Plaintiff amended the Complaint on November 1, 2021. (ECF No. 36.) Thereafter, Defendants filed an Answer, (ECF No. 40), and moved to partially dismiss Plaintiff's Amended Complaint, (ECF No. 38), and Plaintiff moved once again to Amend his Complaint, (ECF No. 45).

Plaintiff's claims that remain in the lawsuit after this Court ruled on both Defendants' Partial Motion to Dismiss and Plaintiff's Motion for Leave to Amend the First Amended Complaint are as follows: (1) racial discrimination and harassment in violation of Title VI against UNC-CH; (2) retaliation in violation of Title VI against UNC-CH; (3) racial discrimination in violation of the Equal Protection Clause pursuant to 42 U.S.C. § 1983 against Defendants Elston, Errede, and Dohlman in their individual capacities; (4) supervisor liability pursuant to 42 U.S.C. § 1983 against Defendant Matson in his individual capacity; and (5) civil conspiracy against Defendants Elston, Errede, and Dohlman in their individual capacities. (*See* ECF No. 49 at 1, 13.) Defendants and Plaintiff now move, respectively, for summary judgment on all claims. (ECF Nos. 66; 73.)

## II.    SUMMARY JUDGMENT

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (citations and internal quotation marks omitted).  "[I]n deciding a motion for summary judgment, a district court is required to view the evidence in the light most favorable to the nonmovant" and to "draw all reasonable inferences in his favor." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019) (citing *Jacobs*, 780 F.3d at 568).  A court "cannot weigh the evidence or make credibility determinations," *Jacobs*, 780 F.3d at 569 (citations omitted), and thus must "usually" adopt "the [nonmovant's] version of the facts," even if it seems unlikely that the nonmoving party would prevail at trial, *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

Where the nonmovant will bear the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the moving party carries this burden, then the burden shifts to the nonmoving party to point out "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In so doing, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).  Instead, the nonmoving party must support

12

its assertions by "citing to particular parts of . . . the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1); *see also Celotex*, 477 U.S. at 324. Where, as in this case, the Court has before it cross-motions for summary judgment, the Court reviews each motion separately to determine if either party is entitled to judgment as a matter of law. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).

## A. Racial Discrimination and Harassment in Violation of Title VI Against UNC-CH

### 1. Racial Discrimination

Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. If there is no direct evidence of racial discrimination, claims of racial discrimination brought under Title VI are analyzed under a test announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), by the U.S. Supreme Court. *Maisha v. Univ. of N. Carolina*, 641 F. App'x 246, 250 (4th Cir. 2016) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802–05). Under this test, to establish a prima facie case of racial discrimination, a plaintiff must show that he: (1) was a member of a protected class, (2) was qualified to continue in the educational program; (3) suffered an adverse action; and (4) was treated differently from similarly situated students who were not members of the protected class. *Elliott v. Del. State Univ.*, 879 F. Supp. 2d 438, 443 (D. Del. 2012); *see also Sanders v. Tikras Tech. Sols. Corp.*, 725 F. App'x 228, 230 (4th Cir. 2018) (per curiam) (applying the *McDonnel Douglas* framework to racial discrimination in employment). The burden of establishing a prima facie case under this test "is not onerous." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S.

Case 1:20-cv-01050-LCB-JLW   Document 99   Filed 03/15/24   Page 13 of 40

248, 253 (1981). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the adverse action. *Middlebrooks v. Univ. of Maryland.*, 166 F.3d 1209 (table), 1999 WL 7860, at *4 (4th Cir. Jan. 11, 1999) (unpublished). If the defendant provides such evidence, "the burden shifts back to the plaintiff to show that the proffered reason is a pretext to mask unlawful discrimination." *Id.*

The first element is not disputed. As an African American man, Plaintiff is a member of a protected class. *See Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994). There is also no dispute with respect to the second element. Although Defendants argue that Plaintiff was not qualified to graduate earlier or to publish a manuscript he never finished, (ECF No. 71 at 17), and Plaintiff alternatively argues that Defendants inexplicably delayed Plaintiff's graduation, (ECF No. 74 at 12), the Parties do not contest that Plaintiff qualified to continue in the doctoral program.[2]

With respect to the third element, Defendants argue that Plaintiff did not suffer an adverse action because he was not at any time excluded from participating in any educational programs or benefits. (ECF No. 71 at 15.) Plaintiff argues that he suffered several adverse actions: (1) Defendants added a new qualification before UNC-CH would permit Plaintiff to defend his dissertation and graduate that no other student was required to complete; (2) Defendants removed Plaintiff from a longstanding research project; (3) Defendants refused to publish Plaintiff manuscript, and (4) Defendants plagiarized Plaintiff's work. (ECF No. 74

---

[2] The Court declines to settle whether Plaintiff could have graduated earlier, as that question is not posed under this element of the applicable standard discussed above. The Court addresses the Parties' arguments concerning this question when discussing whether the additional writing requirement was an adverse action.

14

at 12.) An adverse action is a "significant change" in status or benefits. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011). The Court will address each of the alleged adverse actions in turn.

The first adverse action Plaintiff claims is that Defendants added a qualification for Plaintiff to complete before he could defend his dissertation and graduate. (ECF No. 74 at 12.) The record reflects that the committee determined that Plaintiff was not ready to defend in December 2016 as Plaintiff had proposed and that the committee instructed Plaintiff to do additional research and draft a manuscript on his dissertation topic. (*See* ECF Nos. 66-1 ¶¶ 20-22; 66-3 ¶ 69; 66-4 ¶ 56; 66-5 ¶ 41; 66-3 at 106–07; 66-4 at 100–05; 66-5 at 52.)

"When judges are asked to review the substance of a genuinely academic decision, . . . they should show great respect for the faculty's professional judgment." *Davis v. Univ. of N. Carolina*, 263 F.3d 95, 102 (4th Cir. 2001) (alterations in original) (citations and internal quotation marks omitted). In affording the committee's decision proper deference, the decision that Plaintiff was not prepared to defend his dissertation in December 2016 and to instruct Plaintiff to do additional research and writing and revisit the scheduling of his defense in February 2017 was not "such a substantial departure from accepted academic norms as to demonstrate that [the committee] did not exercise professional judgment." *Maisha v. Univ. of N. Carolina*, No. 1:12-CV-371, 2015 WL 277747, at *7 (M.D.N.C. Jan. 22, 2015) (internal quotation marks omitted) (quoting *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 227 (1985)), *aff'd*, 641 F. App'x 246 (4th Cir. 2016).

Even in affording the committee deference with respect to its academic decision, there is a conflict in the record. Defendant Elston, Plaintiff's advisor, acknowledged that he would

support Plaintiff graduating at any time as Plaintiff "had satisfied the requirements of the curriculum," (ECF No. 74-4 at 108:7-18), in 2015; however, at the October 2016 meeting, the committee, including Defendant Elston, stated that Plaintiff was not ready to defend his dissertation and graduate and required Plaintiff to write a draft manuscript. (ECF No. 66-3 ¶ 31.) The record also reflects that Plaintiff indeed defended his dissertation in July 2017, without having completed this draft manuscript, because he had "met the technical publication requirement for BCB," (ECF No. 66-2 ¶ 33), which conflicts with the October 2016 requirement that Plaintiff complete a draft manuscript in order to defend his dissertation and graduate. Therefore, the Court finds that there are material factual disputes with respect to whether the committee's requirement that Plaintiff complete a draft manuscript on his dissertation was an adverse action.

Second, Plaintiff claims that Defendants removing him from a longstanding research project was an adverse action. (ECF No. 74 at 12.) Although, in his brief in support of his Motion for Summary Judgment, Plaintiff asserts that Defendants removed him from a longstanding research project, Plaintiff cites no evidence in the record to support this claim, (*see id.* at 12–13), and he cites irrelevant evidence that does not support this assertion in the pertinent portion of his Response to Defendants' Motion for Summary Judgment, (ECF No. 80 at 8). This Court "has no duty to and does not scour the record to locate uncited evidentiary support for a party's factual assertions." *Seaman v. Duke Univ.*, No. 1:15-CV-462, 2018 WL 10446957, at *1 (M.D.N.C. June 6, 2018) (citing *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001)). Therefore, the Court finds that Plaintiff has failed to establish this adverse action.

Third, Plaintiff claims that Defendants plagiarized his work and that this was an adverse action. (ECF No. 74 at 12.) Plaintiff repeatedly states that his work was plagiarized without citing to the record. (*See id.* at 12, 13, 15, 17, 18, 19.) Defendants offer evidence that supports their contention that Plaintiff's allegations of plagiarism are not supported. (*See* ECF Nos. 66-5 at 75–80; 66-4 ¶¶ 52–54; 66-3 ¶¶ 64–67 (describing the differences between Plaintiff's work and the work of the student, Kimiko Suzuki-McGirr, that Defendants allegedly aided in plagiarizing Plaintiff's work).) Furthermore, the record reflects that plagiarism software used by UNC-CH did not detect plagiarism between the manuscripts and dissertations of Plaintiff and Suzuki-McGirr. (ECF No. 66-4 ¶ 53.) In his Reply brief, Plaintiff attaches a side-by-side comparison performed by Plaintiff comparing his dissertation and manuscript drafts with Suzuki-McGirr's manuscript. (ECF No. 82 ¶ 8 (citing ECF No. 82-3).) Because the Court does not weigh the credibility of evidence at this stage, the Court finds that there are disputes of the material fact in the record with respect to whether Defendants wrongfully used Plaintiff's draft manuscript.

Finally, Plaintiff claims that Defendants refused to publish Plaintiff's manuscript. (ECF No. 74 at 12.) However, the record reflects that Plaintiff did not respond to either Defendant Errede or Defendant Dohlman's emails after his graduation when they requested a draft of the manuscript. (ECF Nos. 66-4 ¶¶ 49–50; 66-5 ¶¶ 35–36). The Court also considers that evidence in the record reflects that false allegations of student non-responsiveness was allegedly used as a tactic by Defendant Elston and Defendant Errede against a student after the student did not agree with the publication approach of these professors. (*See generally* ECF

No. 80-2.) In this case, however, Plaintiff admitted that he never sent a completed draft manuscript to his advisors. (*See* ECF No. 66-9 at 231:1-9, 352:2-23.)

Although Plaintiff's other alleged adverse actions fail, there are material factual disputes with respect to (1) whether the additional draft manuscript requirement imposed at the October 2016 meeting was an adverse action and (2) whether Defendants wrongfully used Plaintiff's draft manuscript.

Finally, as to the fourth element, treatment different from the treatment of similarly situated students who were not members of the protected class, the Court first addresses the additional draft manuscript requirement imposed at the October 2016 meeting. Defendants argue that Plaintiff cannot show that similarly situated students were allowed to publish or graduate sooner. (ECF No. 71 at 19.) In his Response to Defendants' Motion for Summary Judgment, Plaintiff cites the Amended Complaint and unattached discovery responses arguing that he was treated differently than several similarly situated students. (ECF No. 80 at 9–10.) In Plaintiff's brief in support of his Motion for Summary Judgment, Plaintiff argues without citing any evidence in the record that "Defendants continued to work with a number of non-African American students to publish their manuscripts, including providing meaningful feedback, while simultaneously refusing to work with [Plaintiff] and otherwise obstructing his progress." (ECF No. 74 at 13.) Although not attached to Plaintiff's Response, Plaintiff has pointed to evidence in the record that establishes that he was treated differently from similarly situated students who were not members of the protected class. (ECF No. 66-12 at 5–7.) Defendants contend that the students that Plaintiff identified were not similarly situated as "[m]any were post-doctoral fellows who had already graduated," "[s]everal were not in the

BCB curriculum," "[m]ost did not have Elston and Dohlman as co-advisors," and "[o]nly one student had Errede as an advisor." (ECF No. 71 at 19–20 (citing ECF Nos. 66-3 ¶ 74; 66-4 ¶¶ 59–60; 66-5 ¶¶ 43–44).) At this stage of the case, the Court cannot make credibility determinations or weigh evidence in the record. Therefore, the Court finds that there are factual disputes as to whether comparators exist and were treated differently than Plaintiff.

Assuming Plaintiff has established a prima facie case, the burden would shift to the Defendants to provide a legitimate, nondiscriminatory reason for the adverse action. Defendants contend that the committee exercised its academic judgment and determined that Plaintiff's presentation was not organized, and that further work was needed before he obtained his degree. (ECF No. 71 at 21 (citing ECF Nos. 66-1 ¶¶ 20–22; 66-3 ¶ 69; 66-4 ¶ 56; 66-5 ¶ 41).) Based on this assessment, the committee determined that completing a draft of his manuscript would help him become better prepared to defend, and that it would be in Plaintiff's best interest (as well as the University's) to publish an article on his main work as a BCB Ph.D. student. (*See* ECF Nos. 66-1 ¶¶ 24–25; 66-3. ¶ 69; 66-4 ¶¶ 25–26, 56; 66-5 ¶ 19, 41; 66-3 at 106–07; 66-4 at 100–05).) The Court finds that Defendants have met their burden in providing a legitimate, nondiscriminatory reason for this alleged adverse action.

Because Defendants have provided this evidence, "the burden shifts back to the plaintiff to show that the proffered reason is a pretext to mask unlawful discrimination." *Middlebrooks*, 1999 WL 7860, at *4. Plaintiff must show "by a preponderance of the evidence that the legitimate reasons offered by the [D]efendant[s] were not . . . [their] true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, (2000). "The Fourth Circuit has clearly held that, at a minimum, proof of pretext is required

19

to survive" a motion for summary judgment. *Gary v. Freightliner*, 394 F. Supp. 2d 773, 777–78

(W.D.N.C. 2005), *aff'd sub nom. Gary v. Freightliner LLC.*, 169 F. App'x 756 (4th Cir. 2006).

> A plaintiff when faced with a motion for summary judgment cannot rely on attenuated possibilities that a jury would infer a discriminatory motive, but rather must come forward with sufficient evidence to establish a prima facie case and respond sufficiently to any rebuttal by the defendant to create a genuine issue of material fact. Even where a prima facie case has been established but the defendant has rebutted with a proffer of legitimate, non-discriminatory reasons for the [adverse employment action] a genuine issue of material fact is not automatically presented.

*Id.* at 777 (alteration in original) (citing *McDaniel v. Mead Corp.*, 622 F. Supp. 351, 355 (W.D.

Va. 1985) (quoting *Pace v. Southern Ry. Sys.*, 701 F.2d 1383, 1391 (11th Cir. 1983)), *aff'd* 818 F.2d

861 (4th Cir. 1987). "To establish pretext, [a] plaintiff must either show that [a] defendant's

proffered reason is 'unworthy of credence' or 'offer other forms of circumstantial evidence. .

. .'" *White v. Gaston Cnty. Bd. of Educ.*, No. 3:16-CV-552, 2018 WL 1652099, at *12 (W.D.N.C.

Apr. 5, 2018) (citations omitted). Here, Plaintiff has done neither.

Plaintiff argues that Defendants "have not produced any admissible evidence that any

other Ph.D. student similarly situated to Plaintiff, [in] the Program, or otherwise, who having

met their program's requirements were then subjected to 'last minute' additional requirements

far beyond what was required by their degree granting program." (ECF No. 80 at 10–11.)

Therefore, Plaintiff argues that the addition was racially discriminatory. Because Defendants

have provided a non-discriminatory explanation for their decision, Plaintiff "cannot seek to

expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt

on the explanation's validity, or by raising points that are wholly irrelevant to it." *Holland v.*

*Washington Homes, Inc.*, 487 F.3d 208, 216 (4th Cir. 2007) (citations and internal quotation marks

omitted). A genuine dispute is created where the reason provided is "so questionable as to

20

raise an inference of deceit." *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 254 (4th Cir. 2015). "Deviation from regular procedures is a classic example of evidence used to show pretext." *Weaks v. N.C. Dep't of Transp.*, 761 F. Supp. 2d 289, 304 (M.D.N.C. 2011) (citations and internal quotation marks omitted). The record reflects both that Plaintiff was disorganized during the October 2016 meeting and that working on the draft manuscript was essentially working toward his dissertation. The record also reflects that the committee attempted to add an additional writing requirement in order for Plaintiff to graduate, which could be reasonably characterized as a major discrepancy from the BCB program requirements. Even considering this discrepancy, Plaintiff has failed to show by a preponderance of the evidence that Defendants' reasons for adding the additional writing requirement were *pretextual. See White*, 2018 WL 1652099, at *12 ("[I]t is not the court's job to decide whether a given reason for adverse action was 'wise, fair, or even correct . . . so long as it truly was the reason. . . .'" (quoting *Mercer v. PHH Corp.*, 641 F. App'x 233, 240 (4th Cir. 2016) (unpublished)). Therefore, Plaintiff has not pointed to sufficient evidence to support his claim that the additional draft manuscript requirement imposed at the October 2016 meeting was a result of racial discrimination.

With respect to the second potential adverse action, Defendants argue that Plaintiff has not identified any work copied directly from his manuscript or dissertation. (ECF No. 79 at 17.) However, as previously discussed, there are disputed facts in the record with respect to whether Plaintiff's work was plagiarized and whether Defendants misused Plaintiff's draft manuscript. The record reflects that publication of Plaintiff's work was an important and expected benefit of his Ph.D. program that would have improved his access to future

21

employment. The record reflects that there is also a professional benefit to being the first to publish on one's Ph.D. topic. Given that the standard for establishing a prima facie case of discrimination is not onerous, the Court finds that if this conduct did occur, plagiarizing or misappropriation of Plaintiff's work is an adverse action.

Evidence in the record suggests that during a meeting on December 12, 2016, Defendants Elston and Dohlman instructed Plaintiff to split his manuscript into two separate manuscripts with Dr. Matthew Martz as a first author on one manuscript. (ECF No. 80-2 ¶¶ 8–9.) The record also includes allegations from another student of color that Defendants Errede and Elston misappropriated the work of that student after she graduated from the institution and published that student's work without listing the student as an author. (*Id.* ¶¶ 15–40.) Although these allegations involve another student, the Court cannot ignore the significant similarity to the alleged conduct involving Defendants in this case and Plaintiff, another student of color. Defendants have not provided a legitimate, nondiscriminatory reason for this alleged adverse action, as they deny allowing any student to plagiarize Plaintiff's work. Even if ultimately plagiarism is not found, the facts currently before the Court raise conflicting inferences about whether Defendants misused Plaintiff's work as a result of racial discrimination, and for this reason, summary judgment is inappropriate. *See Morrison v. Nissan Motor Co., Ltd.*, 601 F.2d 139, 141 (4th Cir. 1979) ("[E]ven though there may be no dispute about the basic facts, still summary judgment will be inappropriate if the parties disagree on the inferences which may reasonably be drawn from those undisputed facts.") Therefore, Defendants' motion for summary judgment as to wrongful use of Plaintiff's draft manuscript fails.

Although Plaintiff has pointed to enough information in the record to defeat Defendants' summary judgment motion in part, the disputes in the record also make summary judgment in Plaintiff's favor inappropriate. Furthermore, Plaintiff has not provided or pointed to sufficient undisputed factual evidence to support his racial discrimination claim such that he is entitled to judgment as a matter of law. Accordingly, Plaintiff's motion for summary judgment as to racial discrimination is denied. Defendants, on the other hand, have demonstrated that the undisputed facts do not support Plaintiff's claim for racial discrimination under the *McDonnel Douglas* framework, with the only exception being whether Defendants wrongfully used Plaintiff's draft manuscript, as there are factual disputes on this issue. Therefore, Defendants' motion for summary judgment as to racial discrimination claim against UNC-CH is granted, with exception to the potential adverse action that Defendants wrongfully used Plaintiff's draft manuscript.

### 2. Racial Harassment

To state a claim for Racial Harassment under Title VI, a plaintiff must establish that (1) the defendant is "an educational institution receiving federal funds," (2) plaintiff "was subjected to harassment based on" his race, (3) "the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity," and (4) "there is a basis for imputing liability to the institution." *DJ ex rel. Hughes v. Sch. Bd. of Henrico Cnty.*, 488 F. Supp. 3d 307, 332 (E.D. Va. 2020) (internal quotation marks omitted) (quoting *Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 695 (4th Cir. 2007)). Under the second element, a plaintiff may show he was harassed based on his race by showing that he was treated differently than similarly situated students. *Causey v. Balog*, 162 F.3d 795, 801–02 (4th Cir.

23

1998) (citing *Carter*, 33 F.3d at 461–62). Under the third element, harassment is sufficiently severe or pervasive "when it creates 'an environment that a reasonable person would find hostile or abusive' and that the victim h[im]self 'subjectively perceive[s] . . . to be abusive.'" *Jennings*, 482 F.3d at 696 (alteration in original) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Under the fourth element, liability can be imputed to a university when "an official who . . . has authority to address the alleged discrimination and to institute corrective measures . . . has actual knowledge of discrimination in the [institution's] programs and fails adequately to respond" or displays "deliberate indifference." *Id.* at 700 (alteration in original) (internal quotation marks omitted) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)).

The first element is not disputed as neither Party contests that UNC-CH is an educational institution receiving federal funds. With respect to the second element, Plaintiff's arguments indicate that he seeks to demonstrate harassment based on race by showing that he was treated differently than similarly situated students. (ECF No. 74 at 14.) Plaintiff contends that he was "the only African American man in the department, [and] was the only student singled out for mistreatment." (*Id.*) With respect to the third element, the severity and pervasiveness of the harassment, Plaintiff contends:

> For nearly a year, [Plaintiff's] advisors—the professors tasked with guiding and supporting Plaintiff—refused to meaningfully interact with him. They ignored his emails and dropped meetings. During his dissertation defense, they publicly shamed him by refusing to introduce him or engage at all with his presentation, and thereafter refused to sign the form that would allow him to graduate. They allegedly made threats, refused to publish his work, and then plagiarized his research. While Elston and Dohlman appear to be the most serious offenders, other faculty and staff—with one exception—also allegedly expressed hostility toward Plaintiff or otherwise acquiesced to Elston and Dohlman's behavior.

24

(*Id.* at 15.) A former student of Defendants Elston and Errede reported that Defendants Elston and Errede instructed her to stop working with Plaintiff in or around July 2017. (ECF No. 80-2 ¶ 11.) Plaintiff further contends that he subjectively perceived his environment to be abusive and sought psychological counseling. (ECF No. 74 at 15.)

With respect to the fourth element, Plaintiff contends that he "made the UNC's Dean of Students, Dr. Leslie Lerea, aware of the harassment as early as June 2017, and the Dean of the Graduate School, Matson, was notified by Lentz in December 2017." (*Id.*) According to Plaintiff, neither official's response, nor the response of the Dean of Students who succeeded Lerea, Hoi Ning Ngai, was sufficiently adequate to bring the harassment to an end. (*Id.* at 15–16.)

Defendants contend that Plaintiff fails to provide evidence that he was subjected to a hostile environment due to his race and fails to show that he was subjected to severe and pervasive discriminatory conduct. (ECF No. 81 at 11.)

Even if Plaintiff had satisfied the first three prongs, this record does not provide a basis for imputing liability to UNC-CH. The record reflects that while Defendant was a student at UNC-CH, prior to Dr. Lentz's 2017 email, no mention or suggestion was made to any UNC-CH official about potential racial discrimination or harassment. (*See* ECF Nos. 66-6 ¶ 25 (Dr. Lerea reporting that neither Plaintiff nor Dr. Freeman voiced or raised racial discrimination concerns regarding Plaintiff); 66-7 ¶ 17 (Defendant Matson reporting that no one voiced any concerns to him about Plaintiff at any time that "fell within the definition of prohibited conduct in the University's policy on discrimination, harassment, and retaliation").) Plaintiff does not point to any record evidence to dispute these facts.

As the Court has stated previously:

> [Plaintiff's] claims boil down to contentions that he was treated unfairly, irrationally, and unjustly; that he was the victim of academic politics, professional disputes, and miscommunications. . . . Title VI does not protect against these things, even assuming his contentions are true. Rather, Title VI protects covered students from illegal discrimination.

*Maisha*, 2015 WL 277747, at *7. Unfortunately, the same is true in this case. Plaintiff has not pointed to evidence in the record to support his racial harassment claim against UNC-CH. Accordingly, the Court denies Plaintiff's motion for summary judgment with respect to this claim. On the other hand, Defendants have provided undisputed evidence demonstrating that Plaintiff cannot succeed on his racial harassment claim against UNC-CH. Accordingly, the Court grants Defendants' motion for summary judgment as to this claim.

## B. Retaliation in Violation of Title VI Against UNC-CH

Plaintiff argues that he can prevail on a retaliation claim because he engaged in protected activity, which he describes as reporting discrimination that he reasonably believed had occurred, and because he suffered several adverse actions after his initial report of discrimination in July 2017, as Defendants removed him from a longstanding research project, effectively barred from publishing his manuscript, and allegedly plagiarized his research. (ECF No. 74 at 16–17.) Defendants argue that Plaintiff did not complain of racial discrimination to any University officials while a student or during his post-doctoral fellowship and that no evidence exists of a causal connection between any alleged protected activity and any alleged adverse action. (ECF No. 79 at 25–27.)

To prevail on a claim for Title VI retaliation, a plaintiff must establish (1) that he engaged in protected activity; (2) that the defendant took an adverse action against him, and

(3) that there was a causal link between the two events. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015); *see Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003). A person engages in a protected activity by reporting unlawful discrimination that he "reasonably believed had occurred or was occurring." *Boyer-Liberto*, 786 F.3d at 282 (internal quotation marks omitted) (quoting *Peters*, 327 F.3d at 320). The reasonableness of a reporter's belief is measured with reference to "the severity of the harassment." *Id.* at 284. An action is adverse if it "adversely affect[s] the terms, conditions, or benefits" of plaintiff's education. *Holland*, 487 F.3d at 219 (alteration in original) (internal quotation marks omitted). In the retaliation context, actions are "adverse" if they are "harmful to the point that they could well dissuade a reasonable [student] from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). The causal connection requires but-for causation. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

Plaintiff contends that he was the only African American male in his program and was the only student who was delayed in his ability to defend his dissertation as a result of Defendants requiring him to write a manuscript and threatening not to publish his other manuscript. (ECF No. 74 at 16–17.) Plaintiff contends that he had an objective and subjective basis to believe he was being discriminated against due to his race. (*Id.* at 17.) Plaintiff claims he first reported the delay and harassment, as well as fear of retaliation to Dr. Lerea in June 2017. (*Id.* at 16.) Thereafter, Plaintiff claims, without citing to the record, that the Dean of Students instructed Defendants Elston and Dohlman to "cease all harassment of Plaintiff," and in September 2017, Plaintiff was removed from a longstanding research project. (*Id.* at 17–18.) Plaintiff further claims that he "explicitly indicated that his treatment was racial

27

discrimination" to Dr. Freeman, in August 2017. (*Id.* at 17.) Plaintiff claims that Dr. Lentz reported "possible" racial discrimination against Plaintiff to Defendant Matson in December 2017 and that he included complaints of discrimination in his cease-and-desist notice in March 2019. (*Id.*)

Defendants argue that Plaintiff's complaints to Dr. Lerea were general complaints about his doctoral committee and advisors, and that Dr. Freeman summarized Plaintiff's complaints at Dr. Lerea's request and, contrary to Plaintiff's assertions, did not mention racial concerns. (ECF No. 79 at 25–26 (citing ECF No. 66-6 ¶ 24–25).) Defendants contend that "Plaintiff's only reference to racial discrimination appeared in a March 2019 Cease and Desist letter he sent to various individuals regarding Suzuki-McGirr's alleged plagiarism. By this time, Plaintiff was no longer a student and he had already resigned from his post-doctoral fellowship." (*Id.* at 26.) Defendants argue that "Plaintiff testified that his relationship with his committee was positive until it denied his request to defend – which occurred before any of his alleged complaints." (*Id.* at 27.) Therefore, Defendants contend that even if Plaintiff's complaints were protected activity, Plaintiff cannot satisfy the but-for causation requirement because "the alleged adverse actions Plaintiff complains of in this case allegedly started *before* he voiced *any* concerns to university officials." (*Id.* at 27 (citing ECF No. 66-10 at 492–93).)

Record evidence shows that Plaintiff voiced complaints to Dr. Lerea in June 2017 about having problems with his advisors and the dissertation committee requiring him to write an additional manuscript, as well as feedback he received from Defendant Elston. (ECF No. 66-6 ¶¶ 10–13). Plaintiff had also complained to Dr. Freeman about Dr. Valdar attending his dissertation defense. (*Id.* ¶ 17.) Plaintiff also complained to Dr. Lerea in August 2017 about

feedback that he was receiving from his advisors regarding his manuscript. (*Id.* ¶ 22.) During those interactions, Plaintiff "did not voice racial discrimination concerns." (*Id.* at ¶ 25.) The record reflects that Plaintiff voiced complaints to Dr. Freeman, and when Dr. Lerea asked Dr. Freeman to summarize the events concerning Plaintiff and his complaints, Dr. Freeman "did not voice or raise racial discrimination concerns" in her July 3, 2017, email summary of events. (*Id.*) The record reflects that Plaintiff complained to Dr. Lentz who emailed Dean Matson on December 19, 2017; at this time, Plaintiff had graduated and was a post-doctoral fellow at UNC-CH. (ECF No. 66-7 at 68.) The subject of Dr. Lentz email was "my concern about abuse of a graduate student CONFIDENTIAL." (*Id.*) As is relevant here, Dr. Lentz's email reads: "[w]hile I think that simple faculty bullying and not racism is behind his troubles, it would not look good if he has to resort to extreme measures to get his paper submitted." (*Id.*) Dr. Lentz also stated in this email that "[a] complication is that another student in the Biophysics Program approached me about similar problems with these same two faculty members" and that "[a] post-doc of color recently left these labs to work full time in the lab of a collaborator." (*Id.*) Although Dr. Lentz mentions a post-doc of color, he does not describe the behavior as racial harassment and specifically stated that he thought the conduct was "simple faculty bullying and not racism." (*Id.*) The record reflects that Plaintiff was complaining about the decisions of and his interactions with members of his doctoral committee, however, the record does not reflect that Plaintiff made claims of racial discrimination.

In Title VII retaliation claims, "[a]n employee's belief that a Title VII violation has occurred may be completely reasonable, but if she fails to tie complaints about workplace

conduct to her protected status, the employer could not have retaliated for engaging in a protected activity." *McIver v. Bridgestone Ams., Inc.*, 42 F.4th 398, 412 (4th Cir. 2022). The same principle applies in Title VI cases. Whether Plaintiff believed he was being treated differently because of his race is not the only question, he must show that he complained of a constitutional violation related to his protected status. The record indicates that Plaintiff did not make complaints of racial discrimination until his cease-and-desist notice in March 2019; however, the conduct that Plaintiff alleges were retaliatory adverse actions pre-date his racial discrimination complaint. A close advisor to Plaintiff who was added to Plaintiff's doctoral committee at Plaintiff's request, Dr. Lentz, specifically stated that he did not think that Defendants' conduct had anything to do with racism. "Without notice that [a student] is complaining about discrimination based on their protected status, a[ ] [university official] has no means to distinguish between protected conduct and frivolous complaints about . . . disagreements unprotected by the law." *Id.*

Therefore, the Court finds that Plaintiff's complaints, made while he was a student at UNC-CH, were not protected activity because they were unrelated to Plaintiff's protected status and did not concern racial discrimination or racial harassment. Accordingly, the record does not support the first element of Plaintiff's retaliation claim, and therefore additional findings as to the other elements are unnecessary.

The undisputed facts in the record cannot support Plaintiff's Title VI retaliation against UNC-CH, and therefore, Plaintiff's motion for summary judgment as to this claim is denied. Defendants, on the other hand, have pointed to these same undisputed facts and others that

demonstrate that Plaintiff cannot sustain his retaliation claim. Accordingly, Defendants'
motion for summary judgment as to Plaintiff's Title IV retaliation against UNC-CH is granted.

### C. Racial Discrimination in Violation of the Equal Protection Clause Pursuant to 42 U.S.C. § 1983 Against Defendants Elston, Errede, and Dohlman in Their Individual Capacities

The Equal Protection Clause of the Fourteenth Amendment provides "nor shall any
State . . . deny to any person within its jurisdiction the equal protection of the laws." U.S.
Const. amend. XIV, § 1. Section 1983 of the Civil Rights Act of 1871 allows suits for damages
against any person who, under color of law, subjects another "to the deprivation of any rights,
privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Claims of
racial discrimination, whether brought under Title VI or § 1983, are analyzed under a single
proof scheme. *Middlebrooks*, 166 F.3d 1209, at *5 (citing *McDonnell Douglas Corp.*, 411 U.S. at
802–05); *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003) ("[D]iscrimination that violates the
Equal Protection Clause of the Fourteenth Amendment committed by an institution that
accepts federal funds also constitutes a violation of Title VI."). As discussed above, *see*
discussion *supra* Section A, there are factual disputes with respect to Plaintiff's claim of racial
discrimination in violation of Title VI against UNC-CH where Defendants Elston, Errede,
and Dohlman's actions were attributed to the University. (*See* ECF No. No. 35 at 27–28)
(finding that Plaintiff's Title VI claims against individual Defendants in their official capacities
were duplicative because UNC-CH was sued under Title VI); *Int'l Ground Transp., Inc. v. Mayor
and City Council of Ocean City, Md.*, 475 F.3d 214, 219 (4th Cir. 2007) ("[A] municipality may not
be found liable for a constitutional violation in the absence of an unconstitutional act on the
part of at least one individual municipal actor." (citing *City of Los Angeles v. Heller*, 475 U.S. 796,

Case 1:20-cv-01050-LCB-JLW   Document 99   Filed 03/15/24   Page 31 of 40

798–99 (1986)) (noting that the Fourth Circuit has reaffirmed this principle in the context of § 1983 actions).)

The same *McDonnell Douglas* framework applies to Plaintiff's claim against Defendants Elston, Errede, and Dohlman in their individual capacities for racial discrimination that applied to the UNC-CH, where these Defendants' conduct was attributed to the University. Plaintiff does not rely on any new or different evidence to support the racial discrimination claim against Defendants Elston, Errede, and Dohlman in their individual capacities. Defendants similarly do not rely on new defenses, except for qualified immunity, which the Court addresses separately. Therefore, the same factual disputes that prevented the Court from resolving Defendant's motion for summary judgment as to Plaintiff's Title VI racial discrimination claim against UNC-CH, also prevent the Court from resolving as a matter of law Plaintiff's claim against Defendants Elston, Errede, and Dohlman in their individual capacities.

Accordingly, for the reasons previously discussed, the Court denies Plaintiff's motion for summary judgment with respect to his claim of racial discrimination against Defendants Elston, Errede, and Dohlman in their individual capacities. The Court grants the motion of Defendants Elston, Errede, and Dohlman as to this claim, with exception to the potential adverse action that Defendants wrongfully used Plaintiff's draft manuscript for the reasons previously discussed.

**D.  Supervisor Liability Claim Pursuant to 42 U.S.C. § 1983 Against Defendant Matson in His Individual Capacity**

Plaintiff argues that Defendant Matson was informed of ongoing racial harassment of Plaintiff, that Defendant Matson took no action against Defendants Elston, Errede, and

Dohlman, and that Defendant Matson's deliberate indifference and negligence provided tacit authorization for Defendants Elston, Errede, and Dohlman to further their conspiracy, discrimination, harassment, hostility, and retaliation against Plaintiff. (ECF No. 74 at 20–21.) Defendants argue that Matson was not responsible for supervising or disciplining Defendants Elston, Dohlman, or Errede. (ECF No. 71 at 29 (citing ECF No. 66-7 ¶ 6).) Defendants also contend that the evidence does not "establish notice or deliberately indifferent conduct by Matson." (*Id.*)

"[S]upervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). Such liability "is not premised upon *respondeat superior* but upon a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Id.* (internal quotation marks omitted). Supervisory liability is determined "by pinpointing the persons in the decision making chain whose deliberate indifference permitted the constitutional abuses to continue unchecked." *Id.* (internal quotation marks omitted). Under § 1983, supervisory liability is established by alleging:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices[ ]; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Id.* at 799 (internal quotation marks omitted).

Assuming that, as Dean of the Graduate School at the University, Defendant Matson was a supervisor of Defendants Elston, Errede, and Dohlman, the record does not support supervisor liability. The record evidence reflects that Dr. Lentz sent an email to Defendant Matson with the subject line: "my concern about abuse of a graduate student CONFIDENTIAL" on December 19, 2017, *after* Plaintiff had graduated and was no longer a student but a post-doctoral fellow at UNC-CH. (ECF No. 66-7 at 68, *id.* ¶ 16.) Furthermore, the record does not support that Defendant was notified of racial harassment, as Dr. Lentz's email reads: "[w]hile I think that simple faculty bullying *and not racism* is behind his troubles, it would not look good if he has to resort to extreme measures to get his paper submitted." (*Id.* at 68 (emphasis added).) Dr. Lentz also stated in this email that "[a] complication is that another student in the Biophysics Program approached me about similar problems with these same two faculty members" and that "[a] post-doc of color recently left these labs to work full time in the lab of a collaborator." (*Id.*) Although Dr. Lentz mentions a post-doc of color, he does not describe the behavior as racial harassment and explicitly states that it is his belief that the source of the issue was faculty bullying and not racism. The record reflects that Defendant Matson asked Dr. Hoi Ning Ngai, who was Associate Dean for Student Affairs, to follow up with Dr. Lentz. (*Id.* at 69.) Defendant Matson responded to Dr. Lentz, specifically saying, "I am asking Hoi Ning Ngai (Associate Dean for Student Affairs) to follow up with you on this. If this is a recurring issue, we may need to have a conversation with the DGS and department chair. Hoi Ning will bring me into the conversation when it is necessary." (*Id.*) The record reflects that Dr. Ngai never reported to Defendant Matson that further involvement from him was necessary or that racial discrimination was an issue with Plaintiff. (*Id.* at ¶¶ 14–15.)

34

Therefore, the record does not show that Dr. Matson received any report of racial discrimination, harassment, or retaliation regarding Plaintiff including from Dr. Lerea, Dr. Lentz, or Dr. Ngai, all of whom communicated with Defendant Matson about Plaintiff. (*Id.* ¶¶ 11–12, 14–17.)

Thus, the record does not show that Defendant Matson had actual or constructive knowledge that a subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like Plaintiff, as the reports he received about Plaintiff did not concern racial discrimination. Furthermore, even though Plaintiff was no longer a student at UNC-CH when Dr. Lentz made complaints on his behalf, Defendant Matson referred Dr. Lentz to Dr. Ngai, the Dean who replaced Dr. Lerea. Finally, at the time that Dr. Matson received the complaints, the conduct that Plaintiff alleges was unlawful had already occurred or began. Therefore, there is no affirmative causal link between Defendant Matson's actions and the particular constitutional injury allegedly suffered by Plaintiff.

Accordingly, the undisputed facts in the record cannot support Plaintiff's supervisor liability claim against Defendant Matson, and therefore, Plaintiff's motion for summary judgment as to this claim is denied. Defendants, on the other hand, have pointed to these same undisputed facts that demonstrate that Plaintiff cannot sustain his supervisor liability claim. As a result, Defendant's motion for summary judgment as to Plaintiff's supervisor liability claim pursuant to 42 U.S.C. § 1983 against Defendant Matson is granted.

### E. Civil Conspiracy Against Defendants Elston, Errede, and Dohlman in Their Individual Capacities

Plaintiff argues that Defendants Elston, Errede, and Dohlman agreed to and/or worked in concert to "wrongfully obstruct Plaintiff's ability to publish his research" and that Defendants'

35

actions "were wrongful in that they were racially discriminatory in violation of the Title VI and the Equal Protection Clause." (ECF No. 74 at 22.) Defendants argue that Plaintiff has not shown a constitutional violation or presented evidence that there was an agreement among Defendants to violate Plaintiff's rights. (ECF No. 71 at 31–32.)

To prevail on a claim for civil conspiracy in North Carolina, a plaintiff must prove a prima facie claim by showing: "(1) a conspiracy, (2) wrongful acts done by certain of the alleged conspirators in furtherance of that conspiracy, and (3) injury as a result of that conspiracy." *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 666 S.E.2d 107, 115 (N.C. 2008). A "conspiracy" is defined as "an agreement between two or more individuals to do an unlawful act or to do a lawful act in an unlawful way." *Muse v. Morrison*, 66 S.E.2d 783, 784 (N.C. 1951). Existence of an agreement "may be established by circumstantial evidence," although "the evidence of the agreement must be sufficient to create more than a suspicion or conjecture." *Dove v. Harvey*, 608 S.E.2d 798, 801 (N.C. Ct. App. 2005) (internal quotation marks omitted) (quoting *Henderson v. LeBauer*, 399 S.E.2d 142, 145 (N.C. Ct. App. 1991)).

Although there are factual disputes as to Plaintiff's racial discrimination claim, the undisputed facts in the record do not support conspiracy. The record does not indicate that Defendants wrongfully obstructed Plaintiff's ability to publish his research but rather that Plaintiff never sent a completed draft manuscript to his advisors. (*See, e.g.*, ECF No. 66-9 at 231:1-9, 352:2-21.) Plaintiff cites emails in the record to support his civil conspiracy claim. (*See* ECF No. 82 at 8 (citing ECF No. 66-8).) As discussed above, these emails do not establish conspiracy but instead show that Defendants provided Plaintiff with regular feedback. At this stage of the case, Plaintiff must "rely on more than conclusory allegations, mere speculation,

the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash*, 731 F.3d at 311.  Accordingly, the Court denies Plaintiff's motion for summary judgment with respect to Plaintiff's civil conspiracy claim against Defendants Elston, Errede, and Dohlman.

Given that the undisputed facts do not support the conspiracy element of Plaintiff's claim, Defendant have established that Plaintiff cannot prevail on this claim.  Accordingly, Defendants' Motion for Summary Judgment as to Plaintiff's civil conspiracy claim will be granted.

### F.    Qualified Immunity

Defendants assert qualified immunity as an affirmative defense, (ECF No. 40 at 74), and argue that Defendants Elston, Errede, and Dohlman are entitled to summary judgment based on qualified immunity, (ECF No. 71 at 28–29), because evidence of discrimination is lacking and "[n]o argument exists that Defendants were unreasonable in their belief that they were not violating Plaintiff's rights," (*id.* at 28).

"Qualified immunity protects officials who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 537–38 (4th Cir. 2017) (internal quotation marks omitted).  To overcome qualified immunity, a plaintiff must establish that (1) the defendant infringed on his constitutional right, and (2) the violated right was "clearly established at the time of the official's conduct." *Id.* at 538. (internal quotation marks omitted). A right is "clearly established" only when it is "settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 704 (4th Cir. 2018) (internal quotation marks omitted) (quoting *District of Columbia v.*

Case 1:20-cv-01050-LCB-JLW   Document 99   Filed 03/15/24   Page 37 of 40

*Wesby*, 138 S.Ct. 577, 589–90 (2018)). A court need not have addressed the exact factual scenario to clearly establish a right, since "defendants 'can still be on notice that their conduct violates established law even in novel factual circumstances,' so long as the law provided 'fair warning' that their conduct was unconstitutional." *Booker*, 855 F.3d at 538 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

The U.S. Supreme Court has long held that a public university cannot afford a graduate student "different treatment from other students solely because of his race." *McLaurin v. Okla State Regents for Higher Educ.*, 339 U.S. 637, 638 (1950); *see Billings v. Madison Metro. Sch. Dist.*, 259 F.3d 807, 816–17 (7th Cir. 2001) (finding this right clearly established by *McLaurin*). It was similarly well-established before 2016 that public university faculty may be held personally liable for intentional racial discrimination against their students. *See, e.g.*, *Middlebrooks*, 166 F.3d 1209, at *5; *see also Billings*, 259 F.3d at 812. Finally, this Circuit has applied the same *McDonnell Douglas* burden-shifting test to assess allegations of intentional discrimination under § 1983 since at least 1985. *Gairola v. Commonwealth of Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285–86 (4th Cir. 1985).

As discussed above, there are disputes of material fact as to racial discrimination. A reasonable jury could find that the conduct of Defendants Elston, Errede, and Dohlman violated Plaintiff's right to equal protection under the law. If discrimination is ultimately found, such a finding would be critical to the applicability of qualified immunity. Accordingly, in light of the factual disputes, the Court cannot determine qualified immunity before trial.

## III. CONCLUSION

As discussed herein, Plaintiff's motion for summary judgment is denied in its entirety. Defendants' motion for summary judgment is granted as to: (1) Plaintiff's racial discrimination claim against UNC-CH, with exception to the potential adverse action that Defendants wrongfully used Plaintiff's draft manuscript; (2) Plaintiff's racial harassment claim; (3) Plaintiff's Title VI retaliation claim against UNC-CH; (4) Plaintiff's claim of racial discrimination against Defendants Elston, Errede, and Dohlman in their individual capacities, with exception to the potential adverse action that Defendants wrongfully used Plaintiff's draft manuscript; (5) Plaintiff's supervisor liability claim pursuant to 42 U.S.C. § 1983 against Defendant Matson; and (6) Plaintiff's civil conspiracy claim. The Court will hold in abeyance its ruling as to Defendants' affirmative defense of qualified immunity.

For the reasons stated herein, the Court enters the following:

### ORDER

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment, (ECF No. 66), is **GRANTED IN PART AND DENIED IN PART** as follows:

- Defendants' Motion for Summary Judgment is granted as to all of Plaintiff's claims, except (1) his claim of racial discrimination in violation of Title VI against UNC-CH, only with respect to the potential adverse action that Defendants wrongfully used Plaintiff's draft manuscript and (2) his claim of racial discrimination in violation of the Equal Protection Clause pursuant to 42 U.S.C. § 1983 against Defendants Elston, Errede, and Dohlman in their individual capacities, only with respect to the potential adverse action that Defendants wrongfully used Plaintiff's draft manuscript. Further, Defendants' affirmative

39

defense of qualified immunity shall be held in abeyance pending further factual development at trial.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment, (ECF No. 73), is **DENIED**.

This, the 15th day of March 2024.

/s/ Loretta C. Biggs
United States District Judge